UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| _____ | ) | |
| | ) | |
| THOMAS J. O'LOUGHLIN, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | C.A. No. 04-10257-PBS |
| | ) | |
| MASSACHUSETTS BAY TRANSPORTATION | ) | |
| AUTHORITY and ANNE McCALL and | ) | |
| MICHAEL MULHERN | ) | |
| | ) | |
| Defendants | ) | |
| _____ | ) | |

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION
## FOR SUMMARY JUDGMENT

Defendants Massachusetts Bay Transportation Authority ("MBTA"), Anne McCall

("McCall) and Michael Mulhern ("Mulhern") seek Summary Judgment on all remaining counts[1]

of the Complaint filed by Plaintiff Thomas O'Loughlin ("O'Loughlin" or "Plaintiff") on the

grounds that there are no genuine issues of material fact and they are entitled to judgment as a

matter of law.  More specifically, Defendants say the following:

Plaintiff contends that Defendants retaliated against him in violation of Title VII and

M.G.L. c. 151B by refusing to allow him to teach a class at the MBTA Police Academy ("the

Academy") after he left the employ of the MBTA.  Plaintiff further contends that this retaliation

was for his purported intention to testify in favor of Helder Peixoto ("Peixoto"), an MBTA

policeman with a history of disciplinary problems, in connection with Peixoto's national origin

---

[1] On December 22, 2004, the Court dismissed Counts III-VI; accordingly, Defendants move only with respect to the remaining counts.

(Caucasian Portuguese) complaint at the Massachusetts Commission Against Discrimination.[2]

However, Plaintiff has failed to adduce any evidence whatsoever that Defendants even knew of

O'Loughlin's purported intention to testify for Peixoto, much less that they retaliated against him

for that intention, when Mulhern decided not to permit O'Loughlin to teach at the MBTA Police

Academy (the "Academy").  O'Loughlin would have been paid, at most, $140 for that class.

      The crux of Plaintiff's retaliation claim is that, shortly after Defendants supposedly

learned that O'Loughlin would testify in support of Peixoto, Defendants cancelled his teaching

of the class.[3]  In particular, O'Loughlin contends that McCall was responsible for this retaliation

because of her long-standing belief as Head of Internal Affairs that Peixoto should be disciplined

or terminated due to the number of complaints against him.  (Ex. B, McCall Tr., 43-47).  Plaintiff

has failed to adduce any evidence (a) that Mulhern or McCall even knew about O'Loughlin's

plans to testify at the MCAD[4] when Mulhern cancelled O'Loughlin's teaching of the class; (b)

that McCall had any input whatsoever into Mulhern's decision; and (c) that Mulhern, the

decision maker, bore any retaliatory animus, or animus of any kind, toward O'Loughlin.

O'Loughlin has therefore failed to prove a causal connection between his alleged protected

conduct (the intended testimony at the MCAD) and the purported adverse action against him

(refusing to allow him to teach the class).  Furthermore, O'Loughlin has failed to offer any

evidence whatsoever that Mulhern's reason for his unilateral decision – i.e., concerns about the

effect on the Department and the in-coming Chief of the continuing presence of the

---

[2] It is undisputed that no such testimony ever occurred.

[3] Peixoto was a problem officer with a number of complaints before the Internal Affairs office. (Ex. B, McCall Tr., 44.)  (All exhibits, unless otherwise stated, are attached to Defendants' Statement of Undisputed Material Facts).

[4] O'Loughlin fails to recognize that any purported retaliation related to McCall's personal animosity toward Peixoto, whom she considered a bad cop, and O'Loughlin, who continuously supported Peixoto notwithstanding the complaints against him, is not illegal.  At best, O'Loughlin can create factual issues as to retaliation of this nature.  However, O'Loughlin has adduced absolutely no evidence that any retaliatory conduct against O'Loughlin was because of his only protected activity, to wit: intended testimony on behalf of Peixoto in connection with the latter's allegation that he was the victim of national origin discrimination (Caucasian Portuguese).

controversial[5] prior Chief (O'Loughlin) – was pretextual.  Accordingly, Plaintiff's retaliation claims fail as a matter of law.

Plaintiff's tortious interference claims against Mulhern and McCall fail for the simple reasons that Plaintiff can adduce no evidence (a) that a contract or advantageous relationship existed when the challenged decision was made, or (b) that Mulhern's decision was made with actual malice.

Plaintiff's M.G.L. c. 93A claim against the MBTA fails because public authorities like the MBTA are not "persons" under M.G.L. c. 93A when acting pursuant to legislative mandate.[6] Here, the MBTA was acting pursuant to its legislative mandate to provide training to its police officers; it was not engaging in a business transaction.  In addition, Plaintiff viewed his teaching of the SIDS class as personal, in memory of his son (Boston Globe article dated 2/26/04 entitled "Police chief Sues MBTA, Alleges Retaliation", Ex. I), which takes the issue outside the realm of M.G.L. c. 93A.[7]

The Court should therefore grant Summary Judgment in Defendants' favor.

## STATEMENT OF FACTS[8]

In August of 2002, O'Loughlin left his position as Chief of the MBTA Police Department, although he remained on the payroll until the end of his contract term in October,

---

[5] During O'Loughlin's tenure, the actions of an "Anti-Crime Unit" caused tremendous disruption in the Department and in the community when it was claimed that the Anti-Crime Unit had been targeting minority youth for arrest in connection with violations of a "zero tolerance policy".

[6] As discussed below, a c. 93A claim can only be asserted against a public authority in connection with the transacting of business, e.g., transacting business with a payroll processing firm.

[7] If O'Loughlin had still been employed at the time that he was refused permission to teach the SIDS class, the c. 93A claim would have been barred.  Employment relationships are not in trade or commerce within the meaning of c. 93A.

[8] Defendants accept this recitation of "facts" for purposes of this Motion for Summary Judgment, and not otherwise. Pursuant to Local Rule 56.1, Defendants have separately filed a concise statement of material facts not in dispute.

2002.[9] (Ex. D., O'Loughlin Tr., Vol. I, 15, 30.)  After his departure, O'Loughlin was scheduled by then-Academy Director Frank Wolverton ("Wolverton") to teach one SIDS class at the Academy in January, 2003.  (Ex. D, O'Loughlin Tr., Vol. I, 53, 55-56, 65.)  O'Loughlin, whose son died of SIDS in 1992, had been teaching SIDS classes without supplemental compensation[10] at police academies throughout Massachusetts since 1993.  (Ex. D, O'Loughlin Tr., Vol. I, 11.)  O'Loughlin had no oral or written contract to teach the class in January, 2003.  (Ex. D, O'Loughlin Tr., Vol. I, 25-26, 39, 42-43, 44, 46; Ex. E, O'Loughlin Tr., Vol. II, 110-111.)  Nor did his separation agreement, or his negotiation of that agreement, make any reference to teaching at the Academy.  (Ex. D, O'Loughlin, Tr. Vol. I, 65.)  He is aware that the MBTA was free to choose someone else to teach the SIDS class in January, 2003.  (Ex. E, O'Loughlin Tr., Vol. II, 111.)  However, before Mulhern made the decision not to permit him to teach, others at the Academy, including Wolverton and then-acting Chief William Fleming ("Fleming"), had told him that he would be permitted to teach.  (Ex. D, O'Loughlin Tr., Vol. I, 53, 55, 56, 65.)  Plaintiff, who is now the Chief of Police in Milford, continues to teach SIDS classes at other police academies in Massachusetts.  (Ex. D, O'Loughlin Tr., Vol. I, 14, 18.)

