UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| THOMAS J. O'LOUGHLIN,<br><br>Plaintiff<br><br>v.<br><br>MASSACHUSETTS BAY TRANSPORTATION AUTHORITY and ANNE McCALL and MICHAEL MULHERN<br><br>Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

C.A. No. 04-10257-PBS

## DEFENDANTS' RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 56.1, Defendants Massachusetts Bay Transportation Authority ("MBTA"), Anne McCall ("McCall") and Michael Mulhern ("Mulhern") submit this Statement of Undisputed Material Facts in support of their Motion for Summary Judgment.

**The Parties**

1.      The MBTA is a political subdivision of the Commonwealth of Massachusetts pursuant to MGL Ch. 161A § 2.  (Ex. A, Complaint, ¶7).

2.      McCall is a Lieutenant of the MBTA Police Department.  (Ex. B, McCall Tr., 5:11-12.)  Plaintiff Thomas J. O'Loughlin ("O'Loughlin" or "Plaintiff") at one point promoted her to Deputy Chief, but she was returned to the rank of Lieutenant by O'Loughlin's successor, Joseph Carter ("Carter").  (Id., 6:17-19, 7:13-16.)  While she was Deputy Chief, McCall was responsible for the MBTA Transit Police Academy (the "Academy").  (Id., 8:21-9:8.)

3.     From February, 2002 to May, 2005, Mulhern was the General Manager of the MBTA. (Ex. C, Mulhern Tr., 6:2-7:3.)  Since July, 2006, Mulhern has been the Executive Director of the MBTA Retirement Fund. (Id., 5:5-15.)

4.     From October, 1997 to August, 2002, when he resigned, O'Loughlin was Chief of the MBTA Police Department.  Although he was not physically present at the MBTA after August, 2002, he remained on the MBTA payroll until October, 2002. (Ex. D, O'Loughlin Tr. (Vol. I), 15:9-19, 30:16-21.)  Since the fall of 2002, O'Loughlin has been the Chief of Police of Milford Township. (Id., 5:19-22.)  O'Loughlin's compensation is greater at his current job than it was when he was Chief of the MBTA Police Department. (Ex. E, O'Loughlin Tr. (Vol. II), 147:12-20.)  By the time he started looking for employment elsewhere, the MBTA Board of Directors had decided not to renew his contract. (Ex. D, O'Loughlin Tr (Vol. I), 28:17-31:24.)

**Plaintiff's Teaching Of SIDS Classes**

5.     In 1993, O'Loughlin started teaching classes about Sudden Infant Death Syndrome ("SIDS") at various police academies, including the Academy, and district attorney's offices. (Ex. D, O'Loughlin Tr. (Vol. I), 9:1-11:7.)  O'Loughlin's son died of SIDS in 1992. (Id., 8:6-18.)  Since leaving the MBTA, O'Loughlin has continued to teach SIDS classes, other than at the Academy.  He taught twelve SIDS classes in 2006 alone. (Id., 14:4-6, 18:4-11.)

6.     In the several years that O'Loughlin has taught SIDS classes, he has never accepted payment for his teaching services. (Id., 11:8-13:5, 16:10-17:3, 61:17-64:9.)  O'Loughlin believes he could have submitted vouchers to the Massachusetts Criminal Justice Training Council to be paid for his teaching, but he has not done so because he considers that to be "double-dipping" and illegal, in that his teaching has always been part of his larger duties as

US1DOCS 6410770v1

Police Chief, sequentially of the Wellesley, MBTA, and Milford police departments. (Id., 18:12-24, 20:4-16; Ex. E, O'Loughlin Tr. (Vol. II), 144:3-9.)

7.     The pay associated with teaching a SIDS class is minimal: Instructors receive $140, i.e., four hours at $35 an hour. (Ex. D, O'Loughlin Tr. (Vol. I), 19:19-22.)

8.     O'Loughlin has a personal interest in teaching SIDS classes. (Ex. F, Fleming Tr., 132:2-9; Ex. G, Riccobene Tr., 31:1-32:1; Ex. H, Mitchell Tr., 17:11-18:2; Ex. B, McCall Tr., 16:9-12.) In February of 2004, in connection with the filing of this litigation, O'Loughlin publicly said, "[c]learly, I think it's personal. This is one of the many avenues that provide me with an opportunity to make a difference for other people in memory of my son." (Boston Globe article dated February 26, 2004 entitled "Police Chief Sues MBTA, Alleges Retaliation," see Ex. I).

**Plaintiff's Purported Right To Teach A Single SIDS Class In January 2003**

9.     O'Loughlin had no written or oral contract to teach a SIDS class at the Academy in January, 2003. (Ex. D, O'Loughlin Tr. (Vol. I), 25:11-26:4, 39:19-23, 42:7-43:6, 44:7-14, 46:22-47:12; Ex. E, O'Loughlin Tr. (Vol. II), 110:21-111:2.)

10.     When negotiating his separation agreement with the MBTA, O'Loughlin did not obtain the right to teach a SIDS class at the Academy in January, 2003. (Ex. D, O'Loughlin Tr. (Vol. I), 65:16-22.)

11.     The sole bases upon which O'Loughlin claims a right to teach a SIDS class at the Academy in January 2003 are (a) a voicemail form Frank Wolverton ("Wolverton"), the then-Director of the Academy, indicating that he would put O'Loughlin on the schedule to teach the class (Ex. D, O'Loughlin Tr. (Vol. I), 53:4-19, 55:11-56:12, 65:1-6), and (b) a statement by the

then-Acting Chief of the MBTA Police Department William Fleming ("Fleming") that he could teach the class. (Id., 55:4-10.)

12.     O'Loughlin is aware that the MBTA had the right to choose someone else to teach the January, 2003 SIDS class at the Academy. (Ex. E, O'Loughlin Tr. (Vol. II), 111:3-6.)

**Mulhern's Decision To Cancel Plaintiff's Teaching Of The SIDS Class**

13.     McCall, who was then the Deputy Chief in charge of the Academy, made the initial decision not to have O'Loughlin teach at the Academy after his departure from the MBTA (Ex. B, McCall Tr., 18:1-19:8, 19:18-20:8; Ex. J, Wolverton Tr., 22:21-23:11.)

14.     McCall did not consult with anyone before making her decision. (Ex. B, McCall Tr., 20:12-19.)

15.     Fleming, who was then-Acting Chief, reversed her decision and decided that O'Loughlin would teach the class. (Ex. F, Fleming Tr., 33:12-34:5; Ex. B, McCall Tr., 24:5-26:14.)

16.     McCall told Fleming she thought his decision was a bad idea, but she did not otherwise object to Fleming's decision to permit O'Loughlin to teach. (Ex. B, McCall Tr., 26:15-24; Ex. F, Fleming Tr., 55:4-17.)

17.     After Fleming's decision, Mulhern, then the General Manager of the MBTA, learned from Paul Byrne ("Byrne"), a representative of the MBTA Police Patrolman's Association (Ex. K, Byrne Tr., 6:13-20), that O'Loughlin was going to teach a SIDS class at the Academy. Mulhern did not know O'Loughlin was going to teach until speaking with Byrne. (Ex. C, Mulhern Tr., 8:7-19, 117:23-118:16; Ex. K, Byrne Tr., 16:1-17:12, 25:3-27:19, 28:21-30:24, 32:23-43:18.)

18.     Mulhern was surprised at the news that O'Loughlin was going to teach at the Academy.  Mulhern felt that O'Loughlin's continued presence at the MBTA Police Department would be a distraction to the incoming Chief of the MBTA Police Department, Carter.  Accordingly, Mulhern did not want O'Loughlin to teach at the Academy.  (Ex. C, Mulhern Tr., 119:13-120:21, 121:14-122:20, 123:11-124:11.)

19.     After speaking with Byrne, Mulhern contacted Fleming and told him that O'Loughlin could not teach at the Academy because his teaching would be a distraction and the MBTA needed to lay the groundwork for the new Chief, Carter.  (Id., 128:19-130:18.)  Fleming relayed Mulhern's decision to O'Loughlin.  (Ex. F, Fleming Tr., 60:10-62:11.)  McCall conveyed Mulhern's decision to Wolverton at the Academy.  (Ex. J, Wolverton Tr., 35:20-36:9.)

