COPY

1

2               UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
3                       VOLUME I

4        ****************************************
         THOMAS J. O'LOUGHLIN,
5                          Plaintiff
                    vs.
6        MASSACHUSETTS BAY TRANSPORTATION
         AUTHORITY and ANNE McCALL and MICHAEL
7        MULHERN,
                         Defendants
8        ****************************************

9

10

11              DEPOSITION of MICHAEL H.

12      MULHERN, a witness called on behalf of

13      the Plaintiff, pursuant to the

14      Massachusetts Rules of Civil Procedure,

15      before Lisa E. Berkland, a Certified

16      Shorthand Reporter and Notary Public in

17      and for the Commonwealth of

18      Massachusetts, held at Wilmer, Cutler,

19      Pickering, Hale & Dorr, 60 State Street,

20      Boston, Massachusetts, on Friday, April

21      13, 2007, commencing at 10:10 a.m.

22

23                  LISA E. BERKLAND, CSR
                       P.O. Box 286
24                   Westwood, MA 02090
                      (508) 850-5171

1

    APPEARANCES:

2

LAW OFFICE OF MITCHELL J. NOTIS

3
    (By Mitchell J. Notis, Esquire)
    370 Washington Street

4
    Brookline, Massachusetts  02445
    (617) 566-2700

5
        On behalf of the Plaintiff.

6

WILMER, CUTLER, PICKERING, HALE & DORR,

7
LLP
    (By Joan A. Lukey, Esquire)

8
    60 State Street
    Boston, Massachusetts  02109

9
    (617) 526-6798
        On behalf of the Defendants.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1          address in the near future?

2     A.   No.

3     Q.   Are you currently employed, sir?

4     A.   Yes.

5     Q.   Who is your employer?

6     A.   MBTA Retirement Fund.

7     Q.   Okay.  That's a separate entity, is it

8          not, from the MBTA itself?

9     A.   Yes.

10    Q.   What position do you hold with the MBTA

11         Retirement Fund?

12    A.   Executive director.

13    Q.   How long have you been the executive

14         director of the MBTA Retirement Fund?

15    A.   Since July 1, 2006.

16    Q.   What was your job immediately prior to

17         July 1, 2006?

18    A.   I was vice president in the civil

19         division for Jacobs Engineering.

20    Q.   Prior to Jacobs Engineering, you were the

21         general manager of the MBTA?

22    A.   Till -- yes.

23    Q.   How long had you been an employee of the

24         MBTA?

1    A.   26 years and two months.

2    Q.   Okay.  Do you recall the exact dates

3         during which you were general manager of

4         the MBTA?

5    A.   Yes.

6    Q.   What were they?

7    A.   Well, not necessarily the exact dates.

8    Q.   If you can tell me as exactly as you can

9         when you were general manager?

10   A.   My recollection is that my predecessor,

11        Bob Prince, announced his departure with

12        the MBTA Board of Directors in the summer

13        of 2001, to take effect later that year,

14        November of 2001.  In September, 2001,

15        the Board voted to appoint me as acting

16        general manager.  I worked with the

17        general manager during the next couple of

18        months.  The general manager left in

19        November of 2001; and I took over as

20        acting general manager effective with his

21        departure.  In February of 2002, I was

22        formally appointed the general manager,

23        and the title of "acting" was removed.

24   Q.   You were formally put in in February of

1          '02.  When did you leave the position of

2          general manager?

3    A.    May of '05.

4    Q.    Okay.  You know Thomas O'Loughlin?

5    A.    I do.

6    Q.    How do you know Mr. O'Loughlin?

7    A.    He was the MBTA Police Chief for a period

8          of approximately five years.

9    Q.    All right.  You are one of the defendants

10         in this lawsuit?

11   A.    I am.

12   Q.    Okay.  What is your understanding of

13         Chief O'Loughlin's claims against you in

14         this lawsuit?

15   A.    He has claimed that I violated his rights

16         because I decided not to allow him to

17         teach at the MBTA Police Academy.

18   Q.    Is it correct that you did not allow him

19         to teach at the MBTA Police Academy?

20   A.    Yes.

21   Q.    And that was your decision?

22   A.    That was my decision.

23   Q.    Was it solely your decision?

24   A.    Yes.

1    Q.   Did anyone influence you in making that

2         decision?

3    A.   No.

4    Q.   Did anyone suggest to you that that

5         decision be made?

6    A.   No.

7    Q.   Did you have any discussions with anyone

8         about whether that decision should or

9         should not be made before actually making

10        it?

11   A.   I received a phone call from a union

12        official.  I think it was Paul Byrne, who

13        was upset with the fact that the Chief,

14        Tom O'Loughlin, would be teaching at the

15        Police Academy.  I told him that that was

16        not true, because I didn't know anything

17        at the time about the issue.  It was

18        inconsistent with my understanding of

19        Tom's departure and a new job.

20   Q.   I'll get into that a little bit more a

21        little later.

