1      SIDS-related matters?

2  A.  No, not specific courses.  I, you know, as far

3      as reviewing materials, medical information and

4      materials online and then I was provided with

5      information from the Massachusetts SIDS Center

6      which is located at the Boston Medical Center.

7      That's it.

8  Q.  Were these materials that you requested after

9      Michael's death so you could better understand

10     what had happened?

11  A.  That's correct.  The SIDS Center had contacted

12     us, they were notified by the Medical Examiner

13     and then subsequently just research on my own as

14     well as, you know, looking at materials and

15     having discussions with professionals that are

16     engaged in research related to SIDS.

17  Q.  Did there come a time when you began to teach

18     courses or seminars that related to SIDS?

19  A.  Yes.

20  Q.  Do you recall when you first did so?

21  A.  I believe it was 1993.

22  Q.  And in what setting did you do so?

23  A.  The training was related to police recruits and

24     police investigators.

Page 10

1   Q.   Where was it?

2   A.   Well, various police academies in the

3        Commonwealth.  They're situated throughout the

4        Commonwealth as well as the District Attorney's

5        Offices.

6   Q.   So it was more than one location; you were

7        moving around?

8   A.   Oh, correct.  Yes.

9   Q.   Okay.  Can you tell us in 1993 with what

10       frequency you were teaching these courses?  That

11       is was it something like a monthly occurrence or

12       every two or three months?

13  A.   On average I would teach eight to twelve academy

14       classes.

15  Q.   Per year?

16  A.   Within a year.

17  Q.   Okay.  And those are police academy classes?

18  A.   That's correct.  And that was initially.  And

19       the District Attorney's Offices I did some of

20       them and Mary McClain from the SIDS Center did

21       the others.

22  Q.   And to the best of your memory how many district

23       attorney classes were you doing at that time

24       when you initially started?

1   A.   I remember I went in and did some training with

2        Middlesex, Suffolk, Norfolk, Plymouth and I

3        believe Mary did the others.

4   Q.   By whom were you employed at the time when you

5        started doing SIDS training?

6   A.   I was the chief of police in the Town of

7        Wellesley.

8   Q.   Were you paid for these classes or teaching

9        these classes?

10  A.   I was -- well, I was paid by the Town of

11       Wellesley because I was on my work schedule.

12  Q.   I see.  So during the period that you were doing

13       these classes while you were the chief in

14       Wellesley you were permitted to take time from

15       your job to travel to the police academies or

16       the D.A.'s offices to do this training?

17  A.   Right.  To provide training to public safety

18       personnel.  Law enforcement personnel, yes.

19  Q.   Did the Town of Wellesley pay you anything extra

20       for doing these classes?

21  A.   No, they paid me my hourly wage.

22  Q.   Were you in fact on an hourly basis rather than

23       a weekly salary?

24  A.   I was on a salary but I got paid my week's pay

1           and that was part of my week's work.

2    Q.    Forgive me for not knowing how the structure

3          works for a police department, --

4    A.    That's okay.

5    Q.    -- but if you worked more than 40 hours in a

6          week, which I assume you did, --

7    A.    Uh-huh.

8    Q.    -- were you paid more or were you a strict

9          exempt salary?

10   A.    No, I was a strict salaried employee.

11   Q.    So any compensation that you received in the

12         time period that you were employed in the Town

13         of Wellesley -- is it town or city --

14   A.    Town of Wellesley.

15   Q.    -- to do SIDS training was part of your regular

16         compensation?

17   A.    Correct.

18   Q.    Did there come a time -- let me ask you this

19         way.

20              What were the years when you were serving

21         as the chief of police in Wellesley?

22   A.    1992 to 1997.

23   Q.    Now, with regard to the time period from 1993

24         when you started teaching the SIDS courses until

Page 13

1       1997, was it always the case that your SIDS

2       training was encompassed in your regular salary

3       compensation?  That is you were never paid

4       anything extra for teaching those classes?

5   A.   I believe so.

6   Q.   And did the frequency with which you taught stay

7       constant in that time period?

8   A.   The number of academy classes actually

9       increased, I believe, when they, the course was

10      piloted in a number of academies and then was

11      merged into the core curriculum as a required

12      course of study and also the number of academy

13      classes increased during the time when the

14      federal government was providing funding to

15      communities to hire police officers, so there

16      was a frequency that increased and now I've

17      probably taught this year in a dozen academies.

18   Q.   Looking at the period between 1993 and 1997, was

19      it a gradual increase in the number of classes

20      or did it happen in one given year?

21   A.   There was a gradual increase over that short

22      period of time, '93, '94, and then it was every

23      academy class that was held in the Commonwealth.

24   Q.   When did it start being every academy class?

Page 14

1   A.   I believe it was '94.

2   Q.   And for how long did that continue?

3   A.   To today.

4   Q.   So how many times a year would it now involve?

5   A.   My sense is I've taught a dozen or more academy

6       classes this year.

7   Q.   Will you have more before the end of the

8       calendar year?

9   A.   Yes, I have one this Friday, the Boston Police

10      Department.

11  Q.   If we look at the calendar years now during the

12      time period that you've been teaching this

13      course for all of the academies, would it be

14      something in excess of a dozen times a year?

15  A.   Yes.

16  Q.   And how about the D.A. programs, have those gone

17      up?

18  A.   The D.A.'s program was a, really just a one-time

19      thing to go in and work with the investigators,

20      the state police and local investigators

21      assigned to the District Attorney's Office.  The

22      goal of the training for police officers was to

23      capture officers as they were entering the

24      police service.  Simply you were able to

1        interface with more officers over a period of

2        time.

3  Q.   Okay.  From somewhere around 1994 through the

4        present has it consistently been the case that

5        you have taught more than 12 times a year either

6        in police academies or in D.A. programs with

7        regard to the SIDS classes?

8  A.   I believe so.

9  Q.   Now, after you left Wellesley in 1997 what was

10       your next position?

11  A.   I was the police chief at the MBTA.

12  Q.   And could you give us your best memory of when

13       in 1997 you began that job?

14  A.   I believe it was October.

15  Q.   And when did you leave that job?

16  A.   I believe it was August.  And I remained on the

17       payroll using leave time until October.