The decision of which O'Loughlin complains – i.e., that he was not to teach the SIDS class at the Academy in January of 2003 – was indisputably made by General Manager Mulhern, on his own, and without the input of defendant McCall.  (Ex. C, Mulhern Tr., 7-8.)  The earlier decision made by McCall to the same effect, was inoperative because it was reversed by Acting Chief Fleming, who in turn was reversed by Mulhern.  (Ex. D, O'Loughlin Tr., Vol. I, 55-57, 64-65; Ex. C, Mulhern Tr., 127-132.)  Because of the chronology of events, and the undisputed fact

---

[9] The Board had not renewed O'Loughlin's five year contract by the time of his decision to look for employment elsewhere.

[10] O'Loughlin testified that he did not believe he could "double dip" since he performed his teaching duties while working as police chief, first of Wellesley, then of the MBTA, and finally of Milford. (Ex. D, O'Loughlin Tr., Vol. I, 18:12-24, 20:4-16; Ex. E, O'Loughlin Tr., Vol. II, 144:3-9.)

that Mulhern did not consult with, or even speak to, McCall, (Ex. C, Mulhern Tr., 7-8, 131-132,

136), O'Loughlin's allegations pertaining to McCall's alleged animosity toward Peixoto and

O'Loughlin are irrelevant to this case.

Mulhern was not aware at the time that he made his decision that O'Loughlin intended to

testify on behalf of Peixoto at the MCAD. (Ex. C, Mulhern Tr., 136-138.)[11] Although

O'Loughlin's attorney sent a letter to the MBTA's outside law firm under dated of October 29,

2002 (the "10/29/02 Letter"), in which Plaintiff's counsel stated that Plaintiff would testify in

support of Peixoto in an MCAD proceeding, Mulhern did not see this letter, nor was he aware of

its contents, when he made the decision not to permit O'Loughlin to teach at the Academy in

January of 2003. (Id.) Although McCall was not relevant to the operative decision, she, too, was

unaware of the letter and its contents until after the filing of this litigation. (Ex. B, McCall Tr.,

52.)

## STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, a party is entitled to Summary

Judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); see

also Hahn v. Sargent, 523 F.2d 461, 466-7 (1st Cir. 1975) (holding that an affidavit that was

simply "a compendious replica of the complaint" was insufficient to preclude Summary

Judgment). In defending against a motion for Summary Judgment, "an adverse party may not

rest upon the mere allegations or denials of the adverse party's pleading, but ... must set forth

specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); see also

---

[11] Although Mulhern has no memory of doing so, he signed the MBTA's Verified Response to Peixoto's MCAD Complaint. However, that told him absolutely nothing with regard to O'Loughlin's views of the merits of Peixoto's case, or O'Loughlin's intention to assist Peixoto by testifying in that case. Hence, no genuine issue of material fact is created in this case by his signing of the Response.

<u>Anderson v. Liberty Lobby</u>, 477 U.S. 242 (1986).  Specifically, the First Circuit has noted that "[e]ven in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." <u>Medina-Muñoz v. R.J. Reynolds Tobacco Co.</u>, 896 F.2d 5, 8 (1st Cir. 1990).  Under this standard, the Court should grant Summary Judgment in Defendants' favor on all counts of the Complaint.

## LEGAL ARGUMENT

**I.  THE COURT SHOULD GRANT SUMMARY JUDGMENT ON PLAINTIFF'S RELALIATION CLAIMS BECAUSE HE HAS ADDUCED NO CAUSAL CONNECTION BETWEEN PLAINTIFF'S PROTECTED ACTIVITY AND MULHERN'S DECISION NOT TO PERMIT THE PLAINTIFF TO TEACH, AND BECAUSE THERE IS NO EVIDENCE THAT MULHERN'S STATED NONRETALIATORY REASONS ARE PRETEXTUAL.**

Plaintiff has failed to adduce any evidence that Defendants retaliated against him in violation of M.G.L. c. 151B and Title VII (42 U.S.C. § 2000e), by showing that there is a causal relationship between his intention to testify in support of Peixoto's national origin (Caucasian Portuguese) discrimination case at the MCAD, and Mulhern's decision not to let him teach at the Academy.  Where, as here, McCall and Mulhern did not know about Plaintiff's intention to testify in support of Peixoto until *after* Plaintiff was prevented from teaching at the Academy, (Ex. C, Mulhern Tr., 136-138; Ex. B, McCall Tr., 52), there can be no claim of retaliation against Defendants.  <u>Pilgrim v. Trustees of Tufts College</u>, 118 F.3d 864, 868 n.1 (1st Cir. 1997) (granting Summary Judgment on state and federal retaliation claims where defendants engaged in alleged retaliatory conduct two months *before* their knowledge of alleged protected activity); <u>Lewis v. Gillette, Co.</u>, 22 F.3d 22, 25 (1st Cir. 1994) (granting Summary Judgment on state retaliation claim where plaintiff failed to prove causal link between alleged retaliation and his alleged protected activity: "To succeed on claims of retaliatory discharge and retaliatory harassment, a

- 6 -

plaintiff must establish the basic fact that he was subjected to an adverse employment action *because* of his protected activity."); Dziamba v. Warner & Stackpole LLP, 56 Mass. App. Ct. 397, 407 (2002) (granting Summary Judgment on state retaliation claims where alleged retaliatory conduct occurred before plaintiff exercised his protected rights). Mulhern's and McCall's testimony that they were not aware of Plaintiff's plans to testify in support of Peixoto, and that they did not see the 10/29/02 Letter to outside counsel until after this lawsuit was filed, is undisputed and fatal to Plaintiff's retaliation claims. (Ex. C, Mulhern Tr., 136-138; Ex. B, McCall Tr., 52.)