20.     O'Loughlin contacted William Mitchell ("Mitchell"), the MBTA's General Counsel, and complained about the cancellation of his teaching.  O'Loughlin told Mitchell he would litigate over the cancellation and Mitchell said he would look into the situation.  Prior to this conversation with O'Loughlin, Mitchell was not aware that O'Loughlin would teach at the Academy.  (Ex. H, Mitchell Tr., 17:8-19:22, 20:23-21:8, 23:17-24.)  Mitchell believes based upon a subsequent call with Mulhern that O'Loughlin was not allowed to teach at the Academy because O'Loughlin caused many problems at the MBTA Police Department and his continued presence would cause problems for Carter, the incoming Chief.  (Id., 26:12-27:7.)

**Plaintiff's Claims Of Retaliation**

21.     O'Loughlin claims McCall did not let him teach at the Academy because O'Loughlin intended to provide testimony before the Massachusetts Commission Against Discrimination ("MCAD") favorable to former MBTA Police Department Patrolman Helder

Peixoto ("Peixoto").[1] (See Ex. A, Complaint.) O'Loughlin testified that the following facts support this claim: (1) O'Loughlin was scheduled to teach the class; (2) McCall cancelled it; (3) McCall dislikes O'Loughlin; (4) O'Loughlin's attorney, Mitchell Notis, sent a letter dated October 29, 2002 (the "10/29/02 Letter") (see Ex. L), in which it is stated that O'Loughlin will testify in support of Peixoto[2]; (5) Fleming told O'Loughlin McCall was retaliating against O'Loughlin; (6) Mitchell acknowledged that McCall had retaliated against O'Loughlin; and (7) Fleming told O'Loughlin McCall was angry when she spoke with Fleming. (Ex. E, O'Loughlin Tr. (Vol. II), 80:17-81:2, 82:1-8, 83:5-84:17; see also Ex. L, 10/29/02 Letter.)

22.    Despite the claims as summarized in paragraph 21, the following facts are undisputed by any competent or admissible evidence:

a.    McCall did not know prior to the filing of this lawsuit that O'Loughlin intended to testify in support of Peixoto. (Ex. B, McCall Tr., 52:21-24.)

b.    O'Loughlin does not know if McCall ever learned of the 10/29/02 Letter. (Ex. E, O'Loughlin Tr. (Vol. II), 81:3-7, 84:18-21.)

c.    McCall was not angry when she spoke with Fleming about O'Loughlin and at no point did she use profanities in reference to O'Loughlin or say things like O'Loughlin

---

[1] Peixoto was a problem officer, who, while rushing to work after having been caught off-duty, accidentally killed a pedestrian with his car. (Ex. F, Fleming Tr., 53:2-20). Peixoto recently committed suicide after the mysterious death of his girlfriend, whom the authorities believe he also killed. (See Ex. M). McCall did not think Peixoto should be a police officer. (Ex. B, McCall Tr., 47:23-48:2.)

[2] O'Loughlin claims Defendants knew in 2001 he would testify in Peixoto's support before the 10/29/02 Letter was sent but admits that nobody attempted to stop him from teaching a SIDS class at the Academy until late 2002, after he was no longer employed by the MBTA. (Ex. E, O'Loughlin Tr. (Vol. II), 118:20-120:2).

"will not set a fucking foot in my academy."[3]  (Ex. B, McCall Tr., 22:1-23:5; Ex. F, Fleming Tr., 75:16-18, 122:8-12; Ex. J, Wolverton Tr., 24:8-19; Ex. N, Donahue Tr. 21:24-22:24.)  In fact, Fleming, who has firsthand knowledge of his conversations with McCall, does not think McCall acted unfairly regarding the issue of O'Loughlin's teaching the class.  (Ex. F, Fleming Tr., 47:5-24.)

        d.      It was Mulhern's later decision, not McCall's initial decision, that prevented O'Loughlin from teaching the SIDS class in January, 2003.  (Ex. D, O'Loughlin Tr. (Vol. I), 178:7-180:9; Ex. C, Mulhern Tr., 7:18-24, 136:3-10, 141:10-142:2.)

        23.      When he decided that O'Loughlin would not teach at the Academy, Mulhern did not know that O'Loughlin intended to provide testimony favorable to Peixoto.  Mulhern also had not seen the 10/29/02 Letter.  Mulhern did not become aware of these issues or the 10/29/02 Letter until after this lawsuit was filed.  (Ex. C, Mulhern Tr., 93:20-94:10, 133:22-134:3, 135:19-136:2, 138:2-19.)

        24.      It was solely Mulhern's decision not to let O'Loughlin teach at the Academy, and Mulhern was not influenced by anyone else's opinion, including McCall's.  (Ex. C, Mulhern Tr., 7:18-24, 136:3-10, 141:10-142:2.)

        25.      Mulhern had no conversations with McCall regarding O'Loughlin's teaching.  (Id., 61:18-22; Ex. B, McCall Tr., 40:7-9.)

        26.      McCall did not contact Byrne to inform Byrne that O'Loughlin would be teaching at the Academy.   (Ex. E, O'Loughlin Tr. (Vol. II), 94:20-95:13.)  Byrne learned of

---

[3] O'Loughlin has only hearsay evidence in support of his claim that McCall used expletives and said that she would not permit O'Loughlin to "set […] foot" in her Academy.  O'Loughlin testified Lisa Riccobene ("Riccobene") told O'Loughlin that Nancy O'Loughlin told her (Riccobene) that Wolverton told Nancy O'Loughlin that McCall used expletives when she called Wolverton to cancel O'Loughlin's teaching.  (Ex. D, O'Loughlin Tr. (Vol. I), 66:14-24; see also, Ex. G, Riccobene Tr., 88:15-19, 90:8-24.)  Riccobene is O'Loughlin's best friend, and she is also "very good" friends with Nancy O'Loughlin.  (Ex. G, Riccobene Tr., 13:6-7, 83:23-84:7, 111:2-8.)  By contrast, Riccobene does not like McCall and Mulhern.  (Id., 113:8-14.)  In any event, hearsay, particularly of this totem pole variety, would be inadmissible at trial and cannot be used to refute the defendants' competent evidence.

O'Loughlin's teaching from a call he had with Fleming. (Ex. K, Byrne Tr., 11:8-23:1.)

27.     The cancellation of O'Loughlin's teaching of the January 2, 2003 class at the

Academy has not affected his ability to teach SIDS classes at other academies.  (Ex. D,

O'Loughlin Tr. (Vol. I), 163:5-9.)

28.     O'Loughlin has no memory of testifying in support of Peixoto before the MCAD

(Id., 98:7-19.)

Respectfully submitted,

MASSACHUSETTS BAY TRANSPORTATION
AUTHORITY, ANNE MCCALL, MICHAEL
MULHERN

By their attorneys,


/s/Gregory M. Reiser
Joan A. Lukey (BBO #307340)
joan.lukey@wilmerhale.com
Gregory M. Reiser (BBO # 662284)
gregory.reiser@wilmerhale.com
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts  02109
Tel:  (617) 526-6000
Fax: (617) 526-5000

Dated:  October 22, 2007

## CERTIFICATE OF SERVICE

I hereby certify that on October 22, 2007, I caused a true and accurate copy of the above document to be served via the Court's electronic docketing system upon Mitchell J. Notis, Esq., Law Office Of Mitchell J. Notis, 370 Washington Street, Brookline, MA 02446.

/s/Gregory M. Reiser
Gregory M. Reiser

# EXHIBIT A

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

District of _Massachusetts_

Thomas J. O'Loughlin

v.