22             Was that conversation just with

23        Mr. Byrne?

24   A.   Yes.

```
 1          a unit without a reasonable set of
 2          controls.
 3    Q.    Were you in favor of Tom O'Loughlin
 4          continuing on as Chief of the MBTA Police
 5          Department beyond June of 2002?
 6    A.    Yes.  I had absolutely no problem with
 7          that.
 8    Q.    Okay.  Did you think he did a good job as
 9          Chief?
10    A.    Tom had some problems.  I think at times
11          he did a very good job.  At other times,
12          in other areas, he struggled,
13          particularly within the inner city and
14          the issue of community policing and some
15          of the public relation issues that
16          confronted the police department.
17          Certainly, with the contract behind us,
18          and there being a certain containment of
19          some of the internal and external issues,
20          I thought the opportunity presented
21          itself for Tom to get a fresh start, and
22          provided he was able to make some bold
23          moves, you know, begin to restore some
24          confidence within the Department.  I
```

```
 1           wasn't 100 percent sure he could do it,

 2           but I was convinced of one thing, that it

 3           was a good opportunity for him, should he

 4           decide to take that opportunity.

 5   Q.   You mean within the MBTA?  I'm a little

 6           confused.  Or do you mean in a new job?

 7   A.   In his capacity as police chief.

 8   Q.   Did you ever give any recommendation to

 9           Tom O'Loughlin to any possible employer?

10   A.   Yes.

11   Q.   Who did you do that to?

12   A.   Tom asked me to speak to, I think it was

13           a select person from the Town of Milford.

14   Q.   Okay.  Do you recall that conversation?

15   A.   Yes.

16   Q.   What did you tell the select person about

17           Tom O'Loughlin?

18   A.   The select person said -- I'm

19           paraphrasing.

20   Q.   I understand that.

21   A.   This goes back a few years.  The select

22           person said that they were very -- the

23           Town of Milford was very interested with

24           the Chief, wanted to talk to me about
```

1      it.  Ultimately he wanted a reference

2      from me for the entire Board of

3      Selectmen.  So he asked me some questions

4      about Tom.  I answered those questions.

5      Eventually the conversation turned to

6      some of the more controversial issues

7      that Tom had to deal with at the police

8      department, you know, dealing with the

9      rank and file union, as well as dealing

10     with some issues that had manifested in

11     inner city neighborhoods and ultimately

12     played out in the front page of the Globe

13     and various news reports.  I explained to

14     this selectman that there were issues, in

15     some respect there were legitimate

16     issues, that Tom could have done a better

17     job on some of those issues.  But in my

18     mind, contrasting the MBTA Police

19     Department's responsibilities and the

20     responsibilities within the Town of

21     Milford, there are two things:  I'm sure

22     Tom had learned from his experiences; and

23     I was confident that he wouldn't be

24     dealing with similar issues in the Town

1     of Milford.  So I think I was able to

2     give him a pretty good recommendation,

3     emphasizing the positive attributes of

4     his skill set and experience at the MBTA

5     and kind of down playing the more

6     controversial moments of his tenure.

7  Q.  But you gave your honest opinion?

8  A.  Yes, I gave my honest opinion.

9  Q.  Was that selectman Harry Mayor or Marr,

10    do you recall?

11  A.  I don't recall.

12  Q.  Do you recall if you said Tom O'Loughlin

13    was a professional, meaning that in a

14    complimentary way?

15  A.  If I said that, I wouldn't be surprised.

16  Q.  Do you recall saying Tom was "...an agent

17    of change"?

18  A.  I would not be surprised.  I would

19    describe Tom as viewing himself as an

20    agent of change.

21  Q.  But do you recall if you said that?

22  A.  No, I don't recall.  But it's certainly

23    consistent with the way I viewed Tom.

24  Q.  Okay.  Do you know if you called Tom

1       don't know if Sonny came up in that one

2       meeting or not.

3   Q.  You don't recall one way or the other?

4   A.  I don't recall.

5   Q.  Okay.  Other than the one meeting you

6       referred to --

7   A.  Like I said to you, I haven't had any

8       other independent conversations with her

9       other than that one meeting.  That's the

10      only time I met with her professionally.

11  Q.  I understand that.  Other than what may

12      have been said during that one meeting

13      when Taylor-Miller and Mahoney were also

14      present, have you ever had any

15      conversations with Anne McCall about

16      Chief O'Loughlin?

17  A.  No.

18  Q.  Have you ever had any conversations with

19      Anne McCall about whether Chief

20      O'Loughlin should teach at the MBTA

21      Police Academy?

22  A.  No.

23  Q.  To your knowledge, has anyone ever called

24      you on behalf of Anne McCall to discuss

```
 1        Anne McCall about Peixoto.
 2   Q.   Again, you don't recall if his name came
 3        up in that meeting with McCall?
 4   A.   No, I don't recall.  I don't recall
 5        having any conversations with her as
 6        general manager, or deputy general
 7        manager, for that matter.
 8   Q.   Okay.  Did you ever have any
 9        conversations with Paul Byrne in which
10        Peixoto's name was mentioned?
11   A.   He may have brought up Peixoto.
12   Q.   Do you have any recollection of that?
13   A.   No, I don't have any recollection of it.
14   Q.   So you don't know whether he did or
15        didn't?
16   A.   No, I don't.  I had a lot of
17        conversations with Paul Byrne.  Sometimes
18        he would call me from his house after he
19        had a few in him.
20   Q.   So, in other words, you would sometimes
21        get calls from Mr. Byrne when it would
22        seem to you he was intoxicated?
23             MS. LUKEY:   Objection.
24   A.   Well, maybe under the influence is a
```

1    better word.  This was during the time --

2    you know, Mr. Byrne and the union at

3    times were very critical of the Chief.

4    Now, I can understand during labor

5    negotiations, when tensions develop and

6    there are hard feelings.  I constantly

7    found myself trying to temper those,

8    trying to get him to be more respectful,

9    and to get the union to be more

10   respectful to the Chief.  I believed the

11   Chief deserved more respect than he was

12   getting from the union.  This

13   particularly became an issue after the

14   Chief announced he was leaving.  I was

15   extremely disappointed in some of the

16   behavior with the rank and file union

17   members; that rather than just let the

18   Chief go on his way and get a new start,

19   you know, they continued to take shots at

20   him.  I can remember letting Byrne know

21   that I was displeased with that and that

22   the Chief deserved better.  The reason

23   why I talked to Byrne was because he was

24   the one person I had a relationship

1     with.  As a general rule, I didn't

2     interact with members of the department.