18  Q.   Of which year?

19  A.   Of 2002.

20  Q.   Now, during the time period that you were

21       employed by the MBTA, and you were the chief; is

22       that correct?

23  A.   That's correct.

24  Q.   During that time period from October of 1997

| | | |
|---|---|---|
| 1 | | until you formally went off payroll in October |
| 2 | | of 2002, were you continuing to teach SIDS |
| 3 | | classes at the police academy a dozen or more |
| 4 | | times a year? |
| 5 | A. | Yes. |
| 6 | Q. | Was there any change in the frequency during |
| 7 | | that time period as compared to the last year or |
| 8 | | two at Wellesley? |
| 9 | A. | No.  I don't believe so. |
| 10 | Q. | Now, during the time period when you were |
| 11 | | employed by the MBTA and were teaching these |
| 12 | | classes were you paid for teaching the classes |
| 13 | | other than as part of your regular salary for |
| 14 | | the MBTA? |
| 15 | A. | No, because I was receiving my salary from the |
| 16 | | MBTA, no, I did not take any other compensation. |
| 17 | Q. | And at the MBTA, as the Town of Wellesley, were |
| 18 | | you a salaried employee who did not receive |
| 19 | | hourly pay or overtime? |
| 20 | A. | That's correct. |
| 21 | Q. | So if I understand correctly then, through at |
| 22 | | least the time that you departed from the MBTA |
| 23 | | in or about October of 2002 you continued to |
| 24 | | receive no separate payment regarding the SIDS |

1          classes but rather that payment was subsumed

2          within your regular salary; is that right?

3   A.   That's correct.

4   Q.   Now, once you actually stopped working at the

5          MBTA in or about August of 2002 when did you

6          first work somewhere else?

7   A.   When I left the MBTA in August I was appointed

8          as the police chief in the Town of Milford.

9   Q.   What month were you appointed?

10   A.   July.

11   Q.   So --

12   A.   I believe it was July.

13   Q.   So you were appointed to become the chief --

14   A.   That's correct.

15   Q.   -- where you actually arrived?

16   A.   That's correct.

17   Q.   And when did you actually assume your

18          responsibilities as the Milford police chief?

19   A.   In August.

20   Q.   So there was a brief period of time when you

21          were still on the MBTA payroll but also on the

22          Milford payroll?

23   A.   That's correct.

24   Q.   And have you consistently remained as police

Page 18

1      chief in Milford from August of 2002 through the

2      present?

3   A.   Yes.

4   Q.   And during that time period has the frequency

5      with which you've taught the SIDS classes

6      remained the same?

7   A.   Yes.

8   Q.   And during that time period have you also been

9      on a salaried basis so you don't receive hourly

10      pay or overtime?

11   A.   That's correct.

12   Q.   And during that time period were you paid

13      separately for teaching the SIDS classes or

14      simply was that part of your salary

15      compensation?

16   A.   No, I didn't submit the vouchers to the training

17      counsel to be paid separately.

18   Q.   Were there vouchers you could have submitted?

19   A.   On every one of these courses, yes.

20   Q.   So throughout the time period when you started

21      in 1993 you were handed a voucher after each of

22      these classes which you could have submitted for

23      payment?

24   A.   That's correct.

Page 19

1    Q.    And to whom were those vouchers addressed, that

2          is who would have been paying you had you chosen

3          to submit them?

4    A.    When I taught in the academies that are managed

5          and administered by the Police Training Council

6          they would have been paid by the Commonwealth of

7          Massachusetts.  When I taught at the MBTA police

8          academy they would have been paid by the MBTA.

9          When I taught at the Lowell police academy they

10         would have been paid by the City of Lowell.

11         When I taught at the Boston police academy they

12         would have been paid by the City of Boston.

13   Q.    Were these vouchers all in the same amount or

14         did they vary?

15   A.    No, there was an established rate of, an hourly

16         rate that's established by the Police Training

17         Council.

18   Q.    What is that if you recall?

19   A.    I believe it's $35 an hour.

20   Q.    How long are these classes, each of these

21         classes?

22   A.    Four hours.

23   Q.    So you would receive a voucher in each instance

24         for four hours at approximately $35 an hour?

Page 20

1  A.  Correct.

2  Q.  But you never submitted them?

3  A.  Correct.

4  Q.  And can you tell us why you did not submit the

5      vouchers?

6  A.  Because I didn't use leave time at my place of

7      employment and that would be double dipping, it

8      would be contrary to law.

9  Q.  So you were performing a function that was

10      related to your job as chief in Wellesley and

11      then at the MBTA and then at Milford?

12  A.  Correct.  And I elected not to use leave time

13      during the time that I was teaching, so it would

14      have put me in a conflict with the law as far as

15      receiving double payment for the same time for

16      services.

17  Q.  Since I'm not familiar with this area let me be

18      sure I understand.  Your options were either to

19      take leave from your job and have the salary

20      reflect that leave had been taken and in which

21      case you would cash the vouchers, or take no

22      leave and refrain from cashing the vouchers?

23  A.  That's correct.

24  Q.  And when you were with the MBTA I gather from

1       something you said a moment ago that in addition

2       to the police academy classes and any D.A.'s

3       programs you did also teach at some MBTA

4       facilities; is that correct?

5  A.   At the MBTA police academy.

6  Q.   Where is that located?

7  A.   Quincy.

8  Q.   During your tenure with the MBTA with what

9       frequency did you teach the SIDS class

10      specifically at the MBTA police academy?

11  A.   Three to four times a year.

12  Q.   When you added those responsibilities three to

13      four times a year at the MBTA police academy,

14      did you reduce the frequency with which you

15      taught at the Massachusetts police academy

16      classes or the other town police academies?

17  A.   No.

18  Q.   So the MBTA classes were an add on to what you

19      were already doing; is that correct?

20  A.   That's correct.

21  Q.   And as of the present time I gather from

22      something you said a moment ago you continue to

23      actively teach SIDS classes; right?

24  A.   That's correct.

Page 22

1   Q.   Okay.  And let me go through a little bit

2         something I jumped right over which is your

3         early employment history.  Once you completed

4         your B.S. degree at Boston State in 1978 what

5         was your first employment?