Even if Plaintiff could make out a *prima facie* case of retaliation by proving a causal link between alleged protected activity and alleged adverse action, which he cannot, Plaintiff cannot prove, as he must, that Mulhern's reasons for cancelling his teaching are pretextual.[12] Mole v. University of Massachusetts, 442 Mass. 582, 591 (2004) (where there is no direct evidence of retaliatory motive, plaintiff must, to establish state and federal retaliation claims, prove that articulated nonretaliatory reasons are pretextual). Mulhern testified that he was surprised to learn from union representative Paul Byrne ("Byrne") that Plaintiff was going to teach at the Academy because that would create a distraction for the new Chief at a time when the MBTA needed to allow the new chief to restore discipline and morale within the department, and restore

---

[12] McCall's motive for making the initial decision to cancel Plaintiff's teaching is irrelevant, because no claim of retaliation can lie against her. The evidence is undisputed that it was Mulhern, not McCall, who made the ultimate decision which prevented Plaintiff from teaching. Lewis v. Gillette, Co., 22 F.3d at 25 (causal link between retaliatory conduct and protected activity required); see also Mole v. University of Massachusetts, 442 Mass. 582, 598-602 (2004) (no retaliation where a "third person's independent decision to take adverse action breaks the causal connection between the supervisor's retaliatory or discriminatory animus and the adverse action."). Here, Mulhern made his decision independently and without input from anyone else, including McCall. (Ex. C, Mulhern Tr., 7, 136, 141-142.)

Although not relevant, Plaintiff's "evidence" of McCall's retaliation is shaky at best. Plaintiff testified that Fleming and William Mitchell ("Mitchell"), the MBTA's General Counsel, acknowledged that McCall was retaliating against Plaintiff when she ordered that he could not teach, but Fleming and Mitchell denied making these acknowledgements. Fleming similarly denied McCall was angry when he spoke to her about O'Loughlin. Lastly, Plaintiff has only inadmissible hearsay evidence in support of his claim that McCall used expletives when speaking to Wolverton about O'Loughlin's teaching at the Academy. Rodriguez v. Boehringer Ingelheim Pharmaceuticals, Inc., 425 F.3d 67, 76 (1st Cir. 2005) ("Hearsay evidence is not admissible at trial or for summary judgment purposes …") (citations omitted).

confidence from the community. (Ex. C, Mulhern Tr., pp.121-124.) Mulhern's proffered

nonretaliatory reasons are wholly unrebutted.[13] O'Loughlin's efforts to suggest that Mulhern

was somehow influenced in a "back door" fashion by McCall are simply contrary to all of the

evidence.[14]

## II.     THE COURT SHOULD GRANT SUMMARY JUDGMENT ON PLAINTIFF'S TORTIOUS INTERFERENCE CLAIMS BECAUSE PLAINTIFF HAD NO CONTRACT OR ADVANTAGEOUS RELATIONSHIP, DEFENDANTS DID NOT ACT WITH ACTUAL MALICE, AND PLAINTIFF HAS SUSTAINED NO PECUNIARY DAMAGES.

Plaintiff has failed to prove the existence of a contract or advantageous relationship

supporting his tortious interference claims against McCall and Mulhern in Counts VII, VIII, IX

and X. To state claims for tortious interference with a contract and advantageous relationship, a

plaintiff must obviously prove as a threshold matter the existence of a contract or advantageous

relationship (which can be defined as a contemplated contract or prospective business

relationship). Buster v. George W. Moore, Inc., 438 Mass. 635, 652-53 (2003) (neither tort

implicated where alleged contract/advantageous relationship consisted merely of creditor's

apparent tolerance "for the time being" of debtor's debts); Swanset Development Corp. v. City of

Taunton, 423 Mass. 390, 397 (1996) (Summary Judgment granted on plaintiff's claim for

tortious interference where there was no contractual or business relationship). Here, Plaintiff

*admits* he had no oral or written contract to teach at the Academy in January, 2003, (Ex. D,

---

[13] To the extent Plaintiff claims Mulhern further retaliated against him by reducing the frequency with which the two met face to face to discuss business, that claim fails because it is not supported by evidence of an adverse employment action. MacCormack v. Boston Edison Co., 423 Mass. 652, 663 (1996) (claim of retaliation under M.G.L. c. 151B requires proof that a plaintiff suffered an adverse employment action which materially disadvantaged him "in respect to salary, grade, or other objective terms and conditions of employment," and mere "subjective feelings of disappointment and disillusionment" will not suffice).

[14] Plaintiff believes he has further evidence of Mulhern's retaliation, but none of this evidence finds support in the record. Plaintiff claims Mulhern's decision to cancel Plaintiff's teaching was based on Mulhern's conversations with Byrne and Greg Lee, another claim representative, who called Mulhern to let him know Plaintiff would be teaching at McCall's urging; but Byrne testified it was Fleming, not McCall, who told him about Plaintiff's teaching. Lee was not deposed. Plaintiff also claims that the manner in which the decision preventing him from teaching was conveyed is evidence of retaliation, in that Mulhern did not call Wolverton directly to convey the news; but Plaintiff admits there is no precedent for the General Manager of the MBTA to call the Academy directly to convey such information.

O'Loughlin Tr., Vol. I, 25-26, 39, 42-44, 46), that he did not negotiated for the right to teach in his separation agreement, (Ex. D, O'Loughlin Tr., Vol. I, 65), and that the MBTA was free to choose someone other than him to teach at the Academy. (Ex. E, O'Loughlin Tr., Vol. II, 111.) Despite his damning admissions, Plaintiff asserts as the sole bases upon which to infer the existence of a contract or advantageous relationship with the MBTA the alleged facts that Wolverton "scheduled" him to teach at the Academy and that Fleming told him (after McCall's initial decision not to let him teach) that he could teach (which was subsequently overruled by Mulhern). Much like the creditor's tolerance of the debtor's debts in Buster, these are more in the nature of contingencies (in that, as Plaintiff admits, the MBTA was free to choose someone other than Plaintiff to teach the class) rather than rising to the more definite level of contemplated contracts or prospective business relationships.

However, to the extent the Court finds the statements by Wolverton and Fleming give rise to an advantageous relationship, Plaintiff's tortious interference claims still fail because Plaintiff has failed to adduce, as is his burden, evidence of actual malice. One of the elements of a claim for tortious interference is that the defendant interfered with a contract or advantageous relationship with "improper motive or means." Brewster Wallcovering Co. v. Blue Mountain Wallcoverings, Inc., 68 Mass. App. Ct. 582, 608-09 (2007). "The improper motive or means element requires proof of the defendants' actual malice, i.e., a spiteful, malignant purpose, unrelated to the legitimate corporate interest." Id. (holding there was no tortious interference where plaintiff failed to demonstrate that defendant's actions were "entirely malevolent and unrelated to any legitimate corporate interest") (citations omitted). Likewise here, Mulhern and

McCall cancelled Plaintiff's teaching based solely upon legitimate corporate interests: avoiding distraction for the new Chief, and restoring employee morale and community confidence.[15]

Furthermore, O'Loughlin has proffered no evidence that Mulhern harbored ill-will or malice towards O'Loughlin. Mulhern, on the other hand, has offered express testimony that he "was as supportive as [he] possibly could have been" in assisting O'Loughlin with his transition away from the MBTA. (Ex. C, Mulhern Tr., 121-122.) Plaintiff's claim that McCall disliked him, even if true, is of no avail. Brewster Wallcovering Co., 68 Mass. App. Ct. at 608-09 (mere dislike is not enough to establish a claim for tortious interference).