MBTA,
Anne McCall,
Michael Mulhern

**SUMMONS IN A CIVIL CASE**

CASE NUMBER:

04-10257 MEL

A TRUE COPY ATTEST

BY _David G. BeaDugnis, Sr._

Constable of Boston

5/27/04
12:30 pm

TO: (Name and address of Defendant)  MBTA
Ten Park Plaza
Boston, MA

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Mitchell J. NOTIS
Law Office of Mitchell J. NOTIS
370 Washington St.
Brookline, MA 02445

an answer to the complaint which is served on you with this summons, within ___20___ days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

TONY ANASTAS

CLERK

(By) DEPUTY CLERK

_February 6, 2004_

DATE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

THOMAS J. O'LOUGHLIN           )
     Plaintiff              )
                    )
                    )
v.                             )    C.A. No. _____
                    )
MASSACHUSETTS BAY              )
TRANSPORTATION AUTHORITY       )
And                            )
ANNE McCALL                    )
And                            )
MICHAEL MULHERN                )
     Defendants              )
                    )

04 - 10257 MEL

MAGISTRATE JUDGE Dein

## COMPLAINT AND DEMAND FOR JURY TRIAL

### Introduction

1.  This is an action under MGL Chapter 151B, 42 USC Section 2000e, 42 USC Section 1983, and MGL Chapter 12 Section 11, for unlawful retaliation and interference with protected rights. Claims are also asserted for intentional interference with contractual relationships, intentional interference with advantageous relationships and unfair business practices in violation of MGL Chapter 93A. The action is brought by Plaintiff Thomas J. O'Loughlin ("Chief O'Loughlin"), former Chief of the Massachusetts Bay Transportation Authority ("MBTA") Police Department. Chief O'Loughlin asserts that after he left his position as Chief of the MBTA Police Department, he was improperly refused permission to work at the MBTA Police Academy teaching a course about Sudden Infant Death Syndrome ("SIDS"), in which he is an expert, and which he had previously taught. Anne McCall ("McCall") had been one of Chief O'Loughlin's subordinate officers while he was Chief, and was responsible at all times relevant to this Complaint, for the administration of the MBTA Police Academy. Michael Mulhern ("Mulhern") was the General Manager of the MBTA while Chief O'Loughlin was the Chief of the MBTA Police Department. McCall and Mulhern were responsible for improperly preventing Chief O'Loughlin from teaching the SIDS course. The actions of McCall and Mulhern (for which the MBTA is responsible) were taken against Chief O'Loughlin for malicious and retaliatory reasons, due to the knowledge held by McCall and Mulhern that it was of great importance to Chief O'Loughlin for personal and professional reasons, to continue teaching the SIDS Training course.

1

Jurisdiction and Venue

2. Jurisdiction over this matter lies in this Court pursuant to 42 USC Section 2000e-5, 28 USC Section 1343, and 28 USC Section 1367 (supplemental jurisdiction).

3. Venue in this District Court is proper because the illegal actions complained of herein occurred in Boston, Suffolk County, Massachusetts.

4. On April 17, 2003 Chief O'Loughlin filed a timely charge of illegal retaliation with the Massachusetts Commission Against Discrimination and the U.S. Equal Employment Opportunity Commission.

5. In October 2003 Chief O'Loughlin requested that his charges of discrimination pending at the Massachusetts Commission Against Discrimination and the U.S. Equal Employment Opportunity Commission be withdrawn to allow him to file suit in court. Those requests have been granted. On November 7, 2003 a Right to Sue Letter was issued by the U.S. Equal Employment Opportunity Commission in this matter. The Right to Sue letter was received by Chief O'Loughlin on or after November 10, 2003. A copy of the Right to Sue Letter is appended to this Complaint. Plaintiff has exhausted his administrative remedies and has timely invoked the jurisdiction of this Court.

**The Parties**

6. Thomas J. O'Loughlin is a resident of Holliston, Middlesex County, Massachusetts.

7. Defendant Massachusetts Bay Transportation Authority ("MBTA") is a political subdivision of the Commonwealth of Massachusetts pursuant to MGL Chapter 161A section 2, with a principal place of business in Boston, Suffolk County, Massachusetts. It was Plaintiff's "employer" within the meaning of MGL Chapter 151B section 5, and a "person" within the meaning of MGL Chapter 151B section 4. At all times relevant to this Complaint, it was Plaintiff's employer within the meaning of 42 USC Section 2000e, was engaged in an industry affecting commerce within the meaning of 42 USC Section 2000e, and in all other respects met all of the requirements for coverage under 42 USC Section 2000e. It is responsible for the illegal actions of Defendant Anne McCall and Defendant Michael Mulhern set forth herein.

8. Defendant Anne McCall is an individual residing in East Walpole, Massachusetts. At all times relevant to this Complaint, she was a Deputy Chief of the MBTA Police Department, was one of Plaintiff's subordinates while he was Chief of the MBTA Police Department, and engaged in all of the illegal and retaliatory actions alleged in this Complaint. Ms. McCall is sued in her individual capacity.

9. Defendant Michael Mulhern is an individual residing in Walpole, Massachusetts. At all times relevant to this Complaint, he was the General Manager of the MBTA, and engaged in all of the illegal and retaliatory actions alleged in this Complaint. Mr. Mulhern is sued in his individual capacity.

## Factual Background

10. Thomas J. O'Loughlin has served as a Chief of Police in the Commonwealth of Massachusetts for over seventeen years, and as a police official for more than 20 years. He has also been a member in good standing of the Massachusetts Bar since 1990.

11. In August 2002, Chief O'Loughlin voluntarily resigned his position as the MBTA Chief of Police to assume his current position as Chief of Police for the Town of Milford. By agreement with the MBTA, he continued in the employ of the MBTA until October 20, 2002. During this period of time, Chief O'Loughlin was scheduled to teach the SIDS Training Course, "Investigation of Infant and Child Deaths with Compassion and Understanding" (referred to hereafter as "SIDS Training") at the MBTA Police Academy. Chief O'Loughlin was scheduled by the Commander of the MBTA Police Academy to serve as an instructor and teach the SIDS Training at the MBTA Police Academy on January 2, 2003.

12. Chief O'Loughlin has taught SIDS courses for more than ten years in every Police Academy in Massachusetts, including the MBTA Police Academy. He has participated in providing SIDS training to more than 6000 police officers in Massachusetts, and has served as an instructor in teaching such courses in other venues as well. For many years he has had a personal and professional commitment to providing SIDS Training to police officers.

13. During 2001 and at other time periods, Chief O'Loughlin provided the MBTA Office of Organizational Diversity and General Manager Mulhern with written statements indicating that Deputy Police Chief McCall had engaged in a campaign and pattern of retaliatory conduct toward another MBTA Police Officer, Officer Helder Peixoto, because Officer Peixoto had filed complaints of discrimination and retaliation with the MBTA Office of Organizational Diversity.

14. On October 29, 2002, counsel for the MBTA was given notice that Officer Peixoto would be filing a lawsuit regarding his claims against the MBTA and Deputy McCall. Counsel for the MBTA was also informed at this time that Officer Peixoto would be relying upon testimony and written evidence supplied by Chief O'Loughlin in order to prove his claims. It was implicit in the notice provided to Counsel for the MBTA that Chief O'Loughlin would be subpoenaed to testify as a witness on behalf of Officer Peixoto in Officer Peixoto's lawsuit, and that Chief O'Loughlin's testimony would be adverse to the MBTA, the MBTA Police Department and Deputy McCall. It is Plaintiff's belief that the MBTA, Michael Mulhern and Deputy McCall were promptly informed of the information transmitted to Counsel for the MBTA.

3

15.  On October 31, 2002, two days after the MBTA was given the information referred to in paragraph 14 above, and presumably after Defendants Mulhern and McCall were given this information as well, so that they knew that Chief O'Loughlin would be an adverse witness to them in a discrimination and retaliation lawsuit, Deputy McCall cancelled Chief O'Loughlin's service as an instructor at the MBTA Police Academy teaching the SIDS Training.  Chief O'Loughlin was  told by the staff of the MBTA Police Academy that he would not be teaching the SIDS Training Course on January 2, 2003. The Academy staff also told Chief O'Loughlin that when they had informed Deputy McCall that Chief O'Loughlin was an expert on the SIDS material, she screamed at them and stated in vulgar language that Chief O'Loughlin "is not setting foot in my Academy and that is final."

16.  As a result of the cancellation of Chief O'Loughlin's services as an Instructor at the MBTA Police Academy, he was prevented from earning a salary of $35.00 per hour for four hours for a total of $140.00, on the January 2003 date as well as on all dates after that on which he would have taught the SIDS course at the MBTA Academy.  The salary would have been paid by the MBTA.  Chief O'Loughlin reasonably believed and expected that he would teach the SIDS Training course at the MBTA Police Academy in January 2003 and thereafter.