3     I thought he was somebody of influence

4     within the department, so he might be

5     able to temper some of those public

6     criticisms and statements.

7  Q.  I understand.  I'm trying to figure out

8     what you meant when you said he would

9     sometimes call you at home and would have

10    a few in him, I think your words were.

11 A.  When things weren't going the way he

12    wanted with the negotiations, he would

13    say, "We're going to call the press, you

14    guys are out of line," that sort of

15    thing.  He tended to be more engaged

16    along those lines at night.  I couldn't

17    tell you unequivocally that he had a few

18    in him, but I noticed a difference in his

19    behavior at nighttime from during the

20    day.  He seemed to be --

21 Q.  Did you think at the time that he had had

22    a few drinks when he had called you?

23 A.  Yes, I did.

24 Q.  Okay.  That's all I'm trying to figure

```
 1         Peixoto with anyone else at the T?
 2    A.   No, I don't.  No.
 3    Q.   Okay.  Do you recall ever discussing
 4         Peixoto with any Board members?
 5    A.   Again, you know, after the accident --
 6    Q.   Prior to the accident.
 7    A.   Prior to the accident, I don't think so.
 8         I don't think so, unless it came up in
 9         the context of the Pierce Report.
10    Q.   Do you recall his name coming up at a
11         Board meeting in the context of the
12         Pierce Report?
13    A.   I'm not sure.  There was follow-up to
14         both the Pierce Report and the Task Force
15         report.  I believe Tom O'Loughlin
16         interacted with the Board, but my memory
17         isn't clear.  Peixoto's name may have
18         come up during those conversations, but I
19         don't have any recollection.
20    Q.   Do you have knowledge of whether Helder
21         Peixoto has ever filed complaints against
22         the MBTA or supervisors or co-workers at
23         the MBTA?
24    A.   Yes.
```

1   Q.   You know that he has done that?

2   A.   Yes.

3   Q.   Okay.  Did you have knowledge of that

4        prior to this particular lawsuit that you

5        are here on today?

6   A.   No.

7   Q.   So prior to -- well, do you recall when

8        you became aware of the lawsuit we are

9        here on today?

10  A.   No.  I'm sure it was when I was served.

11  Q.   Okay.  Well, just for the record, this

12       lawsuit was filed in 2004.  So is it your

13       testimony that prior to 2004, you had no

14       knowledge of any of the complaints or

15       actions Helder Peixoto had filed against

16       the T or co-workers or supervisors there?

17  A.   Well, let me say this:  I don't know if

18       there were negotiations prior to the

19       lawsuit.  I don't have a recollection --

20       my recollection is the first time I had

21       learned of matters involving Peixoto, the

22       way you described, was long after the

23       Chief had left and long after Chief

24       Carter had taken over.

1    Q.   Okay.  I didn't mean to cut you off.  Go
2         ahead.
3    A.   And it was either directly preceding this
4         lawsuit or as a result of this lawsuit.
5         That's my recollection.
6    Q.   Okay.  Let me ask you this:  Is it fair
7         to say that the first time you became
8         aware of complaints, internal or
9         external, or lawsuits filed by Peixoto,
10        is after that accident you were talking
11        about that Peixoto was involved in?
12   A.   I don't know.
13   Q.   Okay.  But it was some point after Carter
14        came in?
15   A.   Yeah.
16   Q.   Okay.  So prior to Carter coming in as
17        Chief, you had no knowledge that Peixoto
18        had filed MCAD charges against the MBTA
19        or employees at the MBTA; is that
20        correct?
21   A.   I don't think so.  I would like to
22        clarify one issue, though.
23   Q.   Yes.
24   A.   From time to time, I had to respond to

1      the MCAD as the general manager/CEO of

2      the organization.

3    Q.   Right.

4    A.   We had an attorney that would handle all

5      the interaction and correspondence with

6      the MCAD.

7    Q.   Sure.

8    A.   From time to time, she would bring down

9      and stand outside my door, because time

10     limits were involved, and she would have

11     me sign off on the T's complaints to the

12     MCAD.  So, you know, could I have signed

13     an official response to a matter

14     involving Helder Peixoto?  That might be

15     possible.  Do I remember ever doing

16     that?  No.  Do I remember any employees

17     involved in those?  The answer is no.

18   Q.   Is that Mary Lagabbo (spelled

19     phonetically) you are talking about?

20   A.   Yes.

21   Q.   When you say you had to sign off on

22     things, are you talking about something

23     called an Affirmation, something at the

24     end of an MCAD statement?

1    A.    I don't recall.  The Authority was

2          required to respond to the MCAD.  It was

3          -- she would come down with a signature

4          page and ask me to sign off on it.

5    Q.    Do you recall if above your signature it

6          would usually say something that you were

7          affirming that the information contained

8          in the Position Statement was true and

9          correct or that you believed it was true

10         and correct?

11   A.    Yeah, that sounds like a fair statement.

12   Q.    Would you actually sign that or would

13         somebody sign it for you?

14   A.    I would sign it.

15   Q.    Is it your testimony that you would sign

16         it without reading the Position

17         Statement?

18              MS. LUKEY:    Objection.

19   A.    Yes.

20   Q.    Okay.  So, again, I understand you were

21         quite busy, but you would sign those

22         Affirmations stating that the information

23         was true and correct, even though you

24         hadn't read it?

1              MS. LUKEY:   Objection.

2    A.   I would have a conversation with the

3         attorney and ask her if the investigation

4         took place; and she had my total

5         confidence.  She would affirm that, yes,

6         you know -- you know, she would give me

7         confidence that I could sign.  It was

8         that type of relationship.