6   A.   It was just prior to that I went to work for the

7         Boston school department as a police officer.  I

8         was only there for about nine months and I

9         received a position with the Boston Housing

10        Authority as an investigator.  Subsequently we

11        too received police authority.  I worked at the

12        Boston Housing Authority from 1978 to 1986.

13        When I left the Housing Authority I was at the

14        rank of superintendent, so I oversaw the

15        officers that worked in the public housing

16        developments in Boston.

17            I went to the Town of Wayland as the police

18        chief in 1986 and served until 1992 when I went

19        to the Town of Wellesley as the police chief.

20   Q.   And what caused you to leave the Town of Wayland

21        to go to the Town of Wellesley?

22   A.   Opportunity, challenge.  Opportunity.

23   Q.   Was it higher compensation?

24   A.   It was a little more.

Page 23

 1   Q.   Was Wellesley or is Wellesley a larger town?

 2   A.   Yes, most certainly.

 3   Q.   And then from Wellesley did you leave directly

 4        to go to the MBTA?

 5   A.   That's correct.

 6   Q.   And why did you leave Wellesley?

 7   A.   That's a good question.  I was approached by the

 8        Secretary of Transportation and initially he had

 9        offered me the position and I declined.  They

10        came back and spoke with me again and again I

11        saw it as an opportunity, a challenge, and I

12        accepted the position.

13   Q.   And who was the secretary at that time?

14   A.   Patrick Moynihan.

15   Q.   Do you -- did you know Mr. Moynihan?

16   A.   Yes, I did.

17   Q.   How?

18   A.   I had known Patrick Moynihan from the Town of

19        Natick, I'm trying to think of the year.

20   Q.   You can just give us a rough estimate.

21   A.   As far back as the '70s, the late '70s I had

22        known him.

23   Q.   Did you have any relatives by blood or marriage

24        who worked at the MBTA at the time that you were

1        approached?

2    A.   Yes.

3    Q.   Could you tell us who those were, please?

4    A.   My cousin Frank O'Loughlin was a lieutenant and

5         his wife Nancy O'Loughlin was also a lieutenant.

6    Q.   Whom were you succeeding as police chief?

7    A.   John O'Donovan.

8    Q.   Did you know Mr. O'Donovan?

9    A.   For a long, long time.

10   Q.   And do you know what the circumstances were of

11        Mr. O'Donovan's departure; was it a retirement,

12        was he asked to leave?

13   A.   I thought he was retiring.  He had retired from

14        the state police and I thought that he was, he

15        left on his own.

16   Q.   I'm not suggesting to the contrary, I'm asking

17        you.

18   A.   That's all I know.  Yeah -- no.

19   Q.   Do you remember when you joined the MBTA whether

20        you signed an employment agreement?

21   A.   Yes, I did.

22   Q.   Okay.

23           MS. LUKEY:  Let me mark that as Exhibit 1.

24           (Deposition Exhibit 1 marked for

1       identification.)

2   Q.   If you could take a look at Exhibit 1, please,

3        Chief, and just tell us whether that is the

4        employment agreement that you signed upon

5        joining the MBTA.

6   A.   Yes, it is.

7   Q.   Is that your -- is that a copy of your signature

8        that appears on the right-hand side of the last

9        page?

10  A.   Yes, it is.

11  Q.   Was this the only written agreement that you

12       entered into with the MBTA relating to the terms

13       of your employment?

14  A.   No.

15  Q.   What other written agreements did you enter into

16       with them regarding the terms of your

17       employment?

18  A.   I believe there was an agreement that was

19       entered into in August of 2002 as I was leaving

20       the MBTA.

21  Q.   A separation agreement?

22  A.   I wouldn't use the term separation.  I think it

23       was a Memorandum of Understanding.

24  Q.   We'll come to that one in a moment.  That

1      agreement dealt with your departure; is that

2      right?

3   A.    Right.  That's the only other document I signed

4         with the MBTA.

5   Q.    That's all I'm trying to find out to make sure I

6         have the universe of documents.  And I will show

7         you what I think is the one that you're

8         referring to and then we can determine whether

9         that's everything.

10            (Deposition Exhibit 2 marked for

11         identification.)

12  Q.    If you could take a look at Exhibit 2 which is

13         entitled Separation Agreement for and Between

14         Thomas J O'Loughlin and the Massachusetts Bay

15         Transportation Authority and tell us whether

16         that is the agreement to which you were just

17         making reference?

18  A.    That's correct.

19  Q.    And is that your signature which appears on the

20         second page on the right-hand side?

21  A.    Yes, it is.

22  Q.    And as to both of these documents, Exhibits 1

23         and 2, did you read them before you signed them?

24  A.    Yes, I did.

1    Q.    Did you read it carefully before you signed it?

2    A.    I read it.

3    Q.    Did you understand it?

4    A.    I believe so.

5    Q.    Now, you've told us that you resigned in August

6          of 2002 but went off the payroll a few months

7          later; what was it that caused you to resign in

8          August of 2002?

9    A.    I was going to work in the Town of Milford.

10   Q.    So you had accepted another offer?

11   A.    Correct.

12   Q.    Was there any reason that you wanted to leave

13         the MBTA or was it just that you had a better

14         opportunity in Milford?

15   A.    Well, I had the position in Milford so that's

16         why I was leaving the MBTA.

17   Q.    Let me back up a moment then and ask you how it

18         is that you came to have accepted a position in

19         Milford while you were employed by the MBTA?

20   A.    I submitted a resume to them and went through

21         the selection process and they tendered an offer

22         of a position.

23   Q.    Why did you submit a resume?  Let me back off

24         that, it could be interpreted multiple ways.

Page 29

1      Were you looking to leave the MBTA in 2002?

2  A.   Yes.

3  Q.   What caused you to wish to leave the MBTA?

4  A.   The Secretary of Transportation had taken the

5      position that he was not going to issue

6      contracts to senior staff with the exception of

7      general counsel and the general manager and

8      those were conditions that I personally wasn't

9      willing to work under.