Finally, a claim of tortious interference requires that the plaintiff suffer pecuniary loss stemming from the damage to the contract or advantageous business relationship. Ratner v. Noble, 35 Mass. App. Ct. 137, 138 (1993) (holding no tortious interference where only harm alleged was harm to professional reputation). Here, Plaintiff admits he has never accepted payment for teaching SIDS classes. Plaintiff believes that doing so would be illegal and would be "double-dipping" because his teaching of SIDS classes is part of his larger duties as a Chief of Police. (Ex. D, O'Loughlin Tr., Vol. I, 11-13, 16-24, 61-64; Ex. E, O'Loughlin Tr., Vol. II, 144.) Furthermore, Plaintiff considers his teaching of the SIDS class to be a personal matter, as he stated in an article that appeared in the Boston Globe: "Clearly, I think it's personal. This is one of the many avenues that provide me with an opportunity to make a difference for other people in memory of my son." (Ex. I.) Accordingly, Plaintiff has offered no evidence of pecuniary harm to sustain his tortious interference claims.[16]

---

[15] To the extent the Court grants Summary Judgment on Plaintiff's retaliation claims, Plaintiff's tortious interference claims, which are based on the alleged retaliation, also must fail. Dorman v. Norton Co., 64 Mass. App. Ct. 1, 10 (2005) (Summary Judgment granted on tortious interference claim where alleged improper motive and means was dependent on age discrimination allegation and there was no evidence of discriminatory purpose to support age discrimination claim).

[16] Even if the Court credits Plaintiff's claim that he was deprived of a fee for teaching the SIDS class in January 2003, the amount of that fee, $140, is de minimis.

**IIII.    THE COURT SHOULD GRANT SUMMARY JUDGMENT ON PLAINTIFF'S M.G.L. § 93A CLAIM BECAUSE THE MBTA IS NOT A "PERSON" UNDER THE STATUTE, AND PLAINTIFF'S TEACHING OF SIDS CLASSES IS A PERSONAL MATTER NOT IN INTERSTATE COMMERCE.**

Count XI, in which Plaintiff claims the MBTA violated M.G.L. c. 93A, fails as a matter of law because the MBTA is not a "person" under the statute. JBL Bus Co., Inc. v. MBTA, 2001 WL 1182407, *3-4 (Sup. Ct. Aug. 28, 2001)[17] (granting Summary Judgment on M.G.L. c. 93A claim against MBTA because MBTA is not a "person" under the statute when it is following a legislative directive); see also The Quincy Corp. v. MBTA, Memorandum and Order, Civil Action No. 39881 (Suffolk Sup. Ct., Dec. 18, 1984)[18] (MBTA not a "person" where treble damages sought under M.G.L. c. 93A because "it is implausible to impute to a public body an anti-social or wrongful intention").[19]

The Supreme Judicial Court has "repeatedly refrained from imposing liability on parties motivated by legislative mandate, not business or personal reasons." Boston Housing Authority v. Howard, 427 Mass. 537, 538-39 (1998) (holding there was no claim against Boston Housing Authority under M.G.L. c. 93A because Authority did not act in business context in renting apartment to low income tenant) (citations omitted); Morton v. Town of Hanover, 43 Mass. App. Ct. 197, 205-06 (1997) (granting Summary Judgment on M.G.L. c. 93A claim against town based on allegedly illegal water surcharge because "[p]olitical subdivisions of the Commonwealth continue to be excluded from cognizance as such 'persons' under c. 93A where, as here, they do not act in a business context"); Bretton v. State Lottery Commission, 41 Mass. App. Ct. 736, 737-40 (1996) (State Lottery Commission's motion for judgment on the pleadings granted with respect to M.G.L. c. 93A claim because the "activities of the commission are driven

---

[17] A copy of this opinion is attached as Exhibit A hereto.

[18] A copy of this opinion is attached as Exhibit B hereto.

[19] Plaintiff seeks treble damages. (See Complaint.)

by legislative mandate, not business or personal objectives."). Here, the MBTA, a political

subdivision of the Commonwealth, did not act to further a business purpose when it scheduled

Plaintiff to teach at the Academy; rather, it acted pursuant to its legislative mandate to provide

training to its police officers. See M.G.L. c. 6 § 116 (the Municipal Police Training Committee,

of which one member shall be from the MBTA, shall set policies and standards for the training

of municipal police officers); M.G.L. c. 6 § 118 (the Municipal Police Training Committee shall

make rules and regulations for police training schools "relating to courses of study, attendance

requirements, equipment and facilities and qualifications of instructors."); M.G.L. c. 41 § 96B

(every police officer shall complete a course of study approved by the Municipal Police Training

Committee). Accordingly, the MBTA cannot be liable under M.G.L. c. 93A. Boston Housing

Authority v. Howard, 427 Mass. at 538.

Similarly, Plaintiff was not motivated by business reasons in wanting to teach a SIDS

class at the Academy. Plaintiff testified that he started teaching SIDS classes in 1993 after his

son had died from SIDS in 1992. (Ex. D, O'Loughlin Tr., Vol. I, 8-11.) Plaintiff further testified

that he has never accepted payment for teaching SIDS classes. (Id., 11-13, 16-17, 61-64.)

Moreover, Plaintiff stated in an article published by the Boston Globe that: "Clearly, I think it's

personal. This is one of the many avenues that provide me with an opportunity to make a

difference for other people in memory of my son." (Ex. I.) Accordingly, the decision not to

allow O'Loughlin to teach at the Academy was not in "trade or commerce," and no claim can be

sustained under M.G.L. c. 93A.

Even if the Court were to find that the MBTA is a "person" under the statute and there

was a business purpose to the transaction at issue, the evidence is clear that the MBTA's actions

were reasonable and this shields the MBTA from liability under M.G.L. c. 93A. McAdams v.

Massachusetts Mutual Life Ins. Co., 391 F.3d 287, 304 (1st Cir. 2004) (granting Summary

Judgment on M.G.L. c. 93A claim where defendant's actions were fair, reasonable, in good faith, and transparent, notwithstanding differences of opinion between plaintiffs and defendant). As set forth above, Mulhern's decision to cancel Plaintiff's teaching of the class was reasonable and based on legitimate, nonretaliatory, business reasons.[20]

### CONCLUSION

Because there is no dispute that Mulhern cancelled Plaintiff's teaching of a class at the Academy for legitimate business reasons, the Court should grant Summary Judgment in Defendants' favor on all counts of the Complaint.