17.  In response to what he felt was the improper termination of his services as an Instructor, on October 31, 2002  Chief O'Loughlin contacted William Fleming, the Acting Chief of Police for the MBTA Police Department, and explained the situation. Acting Chief Fleming stated that he believed Deputy McCall was acting in a retaliatory manner.

18.  On November 18, 2002 Acting Chief of Police Fleming reversed the decision of Deputy Chief McCall, and reinstated Chief O'Loughlin to his position teaching the SIDS Training at the MBTA Police Academy in January 2003.

19.  At the request of Deputy McCall, two MBTA Police Association union representatives contacted MBTA General Manager Michael Mulhern to ask him to overturn the decision of Acting Chief Fleming to allow Chief O'Loughlin to teach the SIDS Training.

20.  Deputy McCall individually contacted MBTA General Manager Michael Mulhern to ask him to overturn the decision of Acting Chief Fleming to allow Chief O'Loughlin to teach the SIDS Training.

21.  On or about December 13, 2002 MBTA General Manager Michael Mulhern contacted Acting Chief of Police William Fleming and directed him to advise Chief O'Loughlin that he (Chief O'Loughlin) would not be allowed to teach at the MBTA Police Academy.  General Manager Mulhern also contacted Deputy McCall to let her know of his actions, and Deputy McCall in turn contacted the staff of the MBTA Police

Academy. She stated to them that "O'Loughlin's not teaching, that is final from the GM, he is not going to set a fucking foot into my academy."

22. On December 13, 2002 Acting Chief of Police William Fleming informed Chief O'Loughlin that his work as an Instructor of the SIDS Training had been cancelled, and that he could not supply a detailed explanation for the cancellation.

23. Later in December 2002, Acting Chief of Police William Fleming again contacted Chief O'Loughlin regarding the cancellation of Chief O'Loughlin's teaching position at the MBTA Police Academy. Acting Chief Fleming stated that he had been told by General Manager Michael Mulhern not to provide Chief O'Loughlin with any reasons for the cancellation decision. He also stated that Deputy Chief McCall had said that she would cancel the mandatory SIDS Training at the MBTA Police Academy.

24. During this same time period, staff at the MBTA Police Academy were told by Deputy McCall that she would rather forego this mandatory course of instruction at the Academy than have it taught by Chief O'Loughlin. Indeed, Deputy McCall cancelled the SIDS Training scheduled for January 2, 2003 at the MBTA Police Academy.

25. In January 2003 Deputy McCall was informed that MBTA recruit officers were required to have SIDS Training in order to graduate from the MBTA Police Academy. In response, she had Academy staff contact an instructor at the Massachusetts SIDS Center, Ms. Mary McClain. When Ms. McClain stated that the Academy should contact Chief O'Loughlin to teach the course, the Academy staff stated (on instructions from Deputy McCall) that Chief O'Loughlin was tied up and not available to teach the course. This was false

26. Chief O'Loughlin has not been allowed to teach the SIDS Training course at the MBTA Police Academy.

27. The actions of Defendants referred to above have caused Chief O'Loughlin financial harm, damage to his reputation, and emotional pain and suffering.

28. The actions of Defendants referred to above were knowing, intentional and willful.

29. In relation to his actions set forth above, Chief O'Loughlin believed in good faith that the MBTA and Deputy McCall had engaged in wrongful discrimination and retaliation against Officer Peixoto.

30. In taking the actions referred to above, Chief O'Loughlin engaged in protected activity pursuant to MGL Chapter 151B and 42 U.S. Code section 2000e. As a result of engaging in protected activity he suffered an adverse action which was causally related to his having engaged in protected activity.

31. In taking the actions referred to above, Chief O'Loughlin was opposing practices prohibited by MGL Chapter 151B and 42 U.S. Code section 2000e, and has assisted another person in asserting their rights under MGL Chapter 151B and 42 U.S. Code section 2000e.

32. Through their actions set forth above, Defendants have coerced, intimidated, threatened and interfered with Chief O'Loughlin in relation to his exercise and enjoyment of his rights granted pursuant to MGL Chapter 151B and 42 U.S. Code section 2000e, and have done so for his having aided and encouraged another person in his exercise and enjoyment of rights granted pursuant to MGL Chapter 151B and 42 U.S. Code section 2000e.

33. The actions taken by Defendants of which Chief O'Loughlin complains, were taken against Chief O'Loughlin due to his opposition to practices forbidden by MGL Chapter 151B and 42 U.S. Code section 2000e.

## Count I-Against MBTA, Mulhern and McCall for Retaliation in Violation of MGL Chapter 151B

34. Plaintiff realleges and incorporates by reference as if fully set forth herein, paragraphs 1-33 above.

35. By their actions set forth above, Defendants MBTA, Mulhern and McCall have engaged in unlawful retaliation against Chief O'Loughlin for having engaged in protected activities, and have interfered with Chief O'Loughlin's exercise of his protected rights, in violation of MGL Chapter 151B.

WHEREFORE, Plaintiff demands that this Court enter judgment in his favor and against Defendants MBTA, Mulhern and McCall, jointly and severally, in an amount to be determined by this Court, including monies to compensate him for lost pay, lost benefits, punitive damages, emotional pain and suffering, interest, costs, and attorneys fees, that the MBTA be ordered to allow Chief O'Loughlin to teach the SIDS Training course at the MBTA Police Academy, and such other and further relief that this Court deems just and proper.

## Count II-Against MBTA for Retaliation in Violation of 42 USC Section 2000e

36. Plaintiff realleges and incorporates by reference as if fully set forth herein, paragraphs 1-35 above.

37. By its actions set forth above, Defendant MBTA has engaged in unlawful retaliation against Chief O'Loughlin for having engaged in protected activities, and has interfered with Chief O'Loughlin's exercise of his protected rights, in violation of 42 US Code Section 2000e.

WHEREFORE, Plaintiff demands that this Court enter judgment in his favor and against Defendant MBTA, in an amount to be determined by this Court, including monies to compensate him for lost pay, lost benefits, punitive damages, emotional pain and suffering, interest, costs, and attorneys fees, that the MBTA be ordered to allow Chief O'Loughlin to teach the SIDS Training course at the MBTA Police Academy, and such other and further relief that this Court deems just and proper.

## Count III-Against McCall for Violation of 42 USC Section 1983

38. Plaintiff realleges and incorporates by reference as if fully set forth herein, paragraphs 1-37 above.

39. In relation to the illegal and retaliatory actions set forth above which were taken in her position as Deputy Chief of the MBTA Police Department and as an administrator of the MBTA Police Academy, Defendant McCall was acting under color of state law in depriving Plaintiff of his rights under federal law to be free of retaliation for having engaged in protected activities. Defendant McCall's actions in violation of 42 USC Section 1983 set forth herein, have caused injury to Plaintiff, in the form of financial and emotional damages.

40. Defendant McCall's actions in violation of 42 USC Section 1983 set forth herein, were done intentionally, knowingly and willfully, with knowledge of their wrongfulness. Defendant McCall is directly and personally responsible for her unlawful conduct, and was personally involved in committing the unlawful conduct.

41. By her actions set forth herein, Defendant McCall has, while acting under color of state law, deprived Plaintiff of his rights and privileges under federal laws, in violation of 42 USC Section 1983.

WHEREFORE, Plaintiff demands that this Court enter judgment in his favor and against Defendant McCall, in an amount to be determined by this Court, including monies to compensate him for lost pay, lost benefits, punitive damages, emotional pain and suffering, interest, costs, attorneys fees, and such other and further relief that this Court deems just and proper.

7

## Count IV-Against Mulhern for Violation of 42 USC Section 1983

42. Plaintiff realleges and incorporates by reference as if fully set forth herein, paragraphs 1-41 above.

43. In relation to the illegal and retaliatory actions set forth above which were taken in his position as General Manager of the MBTA, Defendant Mulhern was acting under color of state law in depriving Plaintiff of his rights under federal law to be free of retaliation for having engaged in protected activities. Defendant Mulhern's actions in violation of 42 USC Section 1983 set forth herein, have caused injury to Plaintiff, in the form of financial and emotional damages.

44. Defendant Mulhern's actions in violation of 42 USC Section 1983 set forth herein, were done intentionally, knowingly and willfully, with knowledge of their wrongfulness. Defendant Mulhern is directly and personally responsible for his unlawful conduct, and was personally involved in committing the unlawful conduct.