9    Q.   Okay.  And based on that relationship,

10        you felt it was fine; and you would sign

11        that it was true, without having actually

12        read the Position Statement?

13             MS. LUKEY:   Objection.

14   A.   Yes.

15   Q.   Okay.  Prior to Carter coming on as

16        Chief, did you have any knowledge that

17        Peixoto -- well, strike that.

18             What is "ODCR"?  Does that mean

19        anything to you?

20   A.   Office of Diversity & Civil Rights.

21   Q.   What is that office?

22   A.   It's primary mission is to promote equal

23        opportunity and the spirit of racial

24        harmony and ethnic harmony and openness

1    Q.   Prior to this lawsuit, Mr. Mulhern, do

2         you recall seeing a document drafted by

3         Tom O'Loughlin in which he stated that

4         Anne McCall was motivated to file a

5         complaint against him because of her

6         displeasure with his refusal to

7         participate in her scheme of retaliation

8         against Sonny Peixoto?

9    A.   I don't recall any such conversation.

10   Q.   Okay.  Or seeing such a document?

11   A.   Or seeing such a document.  I don't

12        recall.

13                  (Short recess.)

14                  CONTINUING DIRECT EXAMINATION

15   BY MR. NOTIS:

16   Q.   Okay.  We are back on the record.  When

17        we started earlier today, Mr. Mulhern,

18        you mentioned a phone call you had

19        received from Paul Byrne about Tom

20        O'Loughlin teaching a SIDS course at the

21        Police Academy; is that correct?

22   A.   Yes.

23   Q.   Okay.  Let me ask you this:  When did you

24        first become aware, if you know, that Tom

1    O'Loughlin did any teaching at the MBTA
2    Police Academy?
3    A.  I think it was during that phone call.
4    Q.  You didn't know about it before that?
5    A.  Not to my knowledge.  If I did, it
6    wasn't, you know, -- no, I don't recall.
7    My recollection is, I think that Tom was
8    the one who started the Academy.  He
9    deserved a lot of credit forgetting the
10   Academy up and running.  I don't have a
11   recollection of knowing that he actually
12   taught at the Academy.
13   Q.  Prior to that phone call, did you have
14   any knowledge that Tom O'Loughlin had
15   anything to do with the SIDS --
16   A.  No.
17   Q.  You know that's an acronym for Sudden
18   Infant Death Syndrome?
19   A.  Yes.
20   Q.  Where were you when you received that
21   call?
22   A.  In my office.
23   Q.  Did someone tell you that Mr. Byrne was
24   on the phone or was he able to reach you

```
 1        directly?

 2   A.   My calls are filtered.  I'm sure my

 3        assistant said that Mr. Byrne was on the

 4        phone.

 5   Q.   Okay.  I think you had testified that you

 6        felt at that point that you had a decent

 7        working relationship with him from the

 8        negotiations you had been involved in?

 9   A.   Yes.

10   Q.   Okay.  Do you recall roughly when this

11        call was?

12   A.   Again, sometime during the fall of 2002.

13   Q.   Okay.  Tell me everything you remember

14        about that phone call, sir, in terms of

15        who said what?

16   A.   I remember picking up the phone and

17        immediately the call escalated.  Paul was

18        energized.

19   Q.   He hadn't had a few?

20   A.   No, I wouldn't say he had a few.  He

21        might have said something like, "What are

22        you people, crazy?  What are you doing?"

23        I said, "What are you talking about?"  He

24        said, "You told me to let Tom go on his
```

```
 1        way," blah, blah, blah.  "You asked me to
 2        cooperate, play ball."  Again, these are
 3        my words.  He said, "You asked me to be
 4        nice to Tom and now I find out he is
 5        teaching at the Academy."  I said, "Paul,
 6        don't be silly.  He is not teaching at
 7        the Academy."  He said, "He is teaching
 8        at the Academy."  I said, "He is not
 9        teaching at the Academy."  He said, "He
10        most certainly is."  I said, "He most
11        certainly is not.  That's preposterous."
12        We had to focus on moving forward, laying
13        the ground work for the new chief to
14        restore morale in the department, restore
15        confidence in the community, that sort of
16        thing.  I said, "We don't need a
17        distraction.  He is not teaching at the
18        Academy."  He said, "If you're telling me
19        he is not teaching at the Academy, I'll
20        accept that."  I said, "He is not
21        teaching at the Academy."
22   Q.   Was that the extent -- is there anything
23        else in that conversation involving
24        O'Loughlin for the Academy?
```

1    A.   No, I don't think so.  I think it was a

2         relatively brief conversation.  He had

3         interrupted me during the course of my

4         day.  I don't remember being at all

5         pleased with the distraction.  I think I

6         hung up the phone and called Bill

7         Flemming.

8    Q.   Okay.  I don't recall your exact words,

9         but I think you said your recollection

10        was you said to him that it was

11        preposterous that Tom would be teaching

12        at the Academy?

13    A.   Silly, preposterous.

14    Q.   Why did you feel it was silly or

15        preposterous?

16    A.   Because everything I had been doing was

17        trying to restore order in the

18        Department.  Tom was going on his way.

19        He asked for my support while he went on

20        his way; and I was as supportive as I

21        possibly could have been.  I remember

22        wanting him to get a fresh start.  I

23        remember, you know, thinking early on he

24        had become a major distraction for the

1      Department and that it was very

2      important, you know, that not only did

3      Tom get a good transition in his life and

4      get a new career as the new police chief

5      in the Town of Milford, but it was also

6      clear to me that we at the T needed to

7      take the opportunity with the new police

8      chief to restore discipline, restore

9      confidence from the community and restore

10     morale amongst the rank and file.  In my

11     mind, just from a strictly management

12     perspective, non-police perspective, from

13     where I was coming from, if he were to

14     teach in the Academy immediately after

15     his departure, that would have been a

16     huge distraction.  It would have taken

17     away from the opportunity that we were

18     now presented with to welcome in a new

19     chief and give the new chief the full and

20     undivided attention of the rank and file.