10  Q.   Was it the case that at the time you decided to

11      look elsewhere your existing employment

12      agreement, Exhibit 1, was running out, that is

13      the term was ending?

14  A.   It would have ended in October of that year,

15      that's correct.

16  Q.   And is it the case that you were not willing to

17      continue working at the MBTA without a contract?

18  A.   Oh, no, I was, I was offered that I would stay

19      working at the MBTA without a contract.

20  Q.   You offered that?

21  A.   No, they offered to me.  The Secretary of

22      Transportation sent me a letter saying I would

23      continue in my employment as other senior

24      managers do without a contract.

Page 30

1   Q.   What I was trying to understand is whether it

2       was unacceptable to you to continue working

3       without a contract?

4   A.   No, I would have continued working, I have

5       children to take care of.  So that wasn't the

6       question.  The question was in the long term was

7       I going to look at other positions, absolutely.

8   Q.   So you would have continued without a contract

9       at the MBTA if you didn't find a suitable

10      alternative position, but it was your preference

11      to go somewhere where you had a contract; is

12      that right?

13  A.   That's correct.

14  Q.   Were you given a contract at Milford?

15  A.   Yes, I was.

16  Q.   And is it the case that you voluntarily made the

17      decision to leave the MBTA?

18  A.   Absolutely.

19  Q.   And it would not be fair or accurate to say that

20      you were pushed out in any way; is that right?

21  A.   Absolutely.

22  Q.   So of your own volition you determined that you

23      were going to look for other law enforcement

24      positions where you could be provided with an

1           employment contract; is that correct?

2    A.    And other conditions that were acceptable to me,

3           yes.

4    Q.    And you found such a position in the Town of

5           Milford?

6    A.    Yes, I did.

7    Q.    Now with regard to your separation agreement,

8           did you negotiate the terms of that with

9           someone?

10   A.    I believe I had discussions with Bill Mitchell,

11          the general counsel at the MBTA.

12   Q.    Do you recall whether you were represented by

13          counsel yourself?

14   A.    No, I was not.

15   Q.    Did you propose that you be given a separation

16          agreement or did the MBTA propose that the

17          separation agreement be entered into once you

18          had made the decision that you were going to

19          leave?

20   A.    I believe I approached them.

21   Q.    Was there a reason that you wanted to have a

22          written agreement setting forth the terms of

23          your departure?

24   A.    Yes, to protect my personal interests.

Page 39

```
 1            MS. LUKEY:  At any point between August of

 2        2002 and the present.

 3    A.   I don't have a present memory.  My memory is

 4        telling me yes, but I can't cite a specific

 5        case.

 6    Q.   Have you been called as a witness in litigation

 7        commenced by your cousin's wife, Nancy

 8        O'Loughlin?

 9    A.   I was, I was at the deposition of Prince

10        Labelle.

11    Q.   Was that deposition being taken by the MBTA?

12    A.   I honestly don't know who was taking the

13        deposition.

14    Q.   Other than the funds which you received from

15        your accumulated leave time between August and

16        October have you received any compensation from

17        the MBTA for any services of any kind?

18    A.   No.

19    Q.   Now, we've already discussed that Exhibits 1 and

20        2 represent the only agreements you ever entered

21        into with the MBTA regarding your employment; is

22        that right?

23    A.   I believe so.

24    Q.   Do you recall in this litigation which you
```

Page 42

1           MR. NOTIS:  Excuse us for one second.

2    A.   (Attorney/client conference.)

3           (Deposition Exhibit 4 marked for

4    identification.)

5           MS. LUKEY:  Note the consultation.

6    A.   (Attorney/client conference.)

7    Q.   If you look at Exhibit 4, the letter from Alison

8         Taylor to you dated February 23, 2000, is this

9         the only document that you had in your

10        possession, custody or control that was

11        responsive to request number 2 dealing with your

12        SIDS training classes?

13   A.   Dealing with the terms and conditions of

14        employment to teach the SIDS classes?

15   Q.   Right.

16   A.   I believe so.  I'm not sure if my employment

17        contract makes mention of me teaching, but I

18        don't believe it mentions specifically the SIDS.

19   Q.   Would you take a look at Exhibit 1 as you're

20        doing now and tell us whether there's any

21        reference to training SIDS classes in Exhibit 1,

22        your employment agreement?

23   A.   I don't see it specifically mentioned.

24   Q.   Turning then again to Exhibit 4 which was Alison

Page 43

1   Taylor's letter to you, based upon your review

2   of your files this is the only document in your

3   possession, custody or control that relates to

4   the terms and conditions of your teaching SIDS

5   classes while at the MBTA; is that right?

6 A.  Correct.

7 Q.  Now, Miss Taylor's letter refers to the need for

8   a current contract with the Massachusetts

9   Criminal Justice and the enclosure appears to be

10   that contract.  Can you tell us what you

11   understood the purpose of this contract to be?

12 A.  The Criminal Justice, now the Police Training

13   Council, contracts with individuals to teach

14   courses in the police academies throughout the

15   Commonwealth.

16 Q.  Had you previously entered into a contract with

17   the Massachusetts Criminal Justice Council

18   similar to this one?

19 A.  Yes, I believe so.

20 Q.  As far as you are aware, apart from whatever gap

21   Miss Taylor may have identified, have you

22   consistently had a contract with the entity

23   which is apparently known as the Massachusetts

24   Criminal Justice Training Council?

1    A.    And is now known as the Police Training Council,

2          it was changed legislatively, but, yes, as I

3          indicated to you earlier when I teach in the

4          academy they provide you with a voucher which

5          you can then submit to the Commonwealth for

6          payment.

7    Q.    What is the Massachusetts Criminal Justice

8          Training Council, apparently now known as the

9          Police Academy Training Council?

10   A.    It is the state agency that oversees police

11         training in the Commonwealth of Massachusetts.

12   Q.    Is that an entity that's entirely separate from

13         the MBTA?

14   A.    Correct, yes.

15   Q.    Now, Miss Taylor does refer in here to

16         processing your instructor payment and is

17         enclosing the contract to allow her to do that.

18         Did you in fact ever ask to have the instructor

19         payment processed?

20   A.    Those are the vouchers that I spoke about

21         earlier, in order for them to process them you

22         had to have a contract on file.