MASSACHUSETTS BAY TRANSPORTATION
AUTHORITY, ANNE MCCALL, MICHAEL
MULHERN

By their attorneys,


/s/ Gregory M. Reiser
Joan A. Lukey (BBO #307340)
joan.lukey@wilmerhale.com
Gregory M. Reiser (BBO #662284)
gregory.reiser@wilmerhale.com
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA  02109
Telephone:  (617) 526-6000
Facsimile:  (617) 526-5000

Dated:  October 22, 2007

---

[20] If the Court grants Summary Judgment on Plaintiff's tortious interference claims, it should also grant Summary Judgment on Plaintiff's M.G.L. c. 93A claim which is based on the same nucleus of fact (Defendants' alleged retaliation which prevented Plaintiff from teaching a class at the Academy). Pembroke Country Club, Inc. v. Regency Savings Bank, 62 Mass. App. Ct. 34, 40-41 (2004) (M.G.L. c. 93A claim dismissed where it was derivative of dismissed tortious interference claim because "the evidence being insufficient to establish improper motive or improper means on the part of the defendant, it is likewise insufficient to establish an unfair method of competition or an unfair or deceptive act or practice.")

## CERTIFICATE OF SERVICE

I hereby certify that on October 22, 2007, I caused a true and accurate copy of the above document to be served via the Court's electronic docketing system upon Mitchell J. Notis, Esq., Law Office Of Mitchell J. Notis, 370 Washington Street, Brookline, MA  02446.

/s/ Gregory M. Reiser
Gregory M. Reiser

# Exhibit A

Westlaw.

Not Reported in N.E.2d                                                                                    Page 1
Not Reported in N.E.2d, 13 Mass.L.Rptr. 486, 2001 WL 1182407 (Mass.Super.)
**(Cite as: 2001 WL 1182407 (Mass.Super.))**

C

Superior Court of Massachusetts.
JBL BUS COMPANY, INC., Plaintiff,
v.
Massachusetts BAY TRANSPORTATION
AUTHORITY, Southeastern Massachusetts Private
Carriers Association, American Eagle Motor Coach,
Inc., Unda's Bus Service,
Inc., H & L Bloom, Inc., Bonanza Bus Lines, Inc.,
Carey's Bus Lines, Inc. and
Plymouth and Brockton Street Railway Co.,
Defendants.
No. C.A. 00-0688A.

Aug. 28, 2001.

RULINGS UPON THE DEFENDANT MBTA'S
MOTION TO DISMISS DEFENDANT P & B's
CROSS
CLAIM

SIKORA, Justice.

RULING
**\*1** The defendant Massachusetts Bay Transportation
Authority ("MBTA") moves pursuant to Mass. R.
Civ. P. 12(b)(6) to dismiss defendant Plymouth &
Brockton Street Railway Company's ("P & B") cross
claim against it. This litigation arises out of MBTA's
implementation of the Old Colony Railroad
Rehabilitation Project. As a result of that project,
MBTA entered into a 13.7 million dollar settlement
agreement with SEMPCA, an organization consisting
of six transportation companies adversely affected by
the Old Colony Project. Approximately two years
and four months after MBTA had entered into the
settlement agreement with SEMPCA, a seventh
transportation company, JBL, filed this action. The
defendant P & B has cross claimed against the
MBTA for negligent misrepresentation, breach of the
implied covenant of good faith and fair dealing and
violations of G.L. c. 93A. For the reasons discussed
below, the court *ALLOWS* MBTA's motion to
dismiss.

REASONING
*Background*
The following undisputed material facts emerge
from the summary judgment record.

Approximately five years ago, in 1995, the MBTA
began the Old Colony project ("project") to restore
commuter rail service to twenty-seven communities
in southeastern Massachusetts. When the project
began several private bus companies were servicing
the area.

Pursuant to G.L. c. 161A, § 14, "[i]f the authority
shall operate ... a mass transportation service or route
which is not substantially similar to a service or route
previously operated by the authority ... and which is
in competition with a pre-existing mass
transportation service or route provided by a private
company, and if such competition causes substantial
economic damage to such company, the company
may file a claim for relief with the authority within
six months of the commencement of such new
operation." The MBTA anticipated that the
implementation and operation of the project might
adversely affect all six SEMPCA members and, thus,
trigger the MBTA's obligations under G.L. c. 161A, §
14 and the Federal Transit Act. Accordingly, MBTA
negotiated with SEMPCA, acting through its member
companies, to resolve any G.L .c. 161A, § 14 and
Federal Transit Act claims. As a result of these
negotiations, MBTA and SEMPCA entered into an
agreement on August 5, 1995, in which MBTA
tendered a lump sum payment of 13.7 million dollars
in exchange for releases of any § 14 or Federal
Transit Act claims. Specifically, Section 7(b) of the
agreement provides:
    SEMPCA hereby represents and warrants that, to
    the best of its knowledge, there are no private bus
    companies (other than the member carriers
    identified in Section (2) of this Agreement) that, as
    of the Date of this Agreement, operate fixed route
    public transportation services in the Service Area
    using vehicles with a capacity of over 25
    passengers. If any carrier described in the
    preceding sentence makes claims against the
    MBTA, after the Date of this Agreement, for a
    subsidy or damages based upon or in any way
    relating to the operation of Project Services,
    SEMPCA hereby agrees (1) to pay any such
    subsidy or damages and related costs and to
    otherwise fully indemnify and hold harmless the
    MBTA for any such subsidy, damages, and related
    costs; or (2) at the direction of the MBTA, to
    permit such carrier to become a member of
    SEMPCA and to receive an appropriate proportion
    of the Settlement Amount provided under Section 4
    of this Agreement, with such portion to be

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d                                                                                      Page 2
Not Reported in N.E.2d, 13 Mass.L.Rptr. 486, 2001 WL 1182407 (Mass.Super.)
(Cite as: 2001 WL 1182407 (Mass.Super.))

determined in accordance with the formula or other method adopted by SEMPCA for the allocation of the Settlement Amount among its members.

*2 The lump sum payment was to be divided proportionally among SEMPCA's members.

On January 27, 1998, approximately two years and four months after MBTA had entered into the settlement agreement with SEMPCA, JBL Bus Lines, Inc. ("JBL") notified the MBTA that, as of the date of the agreement, it was entitled to monies under Section 14. On November 3, 1999, the MBTA in turn informed SEMPCA that it intended to invoke Section 7(b) of the agreement to direct that JBL become a member and receive an appropriate proportion of the settlement monies. SEMPCA refused and continues to refuse to pay any monies to JBL on the grounds that Section 7(b) is unenforceable and void. On November 16, 2000, the defendant P & B cross claimed against the MBTA upon counts for negligent misrepresentation, breach of the implied covenant of good faith and fair dealing and violations of G.L. c. 93A. The MBTA has responded with the present motion.