45. By his actions set forth herein, Defendant Mulhern has, while acting under color of state law, deprived Plaintiff of his rights and privileges under federal laws, in violation of 42 USC Section 1983.

WHEREFORE, Plaintiff demands that this Court enter judgment in his favor and against Defendant Mulhern, in an amount to be determined by this Court, including monies to compensate him for lost pay, lost benefits, punitive damages, emotional pain and suffering, interest, costs, attorneys fees, and such other and further relief that this Court deems just and proper.

## Count V-Against McCall for Violation of MGL Chapter 12 section 11H

46. Plaintiff realleges and incorporates by reference as if fully set forth herein, paragraphs 1-45 above.

47. In relation to the illegal and retaliatory actions set forth above which were taken in her position as Deputy Chief of the MBTA Police Department and as an administrator of the MBTA Police Academy, Defendant McCall was acting under color of state law in depriving Plaintiff of his rights under state and federal law to be free of retaliation for having engaged in protected activities. Defendant McCall's actions in violation of MGL Chapter 12 section 11H set forth herein, have caused injury to Plaintiff, in the form of financial and emotional damages. By her actions, Defendant McCall has attempted to interfere by threats, intimidation and coercion with Plaintiff's rights under federal and state law, in violation of MGL Chapter 12 sections 11I and 11H.

8

48. Defendant McCall's actions in violation of MGL Chapter 12 sections 11I and 11H set forth herein, were done intentionally, knowingly and willfully, with knowledge of their wrongfulness. Defendant McCall is directly and personally responsible for her unlawful conduct, and was personally involved in committing the unlawful conduct.

49. By her actions set forth herein, Defendant McCall has, while acting under color of state law, attempted though threats, intimidation and coercion to deprive Plaintiff of his rights and privileges under state and federal laws, in violation of MGL Chapter 12 sections 11I and 11H.

WHEREFORE, Plaintiff demands that this Court enter judgment in his favor and against Defendant McCall, in an amount to be determined by this Court, including monies to compensate him for lost pay, lost benefits, punitive damages, emotional pain and suffering, interest, costs, attorneys fees, and such other and further relief that this Court deems just and proper.

## Count VI-Against Mulhern for Violation of MGL Chapter 12 section 11H

50. Plaintiff realleges and incorporates by reference as if fully set forth herein, paragraphs 1-49 above.

51. In relation to the illegal and retaliatory actions set forth above which were taken in his position as General Manager of the MBTA, Defendant Mulhern was acting under color of state law in depriving Plaintiff of his rights under state and federal law to be free of retaliation for having engaged in protected activities. Defendant Mulhern's actions in violation of MGL Chapter 12 section 11H set forth herein, have caused injury to Plaintiff, in the form of financial and emotional damages. By his actions, Defendant Mulhern has attempted to interfere by threats, intimidation and coercion with Plaintiff's rights under federal and state law, in violation of MGL Chapter 12 sections 11I and 11H.

52. Defendant Mulhern's actions in violation of MGL Chapter 12 sections 11I and 11H set forth herein, were done intentionally, knowingly and willfully, with knowledge of their wrongfulness. Defendant Mulhern is directly and personally responsible for his unlawful conduct, and was personally involved in committing the unlawful conduct.

53. By his actions set forth herein, Defendant Mulhern has, while acting under color of state law, attempted though threats, intimidation and coercion to deprive Plaintiff of his rights and privileges under state and federal laws, in violation of MGL Chapter 12 sections 11I and 11H.

WHEREFORE, Plaintiff demands that this Court enter judgment in his favor and against Defendant Mulhern, in an amount to be determined by this Court, including monies to compensate him for lost pay, lost benefits, punitive damages, emotional pain and

9

suffering, interest, costs, attorneys fees, and such other and further relief that this Court deems just and proper.

## Count VII-Against Mulhern for Intentional Interference with Contractual Relationships

54. Plaintiff realleges and incorporates by reference as if fully set forth herein, paragraphs 1-53 above.

55. By his actions set forth above, Defendant Mulhern has intentionally interfered with Chief O'Loughlin's contractual relationships, causing him to suffer damages. Chief O'Loughlin had an express oral agreement with the MBTA that he would be teaching the SIDS Training course at the MBTA Police Academy at least in January 2003, Mulhern knowingly induced the MBTA to breach its agreement with Chief O'Loughlin by acting to prevent him from teaching the SIDS Training course at the MBTA Police Academy, Mulhern's actions were based upon his dislike of Chief O'Loughlin for Chief O'Loughlin having engaged in the protected activities referred to above, all of which has caused Chief O'Loughlin to suffer damages.

WHEREFORE, Plaintiff demands that this Court enter judgment in his favor and against Defendant Mulhern, in an amount to be determined by this Court, including monies to compensate him for lost pay, lost benefits, emotional pain and suffering, interest, costs, attorneys fees, and such other and further relief that this Court deems just and proper.

## Count VIII-Against Mulhern for Intentional Interference with Contractual Relationships

56. Plaintiff realleges and incorporates by reference as if fully set forth herein, paragraphs 1-55 above.

57. By her actions set forth above, Defendant McCall has intentionally interfered with Chief O'Loughlin's contractual relationships, causing him to suffer damages. Chief O'Loughlin had an express oral agreement with the MBTA that he would be teaching the SIDS Training course at the MBTA Police Academy at least in January 2003, McCall knowingly induced the MBTA to breach its agreement with Chief O'Loughlin by acting to prevent him from teaching the SIDS Training course at the MBTA Police Academy, McCall's actions were based upon her dislike of Chief O'Loughlin for Chief O'Loughlin having engaged in the protected activities referred to above, all of which has caused Chief O'Loughlin to suffer damages.

WHEREFORE, Plaintiff demands that this Court enter judgment in his favor and against Defendant McCall, in an amount to be determined by this Court, including monies to

compensate him for lost pay, lost benefits, emotional pain and suffering, interest, costs, attorneys fees, and such other and further relief that this Court deems just and proper.

## Count IX-Against Mulhern for Intentional Interference with Advantageous Relationships

58.  Plaintiff realleges and incorporates by reference as if fully set forth herein, paragraphs 1-57 above.

59.  By his actions set forth above, Defendant Mulhern has intentionally interfered with Chief O'Loughlin's advantageous relationships, causing him to suffer damages. Chief O'Loughlin had a reasonable expectation of being employed by the MBTA to teach the SIDS Training course at the MBTA Police Academy after January 2003, Mulhern knowingly induced the MBTA to refuse to employ Chief O'Loughlin to teach the SIDS Training course at the MBTA Police Academy after January 2003, Mulhern's actions were based upon his dislike of Chief O' Loughlin for Chief O' Loughlin having engaged in the protected activities referred to above, all of which has caused Chief O'Loughlin to suffer damages.

WHEREFORE, Plaintiff demands that this Court enter judgment in his favor and against Defendant Mulhern, in an amount to be determined by this Court, including monies to compensate him for lost pay, lost benefits, emotional pain and suffering, interest, costs, attorneys fees, and such other and further relief that this Court deems just and proper.

## Count X-Against McCall for Intentional Interference with Advantageous Relationships

60.  Plaintiff realleges and incorporates by reference as if fully set forth herein, paragraphs 1-59 above.

61.  By her actions set forth above, Defendant McCall has intentionally interfered with Chief O'Loughlin's advantageous relationships, causing him to suffer damages. Chief O'Loughlin had a reasonable expectation of being employed by the MBTA to teach the SIDS Training course at the MBTA Police Academy after January 2003, NcCall knowingly induced the MBTA to refuse to employ Chief O'Loughlin to teach the SIDS Training course at the MBTA Police Academy after January 2003, McCall's actions were based upon her dislike of Chief O'Loughlin for Chief O' Loughlin having engaged in the protected activities referred to above, all of which has caused Chief O'Loughlin to suffer damages.

WHEREFORE, Plaintiff demands that this Court enter judgment in his favor and against Defendant McCall, in an amount to be determined by this Court, including monies to

compensate him for lost pay, lost benefits, emotional pain and suffering, interest, costs, attorneys fees, and such other and further relief that this Court deems just and proper.