21  Q.  Okay.

22  A.  So that was my thought process.

23  Q.  Tell me this:  First of all, why did you

24     think it would be such a distraction to

1       do that, having him teach there?

2  A.  Because he had become a huge distraction

3       in the Department.  Things didn't settle

4       down until he announced he was leaving.

5       Despite our best efforts to move forward.

6  Q.  I understand that.  I guess I don't

7       understand why having him teach for a few

8       hours every few months would be such a

9       big distraction?

10           MS. LUKEY:   Objection.

11  A.  Well, having managed several units at the

12       T over the course of my career, you know,

13       at least a half dozen different units, I

14       understood the psychology of the rank and

15       file or the employees of the different

16       units; that it was important that when

17       the new boss assumed responsibility for

18       the unit, that he have the full and

19       undivided attention of the employees that

20       work for him.  You know, it's a natural

21       issue to develop during any transition

22       when there is a new boss, in this case a

23       new chief, for that individual to begin

24       to lead the department.  Sometime the

1    department might struggle with the way

2    they used to do things versus the way

3    they were going to do things in the

4    future.  Tom had become an unhealthy

5    distraction for the rank and file.  You

6    know, he became the focus of all the

7    blames, the woes of the department.  That

8    was unfair.  I thought it was best for

9    Tom and best for the department that the

10   department get a fresh start with the new

11   chief.

12   Q.  When you took Mr. Byrne's call, did you

13       know why he was calling?

14   A.  I accepted what he said.

15   Q.  No.  No.

16            MS. LUKEY:   Before you got on

17       the phone.

18   A.  Oh, no, I don't think so.

19   Q.  Okay.

20   A.  As a matter of fact, I'm sure I didn't,

21       because I picked up the phone, you know,

22       and he was energized, and I wasn't

23       expecting that.

24   Q.  Were there any outstanding contract

1      Police Academy, other than Mr. Byrne?

2   A.  It was a matter that I dealt with

3      quickly.  I don't recall talking to

4      anybody other than Mr. Byrne and Acting

5      Chief Flemming.

6   Q.  Okay.

7   A.  I don't remember having any other

8      conversations in that time frame with

9      anybody.

10  Q.  Well, have you ever spoken with Greg Lee

11     about this issue?

12  A.  I don't think so.

13  Q.  Have you ever spoken to Anne McCall about

14     this issue?

15  A.  No, I don't think so.

16  Q.  Okay.  Did you have any opinion as to

17     whether when Byrne called you, he was

18     calling you out of a dislike for Tom

19     O'Loughlin?

20            MS. LUKEY:    Objection.

21  A.  No.

22  Q.  Sir?

23  A.  No.  No.

24  Q.  At the time Byrne called you, did you

1       have any idea what it was that Tom

2       O'Loughlin was going to be teaching at

3       the MBTA Police Academy?

4   A.  I don't remember.  It may have come up.

5   Q.  But you don't recall?

6   A.  I don't recall.

7   Q.  Other than counsel, did you tell anyone

8       about your call from Mr. Byrne?

9   A.  I probably told Deputy Flemming.

10  Q.  Other than Deputy Flemming, anybody else?

11  A.  I may have told general counsel at the T

12      at some point.

13  Q.  I don't want to know about that.

14  A.  Okay.  I don't remember having a

15      conversation -- as I recall, this was a

16      matter I dealt with pretty quickly.  In

17      my mind, the resolution of the matter was

18      pretty clear.

19  Q.  Okay.  So after you spoke with Byrne, you

20      called then Chief Flemming, correct?

21  A.  Yes.

22  Q.  Tell me everything you recall about the

23      conversation with Chief Flemming?

24  A.  I said to him, "Is Tom O'Loughlin

```
 1        scheduled to teach at the Academy,"

 2        something along those lines.  Again, I'm

 3        paraphrasing.  He said, "Well, he is

 4        supposed to be teaching in January, or

 5        something like that, the end of the year

 6        -- no, it was the next class.  I said,

 7         "Bill, he can't teach.  He will be a

 8        huge distraction."  I said, "What we need

 9        to focus on now is laying the ground work

10        for the new chief."  I think at that

11        point, either I knew or it was public

12        knowledge that there was a new chief.  I

13        think at that point my recollection is

14        the decision had been made.  I don't know

15        if we were public about the decision, but

16        in my mind I was trying to contain and

17        lead the department in this leadership

18        vacuum during the interim period between

19        Tom's departure and the new chief's

20        arrival.  I said, "Listen, Bill, I think

21        it's a bad idea."  He said, "If we don't

22        let him teach, we will be sued."

23   Q.   Who said that?

24   A.   Billy said that to me.  I said, "Bill,
```

1      that's not a reason to let him teach."  I

2      said, "After the new chief gets here and

3      he wants to teach in the class after

4      that, that's the new chief's call."  I

5      said that the juncture, until the new

6      chief arrives -- I don't remember if I

7      was using Carter's name or not.  "I think

8      it would be a bad idea for the Chief to

9      teach at the Academy" is what I said.

10     That was the end of it.

11  Q. Do you recall anything else about that

12     conversation with Flemming?