23   Q.    I understood from you, though, that you did not

24         process any of the vouchers; is that right?

Page 45

1   A.   I don't believe so.

2   Q.   Given that you did not intend to process the

3        vouchers do you recall why you completed the

4        contract and sent it back?

5   A.   They require them of each instructor to be

6        contracted and then secondarily the option was

7        always there, if I elected to use leave time and

8        then submit a voucher for a payment, I have

9        taught other courses for the training council in

10       which it was conducted on my own personal time

11       and I was compensated.

12  Q.   Those would be non-SIDS classes?

13  A.   To the best of my recollection, yes.

14  Q.   Did you retain any of the vouchers for the SIDS

15       classes or did you throw them away?

16  A.   I don't have them.

17  Q.   Do you have any idea what happened to them?

18  A.   I likely threw them away.  I don't have them.

19  Q.   And with regard to documents pertaining to the

20       terms and conditions of your teaching of SIDS

21       courses while at the MBTA, did you withhold any

22       of those documents, for example, on the basis of

23       privilege?  Or is this indeed the only document

24       that you had, Exhibit 4?

Page 46

1    A.    In response to that particular?

2    Q.    To request number 2.

3    A.    That's the only document that I had in my

4          possession.

5    Q.    Are you aware of the existence of other

6          documents that would be responsive to request

7          number 2 but that are not currently in your

8          possession?  So that would be request number 2

9          in Exhibit No. 3.

10   A.    Other than scheduling documents that the MBTA

11         has in their possession as it relates to the

12         academy schedule, I don't know if the Police

13         Training Council has any documents.

14   Q.    But there are no documents which were at one

15         time in your possession that you've given away

16         to someone else?

17   A.    No.

18   Q.    Now, again in Exhibit 3, the document request,

19         would you turn to category number 12 which

20         appears on the last page, page 6.

21   A.    (Indicating.)

22   Q.    And you will see that that request reads, "all

23         documents that support your contention that the

24         MBTA promised you that you could teach a SIDS

Page 47

```
 1            training course."  And in response to that

 2            request, again, the only document that you

 3            identified was Exhibit 4, Miss Taylor's letter

 4            and the contract.  Is that the only document in

 5            your possession, custody or control that is

 6            responsive to that request?

 7    A.      Yes.

 8    Q.      Are you aware of the existence of any other

 9            documents that were once in your possession,

10            custody or control, but no longer are, that

11            would be responsive to that request?

12    A.      No.

13    Q.      So Miss Taylor's letter to you and your

14            completion of the contract are the only

15            documents of which you are aware that support

16            your contention that you were promised that you

17            could teach a SIDS training course by the MBTA;

18            is that right?

19    A.      No.

20    Q.      That's not right?

21    A.      No.

22    Q.      What other documents are you aware of that

23            support your allegation that the MBTA promised

24            you that you could teach a SIDS training course?
```

Page 53

1   Q.   And you did indeed serve as an instructor at the

2        MBTA police academy on SIDS courses?

3   A.   I certainly did, yes.

4   Q.   The question is what constitutes a promise from

5        the MBTA that you are going to be allowed to

6        continue to serve in that capacity?

7   A.   I believe I was scheduled to teach.

8   Q.   You've referenced the fact that there was a

9        schedule for one class that would be January --

10  A.   Correct.

11  Q.   -- 2nd of 2003?

12  A.   Correct.

13  Q.   Other than the fact that you were on a schedule

14       and then taken off a schedule, is there

15       anything, any writing which you say supports

16       your allegation that you were promised the right

17       to continue teaching at the MBTA police academy

18       after you ceased to be an MBTA employee?

19  A.   I don't believe so.

20  Q.   With regard to that one class that you were

21       making allusion to, the January 2, '03 class,

22       that was after you ceased to be an employee and

23       after you ceased to be on the payroll of the

24       MBTA; correct?

Page 55

1   Q.   It was sometime while you were still actively

2        the police chief of the MBTA?

3   A.   Yes.

4   Q.   Who is it that you say promised you that you

5        were going to be rehired by the MBTA to teach

6        SIDS classes at the MBTA police academy?

7   A.   The academy director Frank Wolverton and

8        subsequent to him the acting deputy

9        chief -- excuse me, the acting police of chief

10       William Flemming.

11   Q.   When did you have the conversation with Frank

12       Wolverton in which he promised you that you

13       would be rehired to teach the SIDS class when

14       you were no longer an MBTA employee?

15   A.   I don't remember the specific date, but it was

16       after I had left the MBTA Wolverton notified me

17       that they had a class that was in and that I

18       would be teaching.

19   Q.   When you say he notified you, by what mechanism?

20   A.   Telephone.

21   Q.   So he called you?

22   A.   Yes.

23   Q.   Did you speak directly with him?

24   A.   No, I believe it was a voice mail.

Page 56

```
 1   Q.   Now, was this in the period, that is this voice

 2        mail, was that in the period when you were no

 3        longer physically at the MBTA because you had

 4        already started at Milford but while you were

 5        still on the payroll?

 6   A.   I don't recall.

 7   Q.   To the best of your memory what did

 8        Mr. Wolverton say in the voice mail?

 9   A.   That they had an academy class and he was

10        scheduling a meeting for the January 2nd date

11        and if there was a problem to get back to him.

12        There was no problem, I put it into my schedule.

13   Q.   Did you keep a copy of that voice mail?

14   A.   No.

15   Q.   Was Mr. Wolverton at the time an employee of the

16        MBTA?

17   A.   Yes.

18   Q.   Is he still there to your knowledge?

19   A.   Yes.

20   Q.   So the voice mail in essence said I'm going to

21        go ahead and schedule you to teach the class on

22        January 2nd, let me know if you don't want to?

23   A.   Let me know if it's a conflict.

24   Q.   So that would be if you can't?
```

Page 57

```
 1   A.   If I can't teach on that day he would put me on

 2        another day, which is fairly common.

 3   Q.   And that call came to you sometime after you

 4        ceased to be at least an active employee of the

 5        MBTA?

 6   A.   I was in Milford.

 7   Q.   But you don't know whether it came during the

 8        period when you were still on the MBTA payroll;

 9        is that right?

10   A.   That's correct.

11   Q.   Did you understand -- let me ask you this first.

12        Do you have an employment contract with Milford?

13   A.   Yes, I do.

14   Q.   And did you have that employment contract from

15        the time that you were first hired?

16   A.   I've had an employment contract from the time

17        that I was first hired, --

18   Q.   With regard to --

19   A.   -- yes.

20   Q.   -- the employment contract that was in place

21        between the time that you started with Milford

22        in August of 2002 through at least the end of

23        January of 2003, was there any provision in that

24        contract that relates to whether you're allowed
```

1         voucher.  Excuse me, that I would take leave and

2         I would submit a voucher.

3   Q.   Well, your usual practice would certainly be a

4         suggestive factor that you were not going to

5         take leave and you were not going to submit a

6         voucher, wouldn't it, sir?