*Discussion*

When evaluating the sufficiency of a complaint pursuant to Mass. R. Civ. P. 12(b)(6), the court must accept as true the allegations of the complaint, as well as any reasonable inferences to be drawn from them in the plaintiff's favor. *Eyal v. Helen Broadcasting Corp., 411 Mass. 426, 429 (1991).* [FN1] "The plaintiff need only surmount a minimal hurdle to survive a motion to dismiss for failure to state a claim." *Bell v. Mazza, 394 Mass. 176, 184 (1985).* "[D]ismissals on the basis of pleadings, before facts have been found, are discouraged." *Gennari v. City of Revere,* 23 Mass.App.Ct. 979, 980 (1987) (citing *Fabrizio v. Quincy,* 9 Mass.App.Ct. 733, 734 (1980) (citation omitted)). The complaint must be accorded a "generous reading." *New England Insulation Co. v. General Dynamics Corp.,* 26 Mass.App.Ct. 28, 29 (1988). However, as we shall see, none of these favoring canons can save P & B's cross claim.

FN1. Rule 12(b)(6) applies as well to counterclaims, cross claims, and third-party claims.

I. *Negligent misrepresentation.*

P & B, in Count I of its cross claim against MBTA, alleges that MBTA misled it by negligently omitting to mention JBL Bus Lines, Inc. in its environmental impact studies reports. [FN2] The environmental impact study, P & B alleges, was prepared by MBTA in connection with its consideration of viable alternatives to the restoration of rail services. P & B claims that it relied upon the fact that no other potential carriers had appeared in the environmental study as part of its decision to join the SEMPCA-MBTA agreement.

FN2. P & B claims that Count I is a "simple negligence" claim--not merely a claim for negligent misrepresentation. After review of the complaint, it is apparent that Count I indeed is asserting a claim for negligent misrepresentation alone.

Two types of misrepresentations are actionable in Massachusetts: intentional and negligent. J.R. Nolan & L.J. Sortorio, *Tort Law* § 143 (1989). In an action for intentional misrepresentation, a plaintiff must prove "that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon such representation as true and acted upon it to his damage." *Barrett Assocs., Inc. v. Aronson,* 346 Mass. 150, 152 (1963) (quoting *Kilroy v. Barron,* 326 Mass. 464, 465 (1950)). "In order to recover for negligent misrepresentation ... plaintiff must prove that the defendant (1) in the course of his business, (2) supplie[d] false information for the guidance of others (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance upon the information, and [that it] (6) ... fail[ed] to exercise reasonable care or competence in obtaining or communicating the information." *Nota Constr. Corp. v. Keyes Assocs., Inc.,* 45 Mass.App.Ct. 15, 19-20 (1998); see *Fox v. F & J Gattozzi Corp.,* 41 Mass.App.Ct. 581, 587-588 (1996). Ordinarily a claim for negligent misrepresentation is one for a jury, unless the undisputed facts are so clear as to permit only one conclusion. *Fox,* 41 Mass.App.Ct. at 588. Justifiable reliance on a false statement of fact is a necessary element of a misrepresentation claim. *Golber v. BayBank Valley Trust Co.,* 46 Mass.App.Ct. 256, 257 (1999).

*3 Here, P & B's claim for negligent misrepresentation fails as a matter of law because it does not, and apparently cannot, allege that MBTA supplied P & B the environmental impact study as part of the formation of the SEMPCA agreement. The MBTA did not produce the environmental study for purposes of the SEMPCA agreement. It has no duty

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d                                                                                          Page 3
Not Reported in N.E.2d, 13 Mass.L.Rptr. 486, 2001 WL 1182407 (Mass.Super.)
**(Cite as: 2001 WL 1182407 (Mass.Super.))**

to P & B stemming from the report. [FN3] Thus, MBTA's motion to dismiss Count I of P & B's cross claim shall be allowed.

> FN3. P & B's misrepresentation claim fails also because it cannot allege that it reasonably relied on any alleged false statement of fact by defendants. P & B is presumed to have had knowledge of the terms of the agreement and thus may not assert that it justifiably relied on any fact that varies or contradicts the terms of the agreement. The agreement specifically states the following:
> SEMPCA hereby represents and warrants that, to the best of its knowledge, there are no private bus companies (other than the member carriers identified in Section (2) of this Agreement) that, as of the Date of this Agreement, operate fixed route public transportation services in the Service Area using vehicles with a capacity of over 25 passengers. If any carrier described in the preceding sentence makes claims against the MBTA, after the Date of this Agreement, for a subsidy or damages based upon or in any way relating to the operation of Project Services, SEMPCA hereby agrees (1) to pay any such subsidy or damages and related costs and to otherwise fully indemnify and hold harmless the MBTA for any such subsidy, damages, and related costs; or (2) at the direction of the MBTA, to permit such carrier to become a member of SEMPCA and to receive an appropriate proportion of the Settlement Amount provided under Section 4 of this Agreement, with such portion to be determined in accordance with the formula or other method adopted by SEMPCA for the allocation of the Settlement Amount among its members.
> This language specifically contemplates that other carriers might exist; and SEMPCA assumed the responsibility for such a risk. See _Central Massachusetts Television, Inc. v. Amplicon_, 930 F.Supp. 16, 25 (D.Mass.1996). A risk explicitly stated in a written contract and knowingly assumed by a party cannot constitute a misrepresentation to that party. Accordingly, reliance is not reasonable on that basis.

II. _93A._

P & B claims also that MBTA violated G.L. c. 93A

when it failed to disclose that JBL was a qualified public transportation provider under Section 14 prior to entering into the settlement agreement. The MBTA, however, maintains that it is not liable under G.L. c. 93A in this instance because it is not engaged in trade or commerce. As a matter of law, it is correct.

"It is generally accepted that the Commonwealth cannot be impleaded in its courts except where an act of the Legislature clearly manifests its consent." _Bretton v. State Lottery Comm'n_, 41 Mass.App.Ct. 736, 738 (1996). "Chapter 93A contains no explicit indication that governmental entities are to be liable under its provisions." _U.S. Leasing Corp. v. Chicopee_, 402 Mass. 228, 232 (1988) (school committee, in leasing a computer from plaintiff, not engaged in trade or commerce). However, even if this court assumes that the MBTA would qualify as a "person" under the statute, the Chapter 93A claim must fail because the MBTA was not engaged in "trade" or "commerce."