## Count XI-Against the MBTA for Violation of MGL Chapter 93A

62.  Plaintiff realleges and incorporates by reference as if fully set forth herein, paragraphs 1-61 above.

63.  Defendants have claimed in the administrative proceedings related to this complaint that Chief O'Loughlin was not protected from retaliatory actions, as he was not an employee of the MBTA at the time of the events he has complained of, and that he is not entitled to protection from retaliation as a former employee.  Rather, they claim that in relation to his anticipated work at the MBTA Police Academy, Chief O'Loughlin was an independent contractor and not an employee.  As such, Chief O'Loughlin is entitled to the protections of MGL Chapter 93A prohibiting unfair and deceptive business practices.

64.  The MBTA, by terminating its agreement to have Chief O'Loughlin teach the SIDS Training course at the MBTA Police Academy in January 2003, and by refusing to have Chief O'Loughlin teach the SIDS Training course at the MBTA Police Academy after January 2003, based upon the fact that Chief O'Loughlin engaged in the protected activities referred to in this complaint, has engaged in unfair business practices in violation of MGL Chapter 93A section 11.

WHEREFORE, Plaintiff demands that this Court enter judgment in his favor and against Defendant MBTA, in an amount to be determined by this Court, including monies to compensate him for lost pay, lost benefits, treble damages, interest, costs, and attorneys fees, that the MBTA be ordered to allow Chief O'Loughlin to teach the SIDS Training course at the MBTA Police Academy, and such other and further relief that this Court deems just and proper.

## JURY TRIAL DEMAND

PLAINTIFF DEMANDS A TRIAL BY JURY OF ALL ISSUES AND COUNTS SO TRIABLE.

Thomas J. O'Loughlin
By his attorney,
MITCHELL J. NOTIS

MITCHELL J. NOTIS

2/6/04

Law Offices of Mitchell J. Notis
370 Washington Street
Brookline, MA 02445
617-566-2700
BBO# 374360

13

EEOC Form 161-B (2/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

To: Thomas J. O'Loughlin
25 Holly Lane
Holliston, MA 01746

From: Boston Area Office
John F. Kennedy Fed Bldg
Government Ctr, Room 475
Boston, MA 02203

☐ *On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR § 1601.7(a))*

| Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| | Rance A. O'Quinn, Enforcement Supervisor | |
| 16C-2003-01470 | | **(617) 565-3192** |

*(See also the additional information enclosed with this form.)*

### NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA must be filed in federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this Notice or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

[X] More than 180 days have passed since the filing of this charge.

[ ] Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of the charge.

[X] The EEOC is terminating its processing of this charge.

[ ] The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

[ ] The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court** <u>WITHIN 90 DAYS</u> of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

[ ] The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of your charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

If you file suit based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Robert L. Sanders,
Director

NOV 7 2003

*(Date Mailed)*

Enclosure(s)

cc: Chief Executive Officer
MBTA, ET AL
Legal Department
10 Park Plaza
Boston, MA. 02116

Mitchell Jay notis
Annenberg & Levine, LLC
Attorneys at Law
370 Washington Street
Brookline, Massachusetts 02446

# EXHIBIT B

**Anne McCall**
**September 21, 2007**



1

Volume I

Pages 1-75

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

THOMAS J. O'LOUGHLIN,

        Plaintiff

vs.                          No. 04-10257-MEL

MASSACHUSETTS BAY TRANSPORTATION AUTHORITY

and ANNE McCALL and MICHAEL MULHERN,

        Defendants

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF:  ANNE McCALL

11:28 a.m. - 12:40 p.m.

Friday, September 21, 2007

Wilmer Cutler Pickering Hale and Dorr LLP

60 State Street

Boston, Massachusetts

-----REPORTED BY: CHRISTINE SILVA-ADERMANN/RPR-----

MERIT REPORTING

P.O. Box 286

Westwood, Massachusetts  02090

508.850.6923

**Anne McCall**
**September 21, 2007**

2

APPEARANCES:


Representing the Plaintiff:

       MITCHELL J. NOTIS, ESQ.

       BY:  MITCHELL J. NOTIS, ESQ.

       370 Washington Street

       Brookline, Massachusetts  02445

       617.566.2700


Representing the Defendants:

       WILMER CUTLER PICKERING HALE and DORR LLP

       BY:  JOAN A. LUKEY, ESQ.

       60 State Street

       Boston, Massachusetts  02109

       617.526.6798    Fax 617.526.5000

       joan.lukey@wilmerhale.com

**Anne McCall**
**September 21, 2007**

5

```
 1   for the record?

 2       A.  Anne McCall.

 3       Q.  What's your residence address?

 4       A.  Five Adrienne Road, Walpole.

 5       Q.  And you're currently employed by the MBTA

 6   Police Department?

 7       A.  Yes.

 8       Q.  How many years have you worked for the MBTA

 9   Police Department?

10       A.  23.

11       Q.  Your current rank is lieutenant?

12       A.  Yes.

13       Q.  Let me direct your attention back to 2001

14   through early 2003.  Do you recall what rank you

15   held in 2001?

16       A.  Department chief.

17       Q.  You held that all throughout 2001?

18       A.  Yes.

19       Q.  How about in 2002, what rank did you hold?

20       A.  Deputy chief and then I believe I went back

21   to lieutenant.

22       Q.  Do you recall when you went back to

23   lieutenant?

24       A.  I believe it was, and I'm bad on dates, I
```

**Anne McCall**
**September 21, 2007**

6

```
1   believe it was September of 2002; is that correct?

2   Or 2003.

3       Q.  Let me ask you this:  Do you recall in 2001

4   and part of 2002 who the chief of the MBTA Police

5   Department was?

6       A.  Tom O'Loughlin.  Actually I was wrong on

7   the dates.

8       Q.  Do you recall there being a point in time

9   when Thomas O'Loughlin left the MBTA Police

10  Department?

11      A.  Yes.

12      Q.  Do you recall what month that was?

13      A.  I believe it was August.

14      Q.  You don't know if he was officially off the

15  payroll in August or a few months later, I take it?

16      A.  Correct.

17      Q.  And were you moved to lieutenant while he

18  was still chief of police?

19      A.  No.

20      Q.  After Tom O'Loughlin was chief, was there

21  an acting chief?

22      A.  Yes.

23      Q.  Who was that?

24      A.  William Flemming.
```

**Anne McCall**
**September 21, 2007**

1    Q.   Were you moved to lieutenant while Flemming

2    was acting chief?

3    A.   No.

4    Q.   After Flemming was acting chief, was there

5    then a permanent chief for the MBTA Police

6    Department?

7    A.   Yes.

8    Q.   Actually his last day is today?

9    A.   It was yesterday.

10   Q.   Yesterday, okay.  Thank you.  That was

11   Joseph Carter?

12   A.   Yes.

13   Q.   Were you moved to lieutenant during the

14   time that Chief Carter was chief for the police

15   department?

16   A.   Yes.

17   Q.   Do you recall if Carter was sworn in

18   January or February of '03?

19   A.   Yes, correct.

20   Q.   And how long after that were you moved to

21   the rank of lieutenant?

22   A.   September 2003.

23   Q.   Okay.  Fine.  September '03.  Very good.

24   At some point did your responsibilities include the

**Anne McCall**
**September 21, 2007**

1  internal affairs division at the MBTA Police

2  Department?

3      A.  Yes.

4      Q.  Do you recall when that was?

5      A.  It was under the role of Chief O'Loughlin

6  under his term.

7      Q.  And that's called IAD?

8      A.  Yes.

9      Q.  Were you responsible for IAD through the

10  time that O'Loughlin left the MBTA police?

11      A.  Yes.

12      Q.  Were you responsible for IAD during the

13  full time Flemming was acting as chief?

14      A.  Yes.

15      Q.  Were you responsible for IAD until you were

16  promoted to rank of lieutenant?

17      A.  Yes.

18      Q.  Lieutenant is your civil service grade;

19  correct?

20      A.  Yes.

21      Q.  At some point under O'Loughlin, were you

22  responsible for the MBTA Police academy?