13  A. No.  No.

14  Q. So you made it clear to him that Tom

15     O'Loughlin wouldn't be allowed to teach

16     at the Academy, correct?

17  A. Yes.  When I hung up the phone, in my

18     mind, the matter was resolved.

19  Q. Now, when Flemming said, "If we don't let

20     him teach, we will be sued," was there

21     any discussion between you about that?

22  A. I said, "That's crazy."  It sounded like

23     my kid in the back seat of a car when

24     somebody cuts me off saying, "Dad, sue

1      that person," you know, when they were

2      young.  It sounds to me like a totally

3      inappropriate response, given the issue

4      at hand.

5  Q.  Okay.

6  A.  I was shocked by it, to be honest with

7      you.

8  Q.  After that conversation, did you have any

9      further conversations with Chief Flemming

10     about this matter?

11 A.  I don't recall.  I don't think so.

12 Q.  All right.  After that conversation with

13     Flemming, where you made it clear that

14     Tom O'Loughlin wouldn't be teaching, did

15     you have any other conversations with

16     anyone about this matter of Tom teaching

17     prior to getting this lawsuit?

18 A.  The first time it became an issue again I

19     think was a call I got from the State

20     Representative Paul DiSoko.

21 Q.  Okay.  We will get to that in a second.

22     Did you give any further directions to

23     Chief Flemming about not having Tom

24     O'Loughlin teach?

1   A.   No, not that I recall.

2   Q.   Okay.  Did Flemming speak to you again

3       about this subject at any point?

4   A.   Not that I recall.

5   Q.   Okay.  You never spoke to Anne McCall

6       about this matter?

7   A.   No, I never spoke to Anne about this.

8   Q.   After this conversation with Byrne, you

9       never spoke to him about this again?

10   A.   I don't think so, no.

11   Q.   And you never spoke to Greg Lee about

12       this?

13   A.   No, because I told Byrne in the

14       conversation I had that he wasn't

15       teaching.

16   Q.   Okay.

17   A.   I was surprised to learn that anybody

18       thought that.

19   Q.   Okay.  Were you at all surprised by

20       Byrne's call?

21   A.   Yes.   I was surprised that he thought

22       that Tom was teaching at the Academy.

23   Q.   Were you surprised that he would call you

24       to complain about that?

A.   No.  Again, we had established some good
     will.  I asked him as a leader within the
     union to temper the behavior of the union
     and make sure that Tom got a proper send
     off, and that there would be no more
     distractions from their end or harmful
     comments to Tom's career.  I thought it
     was extremely important that the union
     control their rhetoric, because at that
     point, if they were making comments, it
     was personal and far beyond anything that
     would be considered a professional
     endeavor on their part.

Q.   In your conversation with Flemming, did
     you tell him of Byrne's call?

A.   I probably did, yes.

Q.   Do you recall doing that?

A.   No, but I think it's logical.  I mean, I
     would have had a reason for calling him.
     I remember calling him immediately after
     I hung up the phone.

Q.   At the time that you had this
     conversation with Byrne, were you aware
     that Tom O'Loughlin was planning on

1          giving testimony favorable to Sonny

2          Peixoto in any legal press briefings?

3     A.   No.

4     Q.   What relationship, if any, did what Chief

5          O'Loughlin told you about Sonny being

6          retaliated play in your decision to let

7          him teach?

8     A.   I don't believe the Chief ever told me

9          that.

10    Q.   Did you acknowledge it otherwise?

11    A.   No.  He was the chief.  He had complete

12         authority over the department.

13    Q.   In the call you received from Byrne, was

14         there any expressed or implied threat to

15         you or the T that if you didn't prevent

16         Tom from teaching, the union would take

17         action?

18    A.   No.  He was calling me on my request to

19         him to get out of the media, stop the

20         rhetoric against Tom.  He said, you asked

21         us -- these are my words.  You asked us

22         to behave ourselves.  We are behaving

23         ourselves, and now we find out -- the

24         tone of the conversation was he took it

```
 1        as a betrayal that the Chief was now

 2        teaching.  That's the way I would

 3        describe it.  He viewed it as a betrayal

 4        on our part to allow the Chief to teach,

 5        whereas they had done their best, you

 6        know, to tone down the media attacks,

 7        tone down criticism of Tom.  So that's

 8        the way it was presented to me, that he

 9        was calling me on it.

10   Q.   Do you have any knowledge as to whether

11        Anne McCall and Mr. Byrne spoke about

12        this matter before Byrne called you?

13   A.   No.  No.

14   Q.   Do you have any knowledge as to whether

15        Anne McCall had feelings about Tom

16        O'Loughlin teaching at the Police

17        Academy?

18   A.   No.

19   Q.   At the time that you had this

20        conversation with Paul Byrne and you

21        instructed Chief Flemming that Tom was

22        not to teach at the Academy, were you

23        aware that Helder Peixoto had filed

24        various complaints and charges against
```

1       the MBTA?

2  A.   No.

3  Q.   Did Anne McCall play any role in your

4       decision not to allow Chief O'Loughlin to

5       teach at the Academy?

6  A.   She was totally irrelevant to my

7       decision.

8  Q.   She didn't play any role in that

9       decision?

10 A.   Not in my decision.

11 Q.   Do you know if she played a role in

12      anyone else's decision about this?

13               MS. LUKEY:    Objection.

14 A.   I made the decision.  She didn't play any

15      role that I know of.  She had no role at

16      all.

17 Q.   Okay.  At the time you made this

18      decision, did you have any knowledge or

19      reason to believe that Tom O'Loughlin

20      might be providing testimony or evidence

21      against Anne McCall in any proceeding?