7   A.   You could conclude that.  That doesn't

8         necessarily mean that's what I'm going to do.

9         Each time I teach a class I take that into

10        consideration.  I make that judgment.

11  Q.   Now, you have told us that there were one or two

12        courses, I believe you said while you were at

13        the MBTA, that were not SIDS classes on which

14        you did submit vouchers; is that right?

15  A.   Not in the time I was at the MBTA, I don't

16        believe.

17  Q.   Have you ever submitted a voucher on any class

18        at any police academy?

19  A.   I believe I have.

20  Q.   During what time period or periods?

21  A.   I believe it was during the time that I was the

22        police chief in Wayland and the time I was the

23        police chief in Wellesley, which would have been

24        1986 to, excuse me, 1986 to 1997.

Page 62

```
 1   Q.   So on those occasions you used leave time and

 2        then submitted a voucher; is that right?

 3   A.   Correct.

 4   Q.   On those occasions did you become an employee of

 5        the police academy for which you were teaching

 6        such that you received a W-2 form for them to

 7        pay your taxes?

 8   A.   Yes.

 9   Q.   So you did not go as an independent contractor

10        and receive a form 1099, you actually became

11        employed by those academies and received a W-2;

12        is that right?

13             MR. NOTIS:  I'm going -- you can answer.

14        I'm going to object to the extent that you're

15        asking for legal conclusions as to whether he

16        was an employee or independent contractor.

17             MS. LUKEY:  Well, I'm asking him what he

18        was called and what kinds of forms he got.

19   A.   I was called an instructor -- no, I don't.  I

20        remember I received a tax form.

21   Q.   Do you know whether it was a W-2 --

22   A.   No, I'm assuming --

23   Q.   -- or 1099?

24   A.   No, I don't.  I'm assuming -- I paid taxes, I
```

Page 63

1    remember that much.

2  Q.  I would hope so.  But you don't remember whether

3      you did it in response --

4  A.  No.

5  Q.  -- to a form 1099 or a form W-2; is that right?

6  A.  No, I don't.

7  Q.  Do you remember which academy or academies you

8      received the money from?

9  A.  No.  It was from the State Training Council.

10 Q.  Okay.  But the last time you did that was before

11     you went to work for the MBTA; is that right?

12 A.  Correct.

13 Q.  And given the timing would I be correct in

14     understanding that the last time you did that

15     may have been before you even started teaching

16     SIDS courses?

17 A.  No, I was teaching before.

18 Q.  So it's your memory that while you never took

19     leave and put in the vouchers on the SIDS

20     courses that you may well have done so on other

21     courses after you started teaching SIDS courses?

22 A.  I don't believe that I submitted on the SIDS

23     courses.  I know that I submitted on other

24     courses, the exact time period I don't recall.

Page 64

```
 1         But I, I know I taught even -- I believe I

 2         taught after 1992.  I could be incorrect on

 3         that.

 4    Q.   Throughout the time that you were at the MBTA

 5         and throughout the time that you've been at

 6         Milford there have been no courses that you've

 7         taught as to which you've submitted a voucher;

 8         correct?

 9    A.   That's correct.

10    Q.   Now, you've told us about the voice mail that

11         you received from Mr. Wolverton, did you have

12         any other communications with him regarding

13         teaching the course on January 2nd?

14    A.   I spoke to him after.  He called and canceled my

15         teaching and William Fleming, the active chief

16         of police, had reinstated my teaching.

17    Q.   Now, when I asked you who at the MBTA had

18         promised you that you could teach a class after

19         you ceased to be an MBTA employee you named

20         Mr. Wolverton and you named Acting Chief William

21         Fleming.  I gather that there were other

22         individuals between those two who indicated that

23         you could not teach the class; is that right?

24    A.   I don't understand.
```

1    Q.    Let me phrase it differently.  Was the voice

2        mail from Frank Wolverton the first occasion on

3        which you had heard anything about teaching any

4        class, any SIDS class at the MBTA police academy

5        when you were no longer an employee of the MBTA?

6    A.    Yes.

7    Q.    Your separation agreement did not have any

8        provision for you to continue teaching at the

9        MBTA police academy, did it?

10    A.    Regrettably, no.

11    Q.    And while you were still actively employed at

12        the MBTA no one had said anything to you about

13        your continuing to teach when you were no longer

14        an employee; isn't that correct?

15    A.    Yes.

16    Q.    And at the time that you tendered your

17        resignation in August of 2002 throughout your

18        negotiations with the general counsel there was

19        no discussion about your continuing to teach at

20        the MBTA police academy, was there?

21    A.    No.  Regrettably I didn't think it was

22        necessary.