"A party is engaging in 'trade or commerce,' as required under c. 93A, when it acts 'in a business context.' " _Peabody N.E., Inc. v. Marshfield_, 426 Mass. 436, 439 (1998) (quoting _Lantner v. Carson_, 374 Mass. 606, 611 (1978)). In determining whether parties are engaged in trade or commerce, a court may consider the following factors: "(1) the nature of the transaction, (2) the character of the parties, (3) the activities participated in, and (4) whether the transaction was motivated by business or personal reasons." _Planned Parenthood Federation of America, Inc. v. Problem Pregnancy of Worcester, Inc._, 398 Mass. 480, 491 (1986). Other relevant factors include, "whether similar transactions have been undertaken in the past, ... and whether the participant played an active part in the transaction." _Linkage Corp. v. Trustees of Boston Univ._, 425 Mass. 1, 24 (1997).

In the light of the relevant factors, the MBTA is not a "person" engaged in "trade or commerce" when it is following a legislative directive pursuant to G.L.c. 161, § 14. See _Peabody N .E., Inc._, 426 Mass. at 439 (G.L. c. 93A does not apply to parties motivated by "legislative mandate, not business or personal reasons ."). Upon the present pleadings, P & B cannot show that MBTA acted outside of its legislative mandate and was instead motivated by business or personal reasons. All of P & B's allegations arise from the settlement formed pursuant to G.L. c. 161A, § 14. The settlement was a legislatively mandated duty of the MBTA. None of P & B's allegations, if shown to

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d                                                                                                         Page 4
Not Reported in N.E.2d, 13 Mass.L.Rptr. 486, 2001 WL 1182407 (Mass.Super.)
**(Cite as: 2001 WL 1182407 (Mass.Super.))**

be true, would permit a reasonable inference that it "was engaged in trade or commerce when it entered into the arrangement [or] when it took the actions of which the [plaintiff] now complains." *Lafayette Place Assoc. v. Boston Redevelopment Auth.,* 427 Mass. 509, 535 (1998).

*\*4* P & B cannot argue that the allegedly unfair or deceptive acts or practices lie outside the scope of the MBTA's statutory authority and thus become subject to regulation under G.L. c. 93A. No matter how allegedly unfair or deceptive MBTA's practices may have been, they were done "wholly in pursuit of the legislatively prescribed mandate" pursuant to G.L. c. 161A, § 14. *Id.* at 535. Thus, the allegations in the plaintiff's complaint relating to Count II cannot lead to a conclusion that MBTA acted for business or personal reasons. Here, the MBTA's activities are driven by legislative mandate, not business or personal objectives. See *Bretton,* 41 Mass.App.Ct. at 738. The MBTA's actions in obedience to Section 14 were public and governmental. It was not acting "in a business context" when it contracted with SEMPCA or P & B. Accordingly, the court grants the MBTA's motion to dismiss Count II of the P & B cross claim against it.

III. *Breach of the implied covenant of good faith and fair dealing.*

Contrary to P & B's assertion, MBTA did not violate the implied covenant of good faith and fair dealing "[b]y forcing SEMPCA and its members to agree to § 7(b) of the SEMPCA agreement." In Massachusetts, the implied covenant of good faith and fair dealing is applicable to every contract. *Anthony's Pier Four, Inc. v. HBC Associates,* 411 Mass. 451, 471 (1991) (citing *Warner Ins. Co. v. Comm'r of Ins.,* 406 Mass. 354, 362 n. 9 (1990)). "[N]either party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Anthony's Pier Four,* 411 Mass. at 471-472 (quotations omitted). "A duty of good faith and fair dealing is implicit in the performance of a contract, even if not stated ... That principle presupposes the formation of a contract under which the parties are to perform their obligations in good faith, in contrast to the far more inchoate status of parties in the courtship dance phase of contract formation." *Schwanbeck v. Federal Mogul Corp.,* 31 Mass.App.Ct. 390, 396 n. 6 (1991) (citations omitted) (emphasis supplied), rev'd on other grounds, 412 Mass. 703 (1992).

Here, the allegation that the MBTA acted in bad faith during contract negotiations does not state a claim upon which relief may be granted because any act or omission occurred in negotiation and not in the performance of the contract. Because P & B does not allege any wrongdoing during the course of performance, Count III, alleging breach of the covenant of good faith and fair dealing, shall be dismissed.

CONCLUSION

For the reasons stated, the MBTA is entitled to dismissal with prejudice of P & B's entire cross-claim. The court urges P & B and any other parties contemplating unsupported claims or defenses to remain mindful of the financial sanctions authorized to a prevailing party at the conclusion of litigation by G.L. c. 231, § 6F.

ORDER FOR JUDGMENT

*\*5* Judgment of dismissal with prejudice shall enter in favor of the defendant MBTA and against the codefendant Plymouth and Brockton Street Railway Company upon all counts of the cross claim of Plymouth and Brockton Railway Company.

Not Reported in N.E.2d, 13 Mass.L.Rptr. 486, 2001 WL 1182407 (Mass.Super.)

END OF DOCUMENT

Exhibit B

57

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

SUPERIOR COURT
CIVIL ACTION
NO.  39881

THE QUINCY CORPORATION
AND DOREL STEEL CORPORATION,
                                Plaintiffs,

                    V.

MASSACHUSETTS BAY TRANSPORTATION AUTHORITY,
                                Defendant.

### MEMORANDUM AND ORDER

The plaintiff corporations in this action allege numerous breaches of contracts by the defendant Massachusetts Bay Transportation Authority ("MBTA") in connection with various construction projects.  The plaintiffs claim additionally that the MBTA's alleged breaches constitute "unfair or deceptive acts or practices" in violation of M.G.L. c. 93A, the Commonwealth's principal consumer protection statute.

The defendant MBTA moves for summary disposition of the latter claim, Count XV of the Amended Complaint, pursuant to Rule 56 or Rule 12, Mass. R. Civ. P., on the ground that it is exempt from the provisions of c. 93A.  The MBTA argues in support of its motion that it is an agency within the executive office of transportation and construction (M.G.L. c. 6A, §19), that it entered into the contracts in question pursuant to express statutory authority to do so (M.G.L. c. 161A, §§ 2, 3), and that therefore it is somehow exempted from c. 93A by Section 3 of that Act.*

---

*"Nothing in this chapter shall apply to transactions or actions otherwise permitted under laws as administered by any regulatory board or officer acting under statutory authority of the Commonwealth or of the United States."  Section 3's second paragraph provides that the burden of proving an exemption shall be on the claimant of it.

-2-

The plaintiffs oppose the MBTA's motion on the grounds, first, that the agency waived the defense by neither pleading it heretofore nor seeking leave to amend now pursuant to Rule 15, Mass. R. Civ. P., and secondly, that the pertinent statutes construed together allow Count XV of the May, 1981 Amended Complaint.