23      A.  Yes.

24      Q.  Were you responsible for that throughout

**Anne McCall**
**September 21, 2007**

9

```
 1    until the end of O'Loughlin's tenure?

 2        A.  Yes.

 3        Q.  Were you responsible for that through

 4    Flemming's tenure?

 5        A.  Yes.

 6        Q.  Were you responsible for that until you

 7    were moved back to lieutenant?

 8        A.  Yes.

 9        Q.  Okay.  Now, what exactly were your duties

10    and responsibilities under O'Loughlin and under

11    Flemming with regard to the MBTA Police Academy?

12        A.  I oversaw the academy.

13        Q.  What did that consist of on a day-to-day

14    basis?

15        A.  Basically consisted of the billing part of

16    it and overseeing if there was any problems with the

17    academy director or staff instructors or any of the

18    teachers.

19        Q.  Okay.  Did you have authority to decide who

20    would be teaching courses and who wouldn't?

21        A.  Yes.

22        Q.  That would be your final say basically

23    other than perhaps to your superiors?

24        A.  Correct.
```

**Anne McCall**
**September 21, 2007**

16

1     A.   I believe he had a son that died of it,

2   sudden infant death syndrome.

3     Q.   Did he ever express to you a particular

4   interest to teach the SIDS course?

5     A.   I don't remember him talking about it, no.

6     Q.   So you're just assuming he particularly

7   wanted to teach the course?

8     A.   Yes.

9     Q.   Prior to this lawsuit here today, did you

10   know he had a particular interest in teaching the

11   SIDS course?

12     A.   Just because of his personal history, yes.

13     Q.   Now, I think you told me you remember that

14   Tom O'Loughlin stopped coming in as chief, stopped

15   actively serving as chief in August of '02?

16     A.   Yes.

17     Q.   Do you know if there was an academy class

18   going on between August '02 and January '03?

19     A.   I believe there was.

20     Q.   Was the SIDS course being taught at that

21   academy?

22     A.   Yes.

23     Q.   Do you know if Tom O'Loughlin taught that?

24     A.   No.

**Anne McCall**
**September 21, 2007**

18

1    Q.   Okay.  Did there come a time in 2002 when

2   you learned that even though Tom O'Loughlin was no

3   longer chief, he'd be teaching the SIDS course at

4   the academy?

5    A.   Yes.

6    Q.   When did you learn that?

7    A.   I believe it was in August 2002 or maybe

8   into September.

9    Q.   How did you learn that?

10    A.   I believe I learned that from Frank

11   Wolverton.

12    Q.   Who was the fellow that was the director?

13    A.   Yes.

14    Q.   Do you recall how this came up between you

15   and Mr. Wolverton?

16    A.   I believe he was going to call Tom

17   O'Loughlin to confirm a date for teaching.

18    Q.   But why did it come up in your conversation

19   with Wolverton?

20    A.   I actually don't know how it came up.

21    Q.   Do you recall exactly what he said to you?

22    A.   No.

23    Q.   Do you recall what you said to him when you

24   learned that?

**Anne McCall**
**September 21, 2007**

19

```
 1        A.   I believe I told him to call and cancel
 2   Chief O'Loughlin.
 3        Q.   Did you tell him that as soon as you
 4   learned that O'Loughlin would be teaching?
 5        A.   I can't remember.
 6        Q.   So it might have been as soon as you found
 7   out?  It might have been a bit later?
 8        A.   Correct.
 9        Q.   Did you tell -- I'm sorry, do you recall
10   what your exact words to Wolverton were?
11        A.   No.  I believe I just -- I told him to
12   cancel Tom O'Loughlin.
13        Q.   Did you tell him that it was unacceptable
14   that Tom was teaching?
15        A.   I don't recall saying that.
16        Q.   But you told him to cancel?
17        A.   Right.
18        Q.   Did you tell him why it should be
19   cancelled?
20        A.   I believe I said that he no longer works
21   here and it wouldn't be good for him to teach at the
22   academy.
23        Q.   Do you recall if you said anything else to
24   Wolverton to explain why Tom shouldn't be teaching?
```

**Anne McCall**
**September 21, 2007**

20

1      A.   I don't remember.

2      Q.   Why did you feel it wouldn't be good for

3  Tom to be teaching at the academy?

4      A.   Because it was such a -- the department was

5  in such disarray the last year, or six months to a

6  year of Tom O'Loughlin's tenure that I didn't feel

7  it would be good for morale or for anything for Tom

8  O'Loughlin to teach at the academy.

9      Q.   That was the immediate past chief that you

10  were saying shouldn't be teaching; correct?

11      A.   Yes.

12      Q.   And prior to making that decision and

13  instructing Wolverton, did you confer with anyone

14  else about that?

15      A.   No.

16      Q.   You didn't think it would be appropriate to

17  confer with the acting chief about it before making

18  that decision?

19      A.   No.

20      Q.   Any particular reason you didn't?

21      A.   Because we made decisions about teachers

22  all the time at the academy.

23      Q.   Even though this was the immediate former

24  chief, you felt this was within your discretion to

Anne McCall
September 21, 2007

22

1      A.  I mean, he -- I'm not sure how to phrase

2  it.  He had a very bad relationship with not only me

3  but with the rest of the department.  I didn't think

4  it would be for the good of the department or the

5  academy.

6      Q.  I understand what you're saying.  I

7  understand you're telling me that you felt it was

8  not for the good of the academy or the force for him

9  to teach.  All I'm trying to figure out is what, if

10  any, role your personal feelings about Tom

11  O'Loughlin at the time played in your decision not

12  to let him teach?

13          MS. LUKEY:  Objection.

14      A.  I don't know that it did play any role.

15      Q.  Okay.  You are not saying it didn't, but

16  you don't know?

17      A.  Right.

18      Q.  Okay.  You've seen the allegations in the

19  complaint in this action, I take it?

20      A.  Yes.

21      Q.  Now, when you spoke to Wolverton that first

22  time, did you tell him Tom O'Loughlin is not setting

23  foot in my academy?

24      A.  I don't remember using those words, no.

**Anne McCall**
**September 21, 2007**

23

1    Q.  Did you tell him Tom O'Loughlin is not

2  setting foot in my fucking academy?

3    A.  No.

4    Q.  You're sure you didn't use that expletive?

5    A.  Yes.

6    Q.  Other than what you said to me, you don't

7  recall anything else you said to Wolverton about

8  this?

9    A.  Not really, no.

10    Q.  Did Wolverton ask you if he should -- what

11  he should say to Tom if Tom asked why he wouldn't be

12  teaching?

13    A.  I don't recall him asking me that.

14    Q.  So your conversation with him was just

15  Tom's not teaching, inform him he's not teaching, or

16  words to that effect?

17    A.  Yes.

18    Q.  No explanation?

19    A.  No.

20        MS. LUKEY:  Objection.

21    Q.  Okay.  After you gave those instructions to

22  Wolverton, did you inform anyone else that you had

23  given him those instructions?

24    A.  No.

**Anne McCall**
**September 21, 2007**

24

1      Q.   After you gave those instructions to

2   Wolverton, did you tell anyone else that Tom

3   wouldn't be teaching at the academy?

4      A.   No.

5      Q.   Okay.  When is the next time you heard

6   anything about the subject of Tom O'Loughlin

7   teaching at the academy?

8      A.   I believe I heard something from Flemming,

9   and I'm not sure of the exact time line.

10      Q.   Again, that's then acting chief, William

11   Flemming?

12      A.   Yes.

13      Q.   What is it you -- I understand you don't

14   recall the exact time line.  Do you have any

15   recollection of approximately how long it was after

16   you had given those instructions to Wolverton?

17      A.   I would just be assuming it would be a

18   couple of days later.

19      Q.   You don't think it was a month later or

20   anything like that?

21      A.   I don't believe so.

22      Q.   How is it that you came to speak to

23   Flemming about this?

24      A.   I believe he had just told me that he

Anne McCall
September 21, 2007

25

 1    reversed my decision and that Tom O'Loughlin would

 2    be teaching at the academy.

 3        Q.  What context did this come up in?

 4        A.  What do you mean by context?

 5        Q.  Sorry, bad question.  In other words, did

 6    Flemming just call you specifically to tell you

 7    that?

 8        A.  I don't believe it was a phone call.  I

 9    believe I talked to him face-to-face.

10        Q.  Were you talking about other subjects and

11    this came up as well?