22 A.   No.

23               MR. NOTIS:    Why don't we mark

24      this.

```
 1              (Exhibit 1, marked for
 2      identification.)
 3   Q.  Let me show you what has been marked as
 4      Exhibit 1 in this deposition,
 5      Mr. Mulhern.  Can you identify that
 6      document for me, please?
 7   A.  Can I take a minute to read it?
 8   Q.  Take as much time as you want.
 9              MS. LUKEY:   I gather you are
10      not asking him to identify it in a sense
11      of this is a letter by Mr. Notis?  You
12      are asking him if he has seen it before?
13              MR. NOTIS:   I'll get to that.
14      I just want him to state for the record
15      what it is.
16              MS. LUKEY:   Well, I just did
17      that.
18              MR. NOTIS:   He hasn't
19      answered.
20   A.  It's a letter addressed to an attorney at
21      Morgan, Brown & Joy from you, Mitchell J.
22      Notis, concerning Helder Peixoto versus
23      the MBTA and Anne McCall.
24   Q.  What is the date of the letter?
```

1    A.    October 29, 2002.

2    Q.    Have you seen that letter before today?

3    A.    I don't think so.

4    Q.    Okay.  Have you seen any copies of that

5          document before today, whether or not

6          they had this fax stamp on top?

7          (Indicating.)

8    A.    No, not that I recall.  I don't remember

9          seeing this document.

10   Q.    Okay.  Prior to receiving the Complaint

11         in this lawsuit, did you realize that Tom

12         O'Loughlin felt that Sonny Peixoto had

13         been treated unfairly in any way?

14   A.    Excuse me?

15   Q.    Prior to receiving the Complaint in this

16         lawsuit, did you realize that Chief

17         O'Loughlin felt Sonny Peixoto had been

18         treated unfairly by the MBTA in any way?

19   A.    No.

20   Q.    In 2002, how frequently would you meet

21         with Bill Mitchell?

22   A.    I met with Bill Mitchell constantly.  I

23         met with him almost daily.

24   Q.    Okay.  Did you ever speak with Tom

1    paraphrasing.

2  Q.  Do you recall anything else about that

3       conversation?

4  A.  No, not right now I don't.

5  Q.  Was there any discussion between you and

6       Chief O'Loughlin about Anne McCall having

7       cancelled his teaching previously?

8  A.  I didn't know that she had previously

9       cancelled his teaching.

10  Q.  Was there any discussion between you and

11       Chief O'Loughlin about that?

12  A.  He may have thought -- I think I had to

13       clarify for him who made the decision.  I

14       think I had to clarify that I made the

15       decision.  He thought it might have been

16       Anne McCall.  She was totally irrelevant

17       to my decision making.

18  Q.  Was there any discussion between you and

19       Chief O'Loughlin as to whether Anne

20       McCall was somehow retaliating against

21       him?

22  A.  There may have been.  Again, I do

23       remember confusion on his part.  He may

24       have thought somebody other than me was

1  responsible for the decision, when in

2  fact I was totally responsible for it.

3  Q.  Did you tell him that you had received a

4  call from Mr. Byrne?

5  A.  I wouldn't be surprised if I did.  That's

6  a fact.

7  Q.  Did he suggest to you that Anne McCall

8  must have put Byrne up to calling you?

9  A.  I wouldn't be surprised if he did.

10 Q.  Would you have any knowledge of that?

11 A.  I don't recall it, but I wouldn't be

12 surprised.  You know, like I said

13 earlier, the two did not like each other,

14 McCall or O'Loughlin.  As I stated, you

15 know, it was clear from my mind that they

16 didn't like each other.

17 Q.  So it wouldn't surprise you if Byrne had

18 been put up to calling you by Ms. McCall?

19       MS. LUKEY:    Objection.

20 A.  I would have no way of knowing one way or

21 the other.  If you are suggesting that

22 they were close, I didn't realize that

23 they were close.

24 Q.  Did you know -- strike that.  When you

# EXHIBIT D

Page 1

```
 1                    Volume:   I

 2                    Pages:    1 - 193

 3                    Exhibits: 1 - 8

 4       UNITED STATES DISTRICT COURT

 5         DISTRICT OF MASSACHUSETTS

 6   -------------------------------------x

 7   THOMAS J. O'LOUGHLIN,

 8            Plaintiff,

 9       v.              C.A. No. 04-10257 MEL

10   MASSACHUSETTS BAY

11   TRANSPORTATION AUTHORITY,

12       and

13   ANNE MCCALL,

14       and

15   MICHAEL MULHERN,

16            Defendants.        ORIGINAL

17   -------------------------------------x

18        DEPOSITION of THOMAS J. O'LOUGHLIN, a

19   witness called for examination by the

20   Defendants, taken pursuant to Rule 30 of the

21   Massachusetts Rules of Civil Procedure, before

22   Laurie K. Langer, Registered Professional

23   Reporter and Notary Public in and for the

24   Commonwealth of Massachusetts, at the offices of
```

Page 2

1    Wilmer Hale, 60 State Street, Boston,

2    Massachusetts, on Wednesday, September 27, 2006,

3    commencing at 10:00 a.m.