23    Q.    Between the time that you physically left the

24        MBTA to start your job in August of '02 at

Page 66

```
 1          Milford and the time that you went off the

 2          MBTA's employee payroll in October, no one spoke

 3          to you about teaching a SIDS course at the MBTA

 4          police academy with the possible exception that

 5          the voice mail from Mr. Wolverton may have

 6          fallen in that period; is that correct?

 7     A.   That's correct.

 8     Q.   So after the voice mail -- strike that.

 9               So the voice mail was the first occasion in

10          which anybody mentioned to you teaching a class

11          on a date that was after you were employed by

12          the MBTA; correct?

13     A.   Yes.

14     Q.   What next happened after the voice mail from

15          Mr. Wolverton that related to the subject of

16          whether you would or would not teach a SIDS

17          class at the MBTA police academy?

18     A.   I believe it was October 31st I received a

19          telephone call from Lisa Riccobene saying that

20          she had received a call from Lieutenant Nancy

21          O'Loughlin who had been told by Frank Wolverton

22          that Anne McCall canceled my teaching at the

23          academy in a tirade that was laced with a number

24          of expletives.
```

1    you ever testified outside of the MBTA and my

2    answer was yes.  I just don't have a present

3    memory of all of the details of that testimony

4    and whether or not the MCAD was one of the

5    forums.  There was a lot of paper flying between

6    these two.  So I just don't remember.

7  Q.  Well, I think the earlier question was, and if

8    it wasn't I will pose the question now, did you

9    ever give testimony or evidence outside of the

10    MBTA in support of the concept that Deputy Chief

11    McCall had discriminated against or retaliated

12    against Officer Peixoto?

13  A.  I don't have a present memory.

14  Q.  Okay.  Do you remember ever giving testimony

15    anywhere as opposed to giving a written

16    statement in your own case at organizational

17    diversity, in which you took Officer Peixoto's

18    side against Deputy Chief McCall?

19  A.  No, I don't.

20  Q.  Did you end up testifying in a deposition

21    regarding Officer Peixoto's claims against the

22    MBTA and Deputy Chief McCall?

23  A.  I don't remember.  I'm trying -- I know that I

24    testified in Peixoto matters and I just can't

Page 132

1   A.   Yeah, the entries should be there.  They should

2        be there.

3   Q.   Is there any reason why we would not be able to

4        tell from your calendar how frequently you met

5        with general managers in the period covered by

6        the calendar which is from January 7th of 2000

7        until your departure on August 7, 2002?

8   A.   Only if I didn't enter the information that the

9        meeting was not held.  If I did then it's there.

10  Q.   I notice there are several entries that have in

11       parentheticals the word "cancel" or "did not

12       attend."  Was it your regular and usual practice

13       to make a notation or cause a notation to be

14       made --

15  A.   Yes.

16  Q.   -- in your calendar if you either canceled or

17       the meeting did not happen?  Or somebody

18       canceled or the meeting did not happen?

19  A.   I never canceled, but, yes.

20  Q.   So we should be able as far as you know simply

21       go through your calendar and ascertain how

22       frequently you met with whoever the general

23       manager was during that period January 2000 to

24       August '02?

1      problem and the lawsuit that was spawned by it?

2   A.  Yes.

3   Q.  Can you tell us please the gist of what

4       Mr. Mulhern said to you on the subject of the

5       profiling complaints?  The youth profiling

6       complaints.

7   A.  He thought that, and I agreed with him, that we

8       had to work towards addressing those concerns in

9       the community.

10  Q.  Was he unhappy that there were problems with the

11      community relating to these allegations by the

12      young people?

13  A.  I don't know if he was unhappy.

14  Q.  Did he express --

15  A.  I know he was concerned.

16  Q.  Did he express unhappiness to you with regard to

17      the conduct of any of the police people,

18      personnel in your department and their

19      participation in the events that gave rise to

20      the litigation?

21  A.  The specific events?  No.

22  Q.  Did he talk to you about something called the

23      zero tolerance policy?

24  A.  I don't remember having that specific

Page 140

1     conversation with Michael Mulhern.  I don't know

2     that anyone has ever shown me a zero tolerance

3     policy.

4   Q.  Were you aware of the zero tolerance policy of

5     any kind that was somehow related to this

6     controversy in the lawsuit?

7   A.  I was aware that the MBTA wanted the police

8     department to address certain concerns on the

9     transit system, one of them being the disorder

10    created by youth.  And in fact, the issues of

11    predominately minority youth being victimized

12    traveling to and from school.

13  Q.  Victimized by other youth?

14  A.  Correct.

15  Q.  And did your department or any division in your

16    department have a zero tolerance policy towards

17    what you have described as the victimization of

18    youth by youth?

19  A.  As I said, I don't know of a policy.  I know

20    that members of the department went out and

21    performed law enforcement services on the

22    system.

23  Q.  When did the controversy arise relating to

24    whether youth were being mistreated by MBTA

Page 141

```
 1        police officers?

 2   A.   I'm not sure of the exact date, but I think that

 3        the attorney Lisa Thurau-Gray first came to the

 4        MBTA, I want to say 2000.

 5   Q.   Who was the general manager at the time?

 6   A.   Robert Prince, I believe.

 7   Q.   Did the existence of the controversy or the

 8        filing of the lawsuit lead to any tensions of

 9        which you were aware between you and the general

10        manager Mulhern?

11   A.   No.

12   Q.   He never said anything to you about the problems

13        being caused by members of your force?

14   A.   He may have, yes.

15   Q.   Did the existence of the controversy regarding

16        the alleged profiling of youths and the lawsuit

17        that sprung from that give rise to any tensions

18        between you and Secretary Sullivan?

19   A.   No, I don't believe so.

20   Q.   Did Secretary Sullivan ever say anything to you

21        about the profiling allegations or about the

22        lawsuit?

23   A.   Yeah, he thought it was a lot of BS.

24   Q.   He told you that?
```

1   A.   (Witness nods in the affirmative.)

2   Q.   You have to answer out loud.

3   A.   Yes.  I'm sorry.

4   Q.   So as far as you were concerned Secretary

5       Sullivan was supportive of your department with

6       regard to the profiling lawsuit and the

7       profiling controversy; is that correct?

8   A.   I don't know that I would say supportive.  I

9       think that he had his opinion.

10   Q.   We talked a few moments ago about the various

11       hearings that were going on involving officer

12       Peixoto in 2001 and into 2002, were these

13       hearings occurring at the same time that the

14       controversy regarding the youth profiling and

15       the litigation regarding the youth profiling

16       were going on?

17   A.   They were occurring at the same time, yes.

18   Q.   Were the occasions on which you were making your

19       feelings known to the general manager or the

20       general counsel and the head of organizational

21       diversity, that Deputy Chief McCall was

22       retaliating against Officer Peixoto, occurring

23       at the same time as the controversy involving

24       youth profiling and the litigation involving

1        youth profiling?