The defendant's motion is certainly belated. On the other hand, there is no suggestion that it has been interposed for delay; and the claimed exemption, if it is jurisdictional, is not waiveable. Second Bank-State Street Trust Company v. Linsley, 341 Mass. 113, 116 (1960). In any event, if the plaintiffs are correct that the claimed exemption is "an avoidance or affirmative defense" which Rule 8(c), Mass. R. Civ. P., requires to be pleaded, I will treat the defendant's present motion as effectively having done so by amendment, because the plaintiffs have shown no prejudice and Rule 15(a) authorizes such amendments "when justice so requires."

The plaintiffs' substantive contentions in response to the MBTA's claim of exemption are: (1) that Section 11 of Chapter 93A is clear that a "person" wronged by another person's unfair practices may sue that latter "person," (2) that Section 1's definition of person includes "corporations" and "any other legal entity," and (3) that under Section 2 of Chapter 161A the MBTA is a body corporate empowered to sue and be sued. In further refutation of the claimed exemption the plaintiffs urge that §3 of Chapter 93A would exempt the MBTA here only if it were acting in its regulatory or governmental

-3-

capacity, as distinguished from its actual proprietary or contracting capacity.

I find the defendant's statutory argument for its claimed exemption unpersuasive. I read Section 3 of the Consumer Protection Act as affording some protection to actions permitted under schemes administered by federal or state regulatory agencies. That protection lessens the risk of subjecting businesses and others to different, and possibly inconsistent, sets of obligations; although see Schubach v. Household Finance Corporation, 375 Mass. 133, 137 (1978). When the MBTA negotiates and administers construction contracts, however, it does not do so subject to regulatory agency oversight. It does so, as the plaintiffs argue, as a body corporate going about a part of its authorized business and expressly empowered "... to sue and be sued in law and equity and to prosecute and defend all actions relating to its property and affairs." M.G.L. c. 161A, §2. In sum, I disagree with the defendant's statutory exemption contention, particularly since the burden of proving this exemption is on the claimant of it. M.G.L. c. 93A, §3.

In addition to its statutory argument the MBTA urges that the Consumer Protection Act should not be applied to its transactions, because language in several Chapter 93A cases indicates that the statute is aimed at protecting consumers from predatory business persons. The plaintiffs in reply reiterate their literal reading of the pertinent statutes, and

-4-

they urge that, because they are subject to the Act, for parity the MBTA must also be bound.* Neither party cites authority directly on point, and the Court has found none.

The difficulty with the application of Chapter 93A contended for by the plaintiffs lies in the sense of the statute not in its words. Chapter 93A seeks to prevent and penalize "unfair or deceptive acts or practices" in commerce, i.e., misconduct that typically involves some form of mens rea. To be sure, it has been said with respect to a prohibited act or practice that "it is not necessary to establish that the defendant knew that the representation was false ...." Slaney v. Westwood Auto, Inc., 366 Mass. 688, 703 (1975). However, I understand that clause to mean that a reckless misrepresenter is not protected by his self-imposed ignorance, and that a statement literally true in some sense may nevertheless be unfair or deceptive in a particular context. That interpretation of the dicta in Slaney is consistent with the

---

*The plaintiffs also argue that the MBTA is ineligible for its asserted statutory exemption because in these transactions it was not acting in a regulatory role; moreover, say the plaintiffs, the defendant was acting in a "proprietary" capacity not a "governmental" one. I do not find the traditional "governmental" versus "proprietary" distinction to be helpful here; and because I have held above that the defendant has failed to establish its entitlement to the statutory exemption, I need not pass on the plaintiff's interpretation of Section 3 of Chapter 93A.

-5-

dictionary definitions of "unfair" and "deceptive", and with the view of our Court of Appeals that: "The objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." <u>Levings</u> v. <u>Forbes & Wallace, Inc.</u>, 8 Mass. App. 498, 504 (1979).

Whether or not a public agency can ever realistically be said to have a state of mind, it is implausible to impute to a public body an anti-social or other wrongful intention. Of course, public agencies are capable of breaching contracts, and when they do so they are liable for specific performance or in damages; and concededly, the managers and staffs of public agencies are capable of unfairness and deception -- for which they should be held individually accountable. See <u>Gildea</u> v. <u>Ellershaw</u>, 363 Mass. 800, 820 (1973), and 3 Davis, <u>Administrative Law</u> 526-530, §26.04. But such misconduct on their part is, as a conceptual matter, ultra vires per se. Otherwise, to ascribe to a publc body the "rascality" of a human malefactor is necessarily to hold that today's malevolent agency can be neutral tomorrow and benevolent on the day after.

In the absence of a showing of legislative intent or clearer statutory language to the foregoing effect, I can not attribute such anthropomorphism to the legislature; and see <u>Hansen</u> v. <u>Commonwealth</u>, 344 Mass. 214, 219 (1962); 3 <u>Sutherland Statutory Construction</u> 63, §62.01 (4th Ed. 1974).

-6-

There is another difficulty with the application of Chapter 93A that is urged by the plaintiffs here. The veil of a private corporation, particularly a closely held one, may be pierced to hold wrongdoing officers individually liable, and corporations may be liable for assertedly unauthorized misconduct by their employees. Nader v. Citron, 372 Mass. 96, 103 (1977); International Art Co. v. F.T.C., 109 F.2d 393, 396 (1940). Furthermore, public corporations are like private ones in numerous respects. However, notwithstanding the vulnerability of private corporations and the resemblance of public corporations to them, courts have been comparatively disinclined to hold public corporations non-statutorily liable for their employees' misdeeds. See e.g., Desmarais v. Wachusett Regional School District, 360 Mass. 591, 593-594 (1971).

There are differences between private corporations and public ones: private corporations, particularly closely held ones, are the creatures of identifiable individuals, whereas public agencies are operating units of the amorphous body politic; private corporations are for-profit entities, and with the possibility of profits go risks to which, arguably, non-profit "common good" agencies ought not be exposed; and public corporations possess some vestigial attributes of governmental immunity. Whether or not those differences and other ones suffice to justify the different treatment of public agencies, the comparative disinclination of the courts to hold them liable

-7-

for their employees' misdeeds is unmistakeable.  Moreover, our Supreme Judicial Court, even as it has criticized traditional governmental immunity doctrine, has emphasized the important role of the Legislature in changing the law.  Whitney v. City of Worcester, 373 Mass. 208 (1977).  That is, even if this public agency defendant could have had an unfair or deceptive state of mind, so as to be within the ambit of Chapter 93A in a conceptual or semantic sense, it would not be subject to the Act, in my judgment, absent a clear legislative mandate to that effect.

Therefore, the defendant MBTA's motion for summary judgment on Count XV of the Amended Complaint, treated as a motion to dismiss that Count for failure to state a claim upon which relief can be granted, Rule 12(b)(6), Mass. R. Civ. P., is **allowed**.

J. Harold Flannery
Justice of the
Superior Court

Dated: December 18, 1984