12        A.  I don't remember.

13        Q.  To the best of your knowledge sitting here

14    today, what exactly did Flemming say to you?

15        A.  Basically that he was overruling my

16    decision and that Tom O'Loughlin was going to teach

17    in the academy.

18        Q.  Do you recall him saying anything else?

19        A.  *I think basically he had gotten a phone

20    call from Tom O'Loughlin and that he had just said,

21    you know, if necessary we'd fill the class with, you

22    know, a bunch of people that didn't like Tom

23    O'Loughlin.

24        Q.  Who said that?

**Anne McCall**
**September 21, 2007**

26

```
1        A.   William Flemming.

2             MR. NOTIS:  Can you read the previous

3   answer back?

4             (*Answer read)

5        Q.   This is something you believe Flemming said

6   to you at the time?

7        A.   Yes.

8        Q.   And did he explain why he was overruling

9   your decision?

10       A.   I assumed he was overruling my decision

11  because he got a phone call from Tom O'Loughlin.

12       Q.   But did he say why he had to respond to

13  that or why he had to agree with O'Loughlin?

14       A.   No.

15       Q.   Did you say anything to him when he

16  informed you of that?

17       A.   I just thought it was a bad idea.

18       Q.   Did you say that to him?

19       A.   Yes.

20       Q.   Do you recall what words you used?

21       A.   No.

22       Q.   Did you say anything other than it's a bad

23  idea?

24       A.   I don't recall.
```

Anne McCall
September 21, 2007

40

1       A.   I believe he came up during our

2   conversation about the Black Legislative Caucus and

3   the direction of the department.

4       Q.   Do you recall what you said to him then?

5       A.   I really don't, no.  It was more in general

6   terms.

7       Q.   Have you ever spoken to Mulhern about Tom

8   O'Loughlin teaching or not teaching at the academy?

9       A.   No.

10       Q.   Did you in any way encourage or instruct

11   Paul Byrne to call Mulhern about O'Loughlin

12   teaching?

13       A.   No.

14       Q.   Did you in any way instruct or encourage

15   Greg Lee to call Mulhern about O'Loughlin teaching?

16       A.   No.

17       Q.   If I understand your testimony then, other

18   than that conversation about the Black Legislative

19   Caucus --

20            MR. NOTIS:  Off the record.

21            (Off record discussion)

22            MR. NOTIS:  Back on the record.

23       Q.   Just so I understand then, I understand you

24   spoke with Mulhern sometime in '01 about the Black

**Merit Reporting**
**508.850.6923**

Anne McCall
September 21, 2007

43

1    you just assumed he was going to deal with it?

2        A.   I believe Flemming had told me he had

3    already notified the academy and I believe they were

4    going to use the nurse that taught it any ways.

5        Q.   I understand that.  When you say -- how did

6    you know they were going to use the nurse?

7        A.   Because she's taught that class a number of

8    times.

9        Q.   I'm not saying she wasn't qualified.  I'm

10   saying how did you know that?  Did you just assume

11   it, or did someone tell you that?

12       A.   I don't recall.

13       Q.   Did you ever instruct anyone to tell

14   McClain that Chief O'Loughlin was not available to

15   teach the course?

16       A.   No.

17       Q.   Did you ever contact the staff at the

18   academy and tell them that O'Loughlin was not

19   teaching, that was final from the general manager?

20       A.   No.

21       Q.   You know someone named Helder Peixoto;

22   correct?

23       A.   Yes.

24       Q.   Is it correct that while Mr. Peixoto was

1    employed by the MBTA Police Department, you felt he

2    should either be disciplined or terminated?

3        A.   Yes.

4        Q.   And when did you first come to that

5    opinion?

6        A.   I'd have to, again, I'm really bad at

7    dates, I'd have to look at the complaints, but I

8    believe it was 2001.

9        Q.   Okay.  Briefly, why did you feel he should

10   be either disciplined or his employment terminated?

11       A.   Because of his abuse of power and a number

12   of different actions that he had taken.

13       Q.   I'm not questioning your good faith and

14   your beliefs in that, ma'am, but is it fair to say

15   that as a result of, well, did you take any actions

16   to try to have Peixoto disciplined or have his

17   employment terminated?

18       A.   Yes.

19       Q.   What actions did you take to do either of

20   those things?

21       A.   I investigated complaints that came in,

22   substantiated internal affairs complaints, and

23   submitted them for discipline and termination.

24       Q.   Did you make recommendations to anyone that

Anne McCall
September 21, 2007

45

```
 1   Peixoto be either disciplined or terminated?

 2       A.  Yes.

 3       Q.  How many times did you do that?

 4       A.  I don't recall the exact number.  But it

 5   was more than once.

 6       Q.  Okay.  Were your recommendations acted

 7   upon?

 8       A.  No.

 9       Q.  Was there a particular person who rejected

10   your recommendations?

11       A.  Yes.

12       Q.  Who was that?

13       A.  Tom O'Loughlin.

14       Q.  How many times did he reject your

15   recommendations?

16       A.  I don't recall the exact number, but it was

17   more than once.

18       Q.  Did he tell you why he was rejecting your

19   recommendations?

20       A.  Yes.

21       Q.  What did he say to you, ma'am?

22       A.  I don't believe he said anything.  I

23   believe he had put a number of things in writing

24   defending Helder Peixoto.
```

1    Q.   What word would you use, ma'am?

2    A.   I would say I was head of internal affairs

3    and he was an officer who had a number of complaints

4    against him.  And he filed a number of retaliatory

5    complaints against not only myself but other members

6    of the department.

7    Q.   By 2002 is it fair to say you disliked

8    Peixoto?

9         MS. LUKEY:  Objection.

10   A.   I mean, that would indicate that there was

11   a personal relationship, and it wasn't.  It was a

12   business and professional relationship.

13   Q.   I understand that completely.  Did you

14   dislike him?

15        MS. LUKEY:  Objection.

16   A.   I don't think he should have been a police

17   officer.

18   Q.   Yes or no, did you dislike him?

19        MS. LUKEY:  Look, she just told you that

20   would have to be a personal relationship and this

21   was a professional assessment, so she can't answer

22   yes or no to your choice of words.

23   Q.   So in 2002 you didn't like or dislike Mr.

24   Peixoto; is that correct?

1    A.   In my professional capacity I don't think

2    he should have been a police officer.

3    Q.   I understand that.  But did you either like

4    or dislike him in 2002, ma'am?

5         MS. LUKEY:   Objection.

6    A.   In my mind those words indicate I had a

7    personal relationship with him that I didn't.

8    Q.   I understand you didn't.  Did you despise

9    him in 2002?

10        MS. LUKEY:   Objection.

11   A.   I wouldn't use that word, no.

12   Q.   Did you devote a fair amount of time to

13   getting him fired in 2002?

14        MS. LUKEY:   Objection.

15   A.   I wouldn't classify that as what I did

16   either.

17   Q.   How much time did you spend in 2002 trying

18   to get him fired?

19        MS. LUKEY:   Objection.

20   A.   I couldn't answer that without looking at

21   complaints.  I wouldn't classify it as trying to get

22   him fired.  I would classify it as I was the head of

23   the internal affairs department that investigated

24   legitimate complaints that came in against an

Anne McCall
September 21, 2007

52

1      A.   I don't believe so, but there may have

2   been.

3      Q.   Did you ever meet with ODCR to discuss

4   Peixoto?

5      A.   Yes.

6      Q.   Was that in relation to complaints Peixoto

7   filed against you?

8      A.   I believe so.

9      Q.   Did you ever learn from your discussions

10  with anyone at ODCR what O'Loughlin's opinion was of

11  your actions towards Peixoto?

12     A.   No.

13     Q.   Did you ever learn through them or anyone

14  else that O'Loughlin had informed ODCR that he felt

15  you were retaliating against Peixoto?

16     A.   No.

17     Q.   You testified a moment ago that Tom

18  O'Loughlin testified in favor of Peixoto at a civil

19  service hearing?

20     A.   Yes.

21     Q.   Okay.   Prior to the filing of this lawsuit,

22  did you have any knowledge that Tom O'Loughlin would

23  be testifying in favor of Peixoto anywhere else?

24     A.   No.

**Merit Reporting**
**508.850.6923**

# EXHIBIT C