4

5    APPEARANCES

6

7        LAW OFFICES OF MITCHELL NOTIS

8        By Mitchell J. Notis, Esq.

9        370 Washington Street

10       Brookline, Massachusetts 02445

11       (617) 566-2700

12       For the Plaintiff

13

14        WILMER CUTLER PICKERING HALE AND DORR LLP

15       By Joan A. Lukey, Esq.

16       Gregory M. Reiser, Esq.

17       60 State Street

18       Boston, Massachusetts 02109

19       (617) 526-6527

20       For the Defendants

21

22

23

24

Page 3

```
 1                    INDEX

 2   ATTORNEY           EXAMINATION   CROSS      REDIRECT

 3   Ms. Lukey          4

 4   EXHIBIT                                     PAGE

 5   1   Employment Agreement                    24

 6   2   Separation Agreement                    26

 7   3   Defendants' First Request for

 8   Production of Documents to Plaintiff

 9   Thomas J. O'Loughlin                        40

10   4   2/23/00 Letter to Chief O'Loughlin      42

11   5   1/7/03 E-mail to obchief@vineyard.net   49

12   6   1/13/03 Letter to Congressman Neal      72

13   7   Calendar for Chief                      107

14   8   10/29/02 Letter to Mr. Manousos         166

15

16

17

18

19

20

21

22

23

24
```

Page 4

```
 1                    P R O C E E D I N G S

 2

 3               THOMAS J. O'LOUGHLIN,

 4      having been satisfactorily identified by the

 5      production of his driver's license, and duly

 6      sworn by the Notary Public, was examined and

 7      testified as follows:

 8

 9          MS. LUKEY:  I propose we reserve all

10      objections, except as to form, and reserve

11      motions to strike until the time of trial.

12              MR. NOTIS:  That's acceptable.

13          MS. LUKEY:  And the witness will read and

14      correct and sign, but we waive the necessity of

15      a notary public.

16              MR. NOTIS:  That's also acceptable.

17          MS. LUKEY:  Thank you.

18

19                       EXAMINATION

20

21      BY MS. LUKEY:

22      Q.  Good morning to you.

23      A.  Good morning.

24      Q.  Can you state your full name, please.
```

| | | |
|---|---|---|
| 1 | A. | My name is Thomas J. O'Loughlin.  That's |
| 2 | | O-'-L-o-u-g-h-l-i-n. |
| 3 | Q. | What is your current residential address? |
| 4 | A. | Number 25 Holly, H-o-l-l-y, Lane, Holliston, |
| 5 | | Mass. 01746. |
| 6 | Q. | And for how long have you resided at that |
| 7 | | address? |
| 8 | A. | Since 1982. |
| 9 | Q. | Do you have any present plans to relocate? |
| 10 | A. | I am looking at a piece of property. |
| 11 | Q. | Can you give us some idea where?  This is just |
| 12 | | for purposes of finding you if it becomes |
| 13 | | necessary at some future date. |
| 14 | A. | In Milford.  But I can be found at the Milford |
| 15 | | Police Department, 250 Main Street, Milford, |
| 16 | | Mass. 01757. |
| 17 | Q. | Would you tell us what your position is there, |
| 18 | | please. |
| 19 | A. | I'm the chief of police. |
| 20 | Q. | And for how long have you been the Milford chief |
| 21 | | of police? |
| 22 | A. | Just over four years. |
| 23 | Q. | And in a moment I'm going to ask you to run |
| 24 | | through your employment history with us but |

Page 6

```
 1        first let me ask you where and when you

 2        graduated from high school.

 3   A.   I graduated from Brighton High School in the

 4        City of Boston in 1973.

 5   Q.   Did you have any formal education after that?

 6   A.   I attended Bunker Hill Community College for two

 7        years in Charlestown, Massachusetts; I attended

 8        Boston State College for three years in Boston,

 9        Massachusetts and received my Associate's and

10        then my Bachelor's.  From 1986 to 1990 I

11        attended New England School of Law and received

12        my JD.

13   Q.   From Bunker Hill is that where you received your

14        Associate's degree?

15   A.   That's correct.

16   Q.   In what year?

17   A.   1975.

18   Q.   Do you recall whether you had any academic

19        honors at that institution?

20   A.   The Dean's list, things of that kind, yes.

21   Q.   And Boston State, did you receive a BA or a BS?

22   A.   BS.

23   Q.   And do you remember in what year?

24   A.   It was, I believe it was 1978.
```

1    Q.    Okay.  And then you indicated that you attended

2          law school, was it New England School of Law?

3    A.    That's correct.

4    Q.    From '86 to '90.  Is that why you were also

5          working, so you were attending school at night?

6    A.    That's correct.

7    Q.    And you received your JD in 1990; is that

8          correct?

9    A.    That's correct.

10    Q.    Do you recall whether you received academic

11          honors while at Boston State?

12    A.    I believe I did.

13    Q.    And what were they?

14    A.    Dean's list.

15    Q.    Did you receive any academic honors at New

16          England School of Law?

17    A.    Likewise, Dean's list.

18    Q.    Are you currently married?

19    A.    No, I'm divorced.

20    Q.    Have you previously been married?

21    A.    Yes.

22    Q.    Once or more than once?

23    A.    Once.

24    Q.    During what years were you married?

Page 8

```
 1    A.    1988 to 2000 -- I'm trying to place in my head

 2          when it went through.  2004.

 3    Q.    Do you have children?

 4    A.    Yes, I do.

 5    Q.    And could you tell us their ages.

 6    A.    Three children.  My son Tom is 16 years of age;

 7          my second son Michael is deceased and my third

 8          son Kevin is 12 years of age.

 9    Q.    Normally I would not ask questions of this

10          nature but it bears on the allegations

11          concerning Sudden Infant Death Syndrome so I

12          apologize for having to go there.

13    A.    Thank you.

14    Q.    I take it that Michael passed away from S-I-D-S

15          or SIDS?

16    A.    That's correct.

17    Q.    In what year was that?

18    A.    1992.

19    Q.    Do you recall how old he was at the time?

20    A.    Three and a half months.

21    Q.    As a result of that experience with Michael did

22          you undertake any training that related to what

23          I'll call SIDS or Sudden Infant Death Syndrome?

24          In other words, did you yourself take courses in
```