2    A.    I believe that I had been raising the issues of

3          Peixoto and McCall before.

4    Q.    Before 2000?

5    A.    No, before the issue as it relates to Lisa

6          Thurau-Gray.  Lisa Thurau-Gray, when I say 2000,

7          sent a FOIR, Freedom of Information Request.

8          That was the extent of her involvement.  And as

9          the law provides I sent her a quote.  "Do you

10         want the records?  Here's what it's going to

11         cost you."  That went on for well over six

12         months if my memory serves me.  And then she was

13         involved directly with the general manager's

14         office.  I think before there was any type of,

15         as you term a controversy, no, I had already

16         been telling them there's an issue here with

17         Peixoto and McCall.

18    Q.    Do you remember when the press reports first

19         began to appear relating to the alleged youth

20         profiling?

21    A.    No, I don't.

22    Q.    Is it the case that the hearings involving

23         Officer Peixoto at which you offered your

24         opinion regarding Deputy McCall's retaliation

Page 144

1    and the controversy surrounding alleged youth

2    profiling were occurring at essentially the same

3    time, that is over the same time period largely

4    into 2001 and into 2002?

5  A.  Right.  But as I said to you, I think I had had

6    discussions prior is my memory.

7  Q.  Okay.  Is it your testimony that Michael Mulhern

8    began to treat you differently by being guarded

9    in his conversations with you and having less

10    direct contact with you before the controversy

11    arose regarding allegations of youth profiling?

12  A.  I'm not sure.

13  Q.  How about Secretary Sullivan, is it your

14    testimony that he began to treat you differently

15    by dealing with you less frequently and

16    otherwise treating you differently before the

17    controversy arose regarding youth profiling?

18  A.  Absolutely.

19  Q.  So you're saying Secretary Sullivan did begin

20    treating you differently before the controversy

21    arose; is that right?

22  A.  I believe so, yes.

23  Q.  And again, when do you think Secretary Sullivan

24    started treating you differently?

Page 163

1      with me again.

2   Q.  Do you remember anything else that you said or

3       that Bill Mitchell said in that conversation?

4   A.  Nothing is coming to mind.

5   Q.  Now, the cancellation of the class on the

6       January 2, '03 date, that didn't have any effect

7       on your teaching the SIDS course at any other

8       academy, did it?

9   A.  No.

10  Q.  Did Bill Mitchell get back to you?

11  A.  I'm not sure if he called me or I called him

12      because I did try to call him several times but

13      we did have, I think we had a conversation.

14  Q.  I don't think I established when that first call

15      with him was; do you remember?

16  A.  I don't know why I have mid December in my head.

17  Q.  Do you remember how much time elapsed before you

18      spoke again, you and Bill Mitchell?

19  A.  It might have been later.  Because it wasn't

20      until the first week in January.  It was after,

21      in fact, it was after the January 2nd date.  The

22      course wasn't held.  It was subsequent to that.

23  Q.  So you think your follow up with Bill was after

24      the January 2nd date?

Page 178

1     Chief Anne McCall, didn't he?

2  A.  Yes.

3  Q.  And he attempted to do so and for some period

4     you thought the teaching was rescheduled; right?

5  A.  The teaching was scheduled for January the 2nd;

6     correct.

7  Q.  So it had been scheduled by Wolverton,

8     apparently canceled by McCall, rescheduled by

9     Fleming and then you received a voice mail from

10    Fleming saying it's canceled?

11 A.  Correct.

12 Q.  Who canceled it the second time?

13 A.  Michael Mulhern.

14 Q.  How do you know that?

15 A.  Fleming told me that.

16 Q.  Before we get to what he said to you, if Fleming

17    told you that Michael Mulhern canceled the

18    second time, why did you say in the letter to

19    Congressman Neal that Anne McCall canceled it?

20 A.  (Witness reviewing.)

21 Q.  Let me rephrase it.  In that paragraph where you

22    said that Anne McCall canceled it are you

23    referring to the first time, that is the

24    cancellation that Fleming subsequently

Page 179

1        overruled?

2    A.   Correct.  That's the first time and then I

3        contacted Fleming.

4    Q.   And in the next paragraph you in fact indicate

5        that he reversed McCall's decision and

6        reinstated the training session; right?

7    A.   Yes.

8    Q.   Then in the next paragraph at the top of the

9        second page of the letter, Exhibit 8, you state,

10       "in mid-December, I was contacted once again by

11       Acting Chief Bill Fleming on behalf of the MBTA

12       and I was told that the training was canceled."

13       Is that the voice mail that you're referring to?

14   A.   That's correct.

15   Q.   Now, in the voice mail did Acting Chief Fleming

16       tell you who had canceled the training on this

17       second occasion?

18   A.   I don't know if he did on the voice mail.  I

19       would have to look at my notes.  But I don't

20       know if he did then or in a subsequent

21       conversation.

22   Q.   At the time that you wrote this letter to

23       Congressman Neal did you know who had

24       purportedly cancelled the training the second

Page 180

1      time?

2   A.   Yes.

3   Q.   Why didn't you say who it was?

4   A.   I don't know.  No specific reason.

5   Q.   Is it your belief as you sit here today that you

6        knew when you wrote this letter on January 13,

7        2003 that it was Michael Mulhern who had

8        canceled the training?

9   A.   I absolutely knew that it was Michael Mulhern.

10  Q.   But you don't know why you didn't say that in

11       the letter to Congressman Neal?

12  A.   No.  In fact, I suggested that he call Michael

13       Mulhern.  I wasn't trying to hide Michael

14       Mulhern's name.

15  Q.   You said that it was in a conversation with Bill

16       Fleming that you found out that the cancellation

17       the second time was not by Anne McCall but by

18       Michael Mulhern; correct?

19  A.   I believe we had a conversation, yes.

20  Q.   Will you tell us about that conversation, when

21       it occurred, who initiated it and the like and

22       then I'll ask you what was said.

23  A.   I don't recall the specific date.  I know that I

24       had tried to call Bill several times.  My memory