# EXHIBIT E

2-1

Volume II
Pages 2-1 to 2-152
Exhibits 9 to 13

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
                                :
THOMAS J. O'LOUGHLIN,           :
          Plaintiff,            :
                                :
     vs.                        :    Civil Action
                                :    No. 04-10257 MEL
MASSACHUSETTS BAY               :
TRANSPORTATION AUTHORITY and    :
ANNE McCALL and MICHAEL         :
MULHERN,                        :
          Defendants.           :
                                :
- - - - - - - - - - - - - - - -x

          CONTINUED DEPOSITION OF THOMAS J.
O'LOUGHLIN, a witness called on behalf of the
Defendants taken pursuant to the Federal Rules of
Civil Procedure, before Jane M. Williamson,
Registered Merit Reporter and Notary Public in and
for the Commonwealth of Massachusetts, at the
Offices of Wilmer Cutler Pickering Hale and Dorr
LLP, 60 State Street, Boston, Massachusetts, on
Friday, March 30, 2007, commencing at 10:23 a.m.

PRESENT:

     Michael J. Notis, Esq.,
          370 Washington Street, Brookline, MA
          02445, for the Plaintiff.

     Wilmer Cutler Pickering Hale and Dorr LLP
          (By Joan Lukey, Esq., and Greg M.
          Reiser, Esq.)
          60 State Street, Boston, MA  02109,
          for the Defendants.

                    *  *  *  *  *

2-2

I N D E X

WITNESS                                          DIRECT      CROSS

THOMAS J. O'LOUGHLIN

  BY MS. LUKEY                                      2-3

* * * *

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 9 | Letter from Michael J. Notis to Gregory M. Reiser dated 9/18/06 with attached log of Thomas O'Loughlin | 2-16 |
| 10 | Memo to James Hoog from Thomas J. O'Loughlin dated 1/19/01 | 2-18 |
| 11 | Document entitled "Complaint and Demand for Jury Trial" | 2-123 |
| 12 | email chain beginning with an email from Robert Powers to Thomas O'Loughlin dated 7/25/02 | 2-131 |
| 13 | Document Bates stamped T.O'L 0297 to 0305 | 2-138 |

* * * *

2-35

1    Q.   So if I understand correctly, with regard

2  to Mr. Mulhern, through August of 2002, the only

3  form of retaliatory conduct that you are alleging

4  against you was that you had less contact with him

5  directly and that you felt that he became guarded in

6  his conversations with you; is that correct?

7    A.   That is what I can recall, yes.

8    Q.   And with regard to Secretary Sullivan,

9  through August of 2002, the only form of retaliatory

10 conduct toward you that you are alleging is that he

11 began to avoid you and limit his dealings with you;

12 is that correct?

13   A.   As best I can recall today, yes.

14   Q.   And with regard to both of those gentlemen,

15 Mr. Mulhern and Mr. Sullivan, you have no evidence

16 that any conduct towards you related to the Anne

17 McCall/Sonny Peixoto situation; is that correct?

18       MR. NOTIS:   Objection.   You can answer.

19   A.   As best I recall today, yes.

20   Q.   Is it your contention that while you were

21 still employed through August of 2002, that Anne

22 McCall herself retaliated against you in some way?

23   A.   Yes, I believe she did.

24   Q.   Could you tell us in what respects you

2-76

1  Peixoto's attorney?

2         MR. NOTIS:  Sorry.  I just wanted to make

3  clear --

4         MS. LUKEY:  You weren't Chief O'Loughlin's

5  attorney at the time.

6         MR. NOTIS:  Yes.

7         MS. LUKEY:  Okay.

8     BY MS. LUKEY:

9     Q.    Other than the decision not to permit you

10  to teach at the Academy, do you contend that you

11  were retaliated against by anyone at the MBTA in the

12  period after August of 2002?

13    A.    Do I contend, meaning do I believe; or do I

14  contend, meaning am I complaining?

15    Q.    Are you alleging in this lawsuit

16  retaliation -- I just want to know what the world or

17  universe is that I need to inquire of.

18         Apart from the decision not to let you

19  teach at the MBTA Police Academy, are you alleging

20  in this litigation that there was any other form of

21  retaliation against you after August of 2002?

22    A.    No, I don't believe so.

23    Q.    Now, last time we went through the sequence

24  of events regarding the teaching.  And I just have a

1    Well, that didn't work out, so, you know, how is

2    this date?  Is it okay type of thing.

3        Q.    Now, is it your contention that Anne McCall

4    made the initial decision that you were not to be

5    allowed to teach?

6        A.    Yes.

7        Q.    And is that contention based on your own

8    conversation with Frank Wolverton, the conversation

9    with Lisa Riccobene in which she related information

10    from Nancy O'Loughlin, and your conversation with

11    Bill Fleming?

12        A.    Yes.

13        Q.    Is there any other basis for your belief

14    that Anne McCall made the initial decision that you

15    were not to teach?

16        A.    I don't believe so.

17        Q.    Do you have any evidence that Anne McCall's

18    decision that you were not to teach was in

19    retaliation for your anticipated favorable testimony

20    on behalf of Officer Peixoto?

21        A.    My evidence would be A, I was scheduled to

22    teach.  B, Anne McCall cancelled it.  C, that's the

23    very reason Anne McCall has a dislike for me.  And

24    lastly, there was a letter from Mr. Notis telling

2-81

1    the MBTA that I was going to be a witness against

2    Anne McCall.

3         Q.    Do you have any information as to whether

4    Anne McCall knew about Mr. Notis' letter or your

5    anticipated testimony at the time that she made the

6    initial decision that you would not be teaching?

7         A.    No.   I think it's circumstantial.

8              MR. NOTIS:   Could we have a moment?

9              MS. LUKEY:   Do you want to consult with

10   him?

11             MR. NOTIS:   Yes.

12             MS. LUKEY:   Sure.

13             (Witness and Mr. Notis leave

14             the room and return)

15        BY MS. LUKEY:

16        Q.    So if I understand you correctly, the

17   evidence upon which you rely in saying that Anne

18   McCall was retaliating against you in connection

19   with your anticipated testimony is that she's the

20   one who cancelled your scheduled teaching date, she

21   disliked you because of the Peixoto issue, and Mr.

22   Peixoto's attorney had recently sent a letter to the

23   MBTA saying that you were expected to give favorable

24   testimony; is that right?

2-82

1    A.    However, to include the part of your

2  question, which said, to include the conversation

3  with William Fleming where William Fleming

4  acknowledges that she's retaliating against me.

5  He's the Chief of Police.  To include -- one of the

6  people you didn't name was Bill Mitchell, because I

7  did have a conversation with Bill Mitchell, and I

8  said to Bill Mitchell, "She's retaliating."

9    Q.    Are you now expanding your answer as to

10  what the factors are?

11    A.    No.  I'm putting within my answer those

12  parts that you had in your question.  You had said

13  to me, other than the conversation of this person,

14  that person, this person, that person, the one that

15  I didn't hear in there was Mitchell.

16    Q.    I did not mention Bill Mitchell.

17    A.    Right.

18    Q.    And that question related to who told you

19  that Anne McCall made the decision, not the basis

20  for Anne McCall's decision.

21         The next question was what evidence --

22    A.    Isn't that evidence?

23    Q.    -- what evidence do you have that Anne

24  McCall was retaliating for your anticipated --

2-83

1      A.    Then I'll add to it that William Fleming

2   said it to me, and Bill Mitchell acknowledged it.

3      Q.    First let me make sure I've got the

4   universe.

5            So you're now saying that the evidence on

6   which you rely in saying that Anne McCall was

7   retaliating against you in making the initial

8   decision that you would not teach -- that is,

9   retaliating for your anticipated testimony for Mr.

10  Peixoto -- was that she was the one who cancelled

11  your scheduled teaching date, she disliked you

12  because of the Peixoto situation, Officer Peixoto's

13  attorney had recently sent a letter to the MBTA

14  regarding your anticipated testimony, and William

15  Fleming and William Mitchell agreed with you that

16  she was retaliating, correct?

17     A.    And the statements that were made by

18  Wolverton.  Wolverton said that she cancelled my

19  training.

20     Q.    You've mentioned the cancellation of the

21  training.  I am now not on the issue of who made the

22  decision to cancel, but on what you base your

23  intention that Anne McCall made the decision because

24  she was retaliating against you for your anticipated

2-84

1   testimony on behalf of Officer Peixoto.

2           So on that latter point -- that is, the

3   reason that you contend she wouldn't let you

4   teach -- did I correctly summarize all of the

5   evidence?

6      A.   And one of the issues that I said to you

7   there is that Anne McCall doesn't like me.

8      Q.   I listed that.

9      A.   I understand that.  And I'm saying Frank

10  Wolverton says that she was angry.  I think someone

11  that's angry is a sign that they have a dislike.

12     Q.   Have we now gone through each of the pieces

13  of evidence on which you contend that Anne McCall

14  was retaliating against you for your anticipated

15  testimony for Mr. Peixoto?

16     A.   That's what comes to memory at this point

17  in time, yes.

18     Q.   Now, you don't know whether she was aware

19  yet of the letter from Mr. Peixoto's attorney,

20  correct?

21     A.   I don't know.

22     Q.   With regard to William Fleming, what did he

23  say that you say constitutes evidence that Anne

24  McCall was retaliating because of your anticipated

2-88

1       A.    Right.

2       Q.    When was it that Bill Fleming told you that

3   you would be permitted to teach after all?

4       A.    It was within a couple of weeks.

5       Q.    Now, is it your contention that Anne McCall

6   made the second and final decision thereafter that

7   you were not going to teach?

8       A.    The final decision that I would not teach?

9       Q.    After Bill Fleming told you you were going

10  to teach --

11      A.    No, that was made by Michael Mulhern.

12      Q.    And is it your contention that Michael

13  Mulhern's decision, the final decision that you were

14  not going to be allowed to teach, was in retaliation

15  for your expected favorable testimony on behalf of

16  Officer Peixoto?

17      A.    Yes.

18      Q.    What evidence do you have that Michael

19  Mulhern made the final decision that you would not

20  be able to teach based upon retaliation because of

21  your expected favorable testimony for Peixoto?

22      A.    His conversation with me, his conversation

23  with Congressman Richard Neal, and I think the facts

24  and circumstances of who lent him advice and how he

2-89

1  conveyed his message back to Wolverton.

2      Q.    Tell us, please, what he said and what you

3  said in the conversation that you say supports your

4  contention that he was retaliating against you in

5  connection with the Peixoto matter.

6      A.    He told me that he received a call from

7  Paul Byrne and Greg Lee.  And that's what he relied

8  on in telling me that I couldn't teach.

9      Q.    So Michael Mulhern's statement to you was

10 that he was relying on a conversation that he had

11 with Paul Byrne and Greg Lee, correct?

12     A.    Yes.

13     Q.    Who was Paul Byrne?

14     A.    Who is Paul Byrne?

15     Q.    Well, what was his position at that time?

16     A.    I don't know.

17     Q.    Well, who do you know him to be?

18     A.    Paul Byrne.

19     Q.    Is he affiliated with the union for the

20 police officers?

21     A.    At that time, I don't know.

22     Q.    Was he the president of the union at that

23 time?

24     A.    I don't believe so.

2-90

1    Q.    Was he the president-elect?

2    A.    I don't believe so.

3    Q.    Who do you think the president was at the

4    time?

5    A.    Gregory Lee.

6    Q.    Was Paul Byrne a union rep?

7    A.    I don't know.

8    Q.    Is he an officer?

9    A.    I don't believe he worked at the MBTA

10   Police.  So I don't know.

11   Q.    Did you know him to be or did you know him

12   at the time to be the officer's union

13   representative?

14   A.    I think I said "no."  I don't know.

15   Q.    I think you said at your last day of

16   testimony that you believed him to be a paid staff

17   representative of the union?

18   A.    He was.  I don't know on that date what he

19   was.  I don't know what his position was on that

20   date.

21          MR. NOTIS:  You're mixing your terms up.

22   A.    He was a union president.  And I know he

23   retired.  And then I know he was doing some work

24   with the union.  I'm not trying to be canny here.

2-92

1    your response was that he relied on testimony of

2    Paul Byrne and Greg Lee, correct?

3          MR. NOTIS:  Objection.  You can answer.

4    A.    He said that he got a call from Paul Byrne

5    and Greg Lee saying they didn't want me to teach.

6    Q.    Is it your contention that the fact that

7    Paul Byrne and Greg Lee called Michael Mulhern is

8    somehow supportive of your claim that Michael

9    Mulhern was retaliating against you for the

10   anticipated favorable testimony to Peixoto?

11   A.    Yeah.  Both of these guys had complaints,

12   as we discussed earlier.  Peixoto made complaints

13   against them.  Both of these guys are tied at the

14   hip to Anne McCall.

15   Q.    Are you assuming that Paul Byrne and Greg

16   Lee didn't want you to teach because of your

17   anticipated favorable testimony to Peixoto?

18   A.    I believe that, yes.

19   Q.    How did they even know --

20   A.    Counsel, then you tell me how they didn't

21   believe that.

22   Q.    Would you tell me, please, whether you have

23   any evidence to suggest that either Paul Byrne or

24   Greg Lee even knew about your anticipated favorable

2-93

 1    testimony in the Peixoto case.

 2         A.   I believe Anne McCall told them.  And I

 3    have as much evidence that that occurred as you

 4    folks have that it didn't.

 5         Q.   There we differ, sir.

 6              With regard to Michael Mulhern, did Michael

 7    Mulhern suggest to you that Mr. Byrne or Mr. Lee had

 8    said anything at all about Peixoto or your

 9    anticipated testimony?

10         A.   No, Michael Mulhern did not say that to me.

11         Q.   The union -- let me rephrase that.

12              Mr. Byrne, as the president of the union

13    during your tenure as Chief, and Mr. Lee, as the

14    president immediately thereafter, didn't like you

15    very much, did they?

16         A.   I don't know.  You'd have to ask them.

17         Q.   Did you have problems with Mr. Byrne and

18    Mr. Lee when you were the Chief?

19         A.   I was the Chief.  They were the union

20    officers.  Did we have problems?

21         Q.   Yes, sir.

22         A.   The answer is "yes."

23         Q.   In fact, there was a Vote of No Confidence

24    from the union, correct?

2-94

1          A.    Yes.

2          Q.    Given that there were problems with the

3    union, given that the union gave you a Vote of No

4    Confidence, on what do you base the belief that the

5    call from Byrne and Lee saying that they didn't want

6    you to teach was tied not to those issues, but to

7    your anticipated testimony for Mr. Peixoto?

8          A.    The Vote of No Confidence was related to

9    their contractual agreement.

10          Q.    Whatever the reason, sir --

11          A.    That was done and taken care of.

12          Q.    Sir, the union and you had had issues and

13    problems for quite a while at the time --

14          A.    The union and the MBTA had had issues and

15    problems, Counselor, not just me.  I represented the

16    MBTA as the Police Chief.

17          Q.    Let me finish my question, sir, or we're

18    not going to have a record here, and then we're

19    never going home.

20          The question is this:  Did the officers of

21    the union have issues with you as the Chief?

22          A.    I believe they did.

23          Q.    Given that the officers of the union had

24    issues with you as the Chief, on what basis do you

1    set aside those issues and contend that they called

2    Michael Mulhern because they had somehow learned

3    that you were going to give favorable testimony for

4    Officer Peixoto?

5         A.    Because I believe Anne McCall told them

6    that I was teaching at the Academy.

7         Q.    Do you have any evidence that that

8    occurred?

9         A.    That's what we're doing here, Counselor.

10        Q.    No, I'm asking you questions, sir.

11        A.    Do I have evidence with me today?  No.

12        Q.    Do you have evidence anywhere?

13        A.    I don't.

14        Q.    Have you ever asked Paul Byrne why he told

15   Michael Mulhern that he didn't want me to teach?

16        A.    I haven't had a conversation with Paul

17   Byrne in quite some time, so no.

18        Q.    Have you ever asked Greg Lee why he told

19   Michael Mulhern that he didn't want you to teach?

20        A.    No, and they never called me to offer.

21        Q.    Do you have any information from Mr. Byrne

22   or Mr. Lee, directly or indirectly, that they called

23   Michael Mulhern to ask him not to let you teach

24   because you were going to testify for Peixoto?

2-96

1      A.    No.

2      Q.    Were Byrne and Lee defendants or

3  respondents in the particular case in which you were

4  expected to give favorable testimony to Mr. Peixoto?

5      A.    I'm not sure.  I don't believe so, but I'm

6  not sure.

7      Q.    So it's your testimony that you drew the

8  inference that Paul Byrne and Greg Lee, who were

9  involved in separate litigation with Mr. Peixoto,

10 had somehow found out that you were going to give

11 testimony in a different case on behalf of Mr.

12 Peixoto, and that that is the reason that they asked

13 Michael Mulhern not to let you teach; is that right?

14     A.    Yes.

15     Q.    And do you have any evidence to support any

16 of that, other than your inferences and assumptions?

17     A.    No.

18     Q.    Now, you also mentioned that you based your

19 belief that Michael Mulhern was retaliating because

20 of your anticipated testimony on a conversation that

21 he had with Congressman Neal; is that right?

22     A.    Yes.

23     Q.    Now, you were not present for that

24 conversation, I assume?

2-102

1    lent advice to Mr. Mulhern, is there anything else

2    that causes you to believe that Mr. Mulhern was

3    acting in a retaliatory fashion?

4         A.    It's my understanding that the ultimate

5    decision, as I said there, was conveyed by Anne

6    McCall to the Academy.

7         Q.    So the fact that Mr. Mulhern -- do you know

8    to whom Mr. Mulhern conveyed his decision?

9         A.    Fleming.

10        Q.    And what did Mr. Fleming then do in terms

11   of conveying the information?

12        A.    Called me.

13        Q.    Did Mr. Fleming convey the information to

14   Anne McCall?

15        A.    I believe he said "no."

16        Q.    You thought he said "no"?

17        A.    I thought that he said "no."

18        Q.    You thought when you were sitting here in

19   this deposition that he said "no"?

20        A.    Yes.

21        Q.    What is the normal or what was the normal

22   protocol at that time with regard to passing

23   information from the general manager to the Academy?

24        A.    At that time or when I was there?

2-103

1       Q.    Well, let's say at the end of your tenure,

2   what would the protocol have been?

3       A.    It would have gone from the general manager

4   to the Police Chief.  I don't know if the general

5   manager is involved in those matters.  But if he

6   wanted to pass something to the Police Department, I

7   think he would go to the Police Chief.

8       Q.    And if the Police Chief wanted to convey

9   information to the Police Academy, what was the

10  protocol for passing that along?

11      A.    Me?  I may have gone directly to them or I

12  may have gone to Anne McCall.

13      Q.    You would not have expected the general

14  manager, upon making a decision that you were not

15  going to be permitted to teach, to convey that

16  information directly to the Academy, would you?

17      A.    Well, I would not have expected that he

18  would have had the person who I was asserting was in

19  conflict on this do it, either.

20      Q.    Would you answer my question.  Would you

21  expect the general manager to make a direct call to

22  the Police Academy?

23      A.    Possibly.

24      Q.    Are you aware of any circumstances in which

2-104

1    the general manager has made a direct call to the

2    Police Academy to convey information?

3        A.    No, I'm not.

4        Q.    Have you now told us each and every basis

5    upon which you rely in contending that Michael

6    Mulhern's decision not to let you teach was

7    retaliation for your anticipated testimony for Mr.

8    Peixoto?

9        A.    As best I can recall today, yes.

10            MS. LUKEY:   Okay.   Why don't we take a

11   break here for lunch.   It is 1:20.

12                    (Luncheon recess taken

13                     from 1:22 to 2:13 p.m.)

14

15

16

17

18

19

20

21

22

23

24

2-110

1    making reference that you thought guaranteed you

2    continuing the right to teach?

3        A.    I was scheduled to teach, and I did have

4    the contract with the Training Council to teach that

5    course.

6        Q.    Did you understand that you had a contract

7    with the MBTA that entitled you to teach that

8    course?

9        A.    At minimum, yeah, I thought I had a verbal

10   contract with them to teach that course.

11       Q.    With whom did you have a verbal contract

12   entitling you to teach that course?

13       A.    With the MBTA.

14       Q.    Well, the MBTA can't talk.  You've just

15   said it was an oral contract --

16       A.    I had a contract with the Training Council

17   to teach the course for the MBTA.  I was scheduled

18   to teach the course.  I didn't schedule myself.

19   Frank Wolverton scheduled me.  I think he's the

20   Academy director.

21       Q.    Did you have an oral contract with an agent

22   of the MBTA that guaranteed you the right to teach

23   the SIDS class in January of '03 or at any other

24   date after you ceased to be employed at the T?

2-111

1      A.    No, because I did not have the conversation

2    with him.

3      Q.    Did the MBTA, as far as you were concerned,

4    have the right to choose to have someone else teach

5    that course?

6      A.    I assume so, yes.

7      Q.    You told us last time that the specific

8    evidence that you had suggesting to you that Anne

9    McCall had influenced Michael Mulhern's decision was

10   that she was the person that delivered the message

11   to the Academy that you couldn't teach; is that

12   correct?

13     A.    Ask that again, I'm sorry.

14     Q.    You told us last time that the specific

15   evidence that you had that Anne McCall influenced

16   Michael Mulhern's decision was that she was the

17   person that delivered the message back to the

18   Academy that you could not teach.

19     A.    I did say that.

20     Q.    And you told us last time that you did not

21   have any other evidence.  Does it continue to be the

22   case that your only evidence that Anne McCall

23   influenced Michael Mulhern's decision is that she is

24   the person that delivered the message to the

2-118

1      Q.    I was referring to what you had plead in

2   your complaint about a notice on October 29th to the

3   MBTA that you were going to be a witness for Mr.

4   Peixoto.   When did Ms. McCall have knowledge of that

5   notice?

6      A.    That notice went to the MBTA, my

7   understanding, at the end of November -- excuse me,

8   the end of October.

9      Q.    The question was, when did Ms. McCall learn

10  of that notice.

11     A.    I wasn't there.   I don't know.

12     Q.    And you told us last time you don't know

13  when Mr. Mulhern learned of that notice, correct?

14     A.    Of that particular notice.

15     Q.    Yes, sir.

16     A.    No, I do not.

17     Q.    Is there any other notice alleged in your

18  complaint?

19     A.    I'm not sure.

20     Q.    Is it your testimony that Michael Mulhern

21  was put on notice sometime earlier than Mr. Notis'

22  October 29, 2002 letter that you were going to be a

23  witness adverse to the MBTA on behalf of Mr.

24  Peixoto?

1    A.    Michael Mulhern, William Mitchell, Anne

2   McCall, Diane Wong.  Yes, they all do; that I had

3   been very clear in saying that Anne McCall was

4   retaliating against this individual for having filed

5   complaints related to the MCAD against him.

6    Q.    Going back to what date had they all been

7   aware?

8    A.    I'd have to look in my notes, but I want to

9   say all the way back into 2001.  I'm not sure of the

10  date that he filed his complaint with the MCAD, but

11  there were a number of complaints filed with MBTA

12  Organizational Diversity.

13   Q.    Did anybody stop you from teaching from

14  that point forward when they became aware that you

15  were going to be a witness favorable to them?

16   A.    No.

17   Q.    Nobody stopped you from teaching until the

18  point in time when you were no longer employed by

19  the MBTA, correct?

20   A.    Yeah, pretty convenient.

21   Q.    Is that a correct statement, sir?

22   A.    My statement, "pretty convenient"?  Yeah.

23   Q.    Sir, is it a correct statement that you

24  were not told that you could not teach at the MBTA

2-120

1  until you were no longer employed by the MBTA?

2      A.   That's true.

3      Q.   What is it that you claim happened that

4  caused Mr. Mulhern, Ms. McCall and the MBTA to

5  retaliate against you by determining that you would

6  not be allowed to teach beginning in January of

7  2003, while you had been allowed to teach until that

8  time?

9      A.   I was no longer the decision-maker.  That's

10  the only thing I can figure.  I wasn't the Chief of

11  Police.  I wasn't there.

12      Q.   And so once you were no longer there, the

13  determination was made that you would not teach,

14  correct?

15      A.   Twice, yes.

16      Q.   Did Mr. Mulhern have the ability to stop

17  you from teaching as the general manager while you

18  were employed as the Chief?

19      A.   Possibly no.

20      Q.   Was he your supervisor?

21      A.   Yes, he was.

22      Q.   Did he determine whether you could perform

23  responsibilities that were not directly related to

24  your being Chief of the MBTA Police?

2-144

1    A.    I teach some with Mary McLain, and there

2    are some I do alone and some that Mary does alone.

3    Q.    And is it continuing to be your practice

4    that you do not take separate compensation; that is,

5    cash or vouchers, for teaching these classes?

6    A.    I have not.

7    Q.    So you continue to do it as part of your

8    responsibilities as a Police Chief; is that right?

9    A.    Correct.

10    Q.    Is it your contention that you have lost

11    any compensation or -- let me phrase it.

12        Have you lost any wages or compensation of

13    any kind as a result of the fact that you're not

14    teaching at the MBTA Academy?

15    A.    Yes, because the decision, as we discussed

16    last time, of whether or not I would put the voucher

17    in rests with me.

18    Q.    But you're not putting the voucher in for

19    any of them, are you?

20    A.    The question was, have I.  And the answer

21    is "No."  But as I discussed last time, that's a

22    personal decision that I make each time.

23    Q.    Well, of course, if you took the voucher,

24    you'd then have to take leave time from your job and

2-147

1    it's worth?

2        Q.    I'm asking you if you can tell us of any

3    dollars you've actually lost in reduced income,

4    reduced salary, anything of that nature.

5        A.    I don't know of any.

6        Q.    You have not lost any other teaching

7    assignments, have you?

8        A.    No.

9        Q.    It certainly hasn't had an adverse impact

10   on your role as Chief in Milford, has it?

11       A.    No.

12       Q.    Are you paid more in Milford than you were

13   paid by the MBTA?

14       A.    My take-home pay was I think just slightly

15   higher than at the MBTA.

16       Q.    You said "was."  Is it still?

17       A.    I don't know, because I don't know what the

18   Chief of the MBTA makes.  My pay is still higher

19   than what I was making, yes, because it's gone up.

20   But at the time that I left...

21       Q.    Are you aware of any professional honors

22   that you have been denied because you are no longer

23   teaching at the MBTA Police Academy?

24       A.    No.

# EXHIBIT F

1

Volume I
Pages 1 to 169
Exhibits None

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - -x
                                    :
THOMAS J. O'LOUGHLIN,               :
            Plaintiff,              :
                                    :
        vs.                         :   Civil Action
                                    :   No. 04-10257 MEL
MASSACHUSETTS BAY                   :
TRANSPORTATION AUTHORITY and        :
ANNE McCALL and MICHAEL             :
MULHERN,                            :
            Defendants.             :
                                    :
- - - - - - - - - - - - - - - - - -x

        DEPOSITION OF WILLIAM FLEMING, a witness
called on behalf of the Defendants taken pursuant to
the Federal Rules of Civil Procedure, before Jane M.
Williamson, Registered Merit Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Wilmer Cutler Pickering Hale and
Dorr LLP, 60 State Street, Boston, Massachusetts, on
Thursday, March 22, 2007, commencing at 10:12 a.m.

PRESENT:

    Michael J. Notis, Esq.,
        370 Washington Street, Brookline, MA
        02445, for the Plaintiff.

    Wilmer Cutler Pickering Hale and Dorr LLP
        (By Joan A. Lukey, Esq., and Greg M.
        Reiser, Esq.)
        60 State Street, Boston, MA  02109,
        for the Defendants.

Also Present:  Thomas J. O'Loughlin

                * * * * *

2

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| WILLIAM FLEMING | | | | |
| BY MS. LUKEY | 3 | | 165 | |
| BY MR. NOTIS | | 98 | | 166 |

\* \* \* \*

E X H I B I T S

None

\* \* \* \*

DORIS O. WONG ASSOCIATES, INC.
(617) 426-2432 ~ Fax (617) 482-7813

21

1          So at the time, instead of being considered

2    invisible, I would probably say that we were

3    considered repressive in the community.

4          Q.    Were you familiar at any point during Chief

5    O'Loughlin's tenure with something called a Zero

6    Tolerance Policy being employed by T police?

7          A.    Yes.

8          Q.    What was the Zero Tolerance Policy?

9          A.    We had had several tragic deaths along the

10    commuter rail.  I had met -- actually, the Chief was

11    with us.  We had gone to the Gay Officers Banquet.

12    And we were discussing -- I think we had five in one

13    week.

14          Q.    Five deaths?

15          A.    Yes.  And particularly -- and it was

16    getting worse.  And I had spoke to John DeFava

17    there, and we had started -- excuse me, who was

18    Colonel of the State Police at the time.  And I

19    asked him if we could borrow his helicopter to fly

20    over the commuter rail to prevent some of these

21    tragedies.

22          At the same time the Chief had decided that

23    combined with the helicopter, that we would enforce

24    the trespassing rules along the right-of-way.  And

1    he utilized the anti-crime officers in conjunction

2    with the helicopter to sweep the right-of-way with a

3    zero tolerance.  And that's -- that was on the MBTA

4    police website, that there would be a zero tolerance

5    utilized against trespassers on the commuter

6    right-of-way.

7        Q.   Is it your understanding that the Zero

8    Tolerance Policy related only to trespassing on the

9    MBTA's right-of-way?

10       A.   That was where a lot of the majority of the

11   arrests came from.  Zero tolerance policies, which

12   were also recommended by the Federal Transit

13   Administration, which had worked in New York and

14   which all the transit systems recommended, I would

15   only point to the fact if the Chief or I had issued

16   a Zero Tolerance Policy, 90 percent of the officers

17   there can go through the whole year without making

18   an arrest.

19            So if there was the policy, which I have

20   not seen ever in writing anywhere, except for the

21   commuter rail, 90 percent of the officers didn't

22   follow it.  It was a perception.

23       Q.   I'm simply trying to understand whether

24   zero tolerance -- whether the Zero Tolerance Policy

23

1   extended to behavior other than trespassing upon the

2   right-of-way, to your knowledge.

3        A.   I wrote the system security plan back then,

4   and I'm sure there's still a copy of it.   The time

5   zero tolerance was mentioned was zero tolerance

6   towards assaults on employees.   And I'm doing this

7   from recollection.   Zero tolerance on the commuter

8   rail for trespassing on the right-of-way.   And I

9   think that might have been -- I don't even think it

10  was mentioned; but if it was, it was crimes against

11  females, violence against women.   But other than

12  that, there is no -- there was no written policy

13  that I know of.   I think we would have

14  seen -- but it was on the website, and it's still on

15  the website that the Zero Tolerance Policy was aimed

16  at the commuter rail.   And I think the website said,

17  "General Manager Robert Prince has instituted a Zero

18  Tolerance Policy for trespassers on the

19  right-of-way."

20       Q.   Now, with regard to the problems with the

21  community, did those relate in some way to the Zero

22  Tolerance Policy?

23       A.   They resulted through several complaints of

24  young -- juveniles being arrested.   And they also

24

1  arose out of complaints -- I'll give you an example.

2  Last night a 14-year-old girl was arrested at one of

3  the stations.  By accident, the officers locked her

4  in the cruiser and couldn't get her out.

5         Now, her parents, when they went to find

6  her or the witnesses to the incident, I was told

7  this morning, went to six different police stations,

8  trying to figure out what police department had

9  arrested her.  So by the time the parents got to our

10 station, it was several hours later.

11        Now, what was happening on the commuter

12 rail, too, was when kids would get, say, arrested --

13 I always remember an incident in Belmont, where 19

14 kids were arrested.  You now have to transport them

15 back to 40 Southampton Street.  The parents are

16 getting phone calls that their kids have been

17 arrested.  They went to the Belmont Police, who

18 don't know anything about it.  The parents are now

19 really up in arms that their kids have been taken to

20 40 Southampton Street in Boston.  That was a lot of

21 the problems.

22        Parents, if their kids were arrested at

23 Forest Hills or Ruggles, would immediately go to the

24 Boston Police station at the time, and they'd say,

25

1   "We don't have your kids here."  That was one of the

2   problems.

3           There were problems that officers used

4   abusive language to the kids, which the Union hotly

5   contested when the Chief suspended some officers for

6   that.  There were officers falsely accused in these

7   lawsuits of being involved in these incidents, and

8   they weren't.

9           So there was a myriad -- not a myriad.  I

10  referred to the article yesterday that because of

11  that, we have now stepped up plainclothes,

12  undercover patrols on the subways.  And this is very

13  logical what is being done, but I'm not so sure that

14  we will not suffer a backlash in the next month or

15  so -- we'll wait and see -- the same type of

16  backlash.

17      Q.   Was the Zero Tolerance Policy ever

18  cancelled?

19      A.   Well, when the Operation Care stopped and

20  the anti-crime unit stopped going out on the

21  commuter rail, I don't think -- I would probably

22  think that when the Chief was here, there were

23  probably -- I'm doing this by guesswork -- there

24  might have been 500 arrests on the commuter rail for

26

1   trespassing, just to give you an example.  We

2   probably made -- and I don't have any idea what the

3   figures are right now.

4        Q.   Was the anti-crime unit ever dissolved?

5        A.   Yes.

6        Q.   When was that?

7        A.   That was probably a year or so before the

8   Chief left.

9        Q.   Was the Zero Tolerance Policy removed from

10  the website at any point?

11       A.   Once about two years probably into -- they

12  redesigned the whole website.  At the time Louis

13  Best redesigned the website.  I don't know what year

14  he redesigned it.

15       Q.   Now, at the time that Chief O'Loughlin left

16  the T, did you have any understanding as to whether

17  he would continue to teach at the T's Police

18  Academy?

19       A.   When the Chief left the T, I don't even

20  think I thought -- I didn't think -- I didn't even

21  think of it, so...  Other officers who have left the

22  T and gone to other departments -- Peter Curran, for

23  example, had left.  He taught for several years down

24  at the Academy.  He's a Norwood detective.  But

32

1    but I don't know the exact -- I can't pinpoint the

2    dates.

3        Q.    Are we talking about 2002?

4        A.    The years, I have no idea.  Probably 2002.

5        Q.    The year in which the Chief left; is that

6    when it was?

7        A.    I think the Chief left in August of 2002.

8    So it would have been -- for some reason, I think

9    October or November.

10       Q.    In any event, you can tell us that the

11   Chief was no longer on premises at the T, correct?

12       A.    Correct.

13       Q.    And do you have any idea how long it was

14   after he had departed from physical presence at the

15   T?

16       A.    A couple of months, I thought.

17       Q.    After this brief phone call in which you

18   told Frank Wolverton about Pat Lopes, what is the

19   next that you heard from anyone relating to the SIDS

20   course at the T Academy?

21       A.    Frank Wolverton called me -- I don't know

22   whether it was three or four weeks later -- and

23   said, "We don't have a teacher for the course."  I

24   said, "Now what's the problem?  I thought Pat Lopes

33

1  was teaching the course."  He said "No."  I said,

2  "Okay."  I said, "I'll get back to you."  And that's

3  my memory.  I have no idea exactly what was said;

4  but I remember after having a conversation with

5  Frank, I remember going to Anne McCall.

6      Q.    So this time it was an in-person

7  conversation with Anne McCall; is that right?

8      A.    The last time --

9      Q.    So they're both personal conversations, not

10 telephone calls?

11     A.    Right.

12     Q.    In this second conversation with Anne

13 McCall on this subject, would you give us your best

14 memory, please, of everything you said and that she

15 said.

16     A.    I said, "Anne, this is what we're going to

17 do about the class."  I said, "Tom O'Loughlin is

18 going to teach it."  And I said -- I wasn't exactly

19 sure what was going on, but we're talking about a

20 class involving kids who had died tragically.  And

21 I've had it with this place, and I'm going to take

22 the people who, for want of a better word, dislike

23 the Chief, and they're going to sit in this class.

24 And I said, "I will go down there, too."  And that's

34

1   what I told her.

2       Q.   Did you use the word "haters," "the haters

3   of Chief O'Loughlin"?

4       A.   I believe I said, "the haters of Chief

5   O'Loughlin," yeah.

6       Q.   Now, what was your purpose in suggesting

7   that the haters of Chief O'Loughlin be sent to

8   attend his class?

9       A.   Because at the time I was so disgusted of

10  how the Chief had been treated, I thought this was

11  the low of the lowest point, and that they would sit

12  in a class and hear what this poor guy had gone

13  through.

14      Q.   When you say that you were disgusted with

15  how he had been treated --

16      A.   Yes.

17      Q.   -- to what are you referring?

18      A.   Treated by certain people in the

19  department.

20      Q.   By what people in the department?

21      A.   I felt that certain people in the

22  department in particular were bitter because Tommy

23  had replaced them in their ranks of deputy chiefs at

24  the time, and they had spread malicious rumors of

47

1    brought her concerns and beliefs about Sonny Peixoto

2    to Chief O'Loughlin?

3        A.    She probably did.  I just don't remember

4    the time or the conversation.

5        Q.    Do you have any basis to believe that Anne

6    McCall in some way acted unfairly towards Chief

7    O'Loughlin because of her concerns that he was

8    protecting Sonny Peixoto?

9        A.    Give me an example of what you would think

10   is unfair.  I'm confused on that.

11       Q.    Let me rephrase the question for you, then.

12              Is there anything Anne McCall did with

13   regard to Chief O'Loughlin's status as Chief of the

14   police department or his employment by the MBTA or

15   his ability to teach at the SIDS Academy that you

16   thought was unfair?

17       A.    As far as the teaching at the Academy, I

18   didn't put it together as Anne ever having something

19   against the Chief.  I never even thought that was a,

20   you know, a component of all of this.  I do know and

21   I found out later that the three Deputy Chiefs --

22   Nadine Taylor-Miller, Anne McCall and John

23   Mahoney -- went to the general manager.  I didn't

24   go.

53

1    years.  I think he was here for about three years.

2        Q.    For the entire duration of his employment,

3    was he considered a problem officer?

4        A.    No, I don't think so at first.  He was

5    actually engaging -- Sonny had a charming

6    personality.  I think he had some problems in the

7    second or third year.

8        Q.    Did those problems include allegations that

9    he had used racial slurs?

10       A.    The Wonderland incident.

11       Q.    Did they involve allegations that he had

12   inappropriately caused a subpoena to be served in a

13   personal setting in a courtroom?

14       A.    Yes.

15       Q.    Did they involve allegations that he had

16   caused the death of an innocent civilian as he was

17   rushing late to work?

18       A.    Not when Chief O'Loughlin was here.

19       Q.    That came afterwards?

20       A.    That came after.

21       Q.    What other incidents do you recall

22   involving Sonny Peixoto during Chief O'Loughlin's

23   tenure?

24       A.    Sonny Peixoto and Greg Lee got into a

55

1     Q.   Now, when you referred to "Tommy," you were

2  talking about Chief O'Loughlin?

3     A.   Yes.

4     Q.   Let me take you back to the conversation we

5  were discussing a while ago, when you went to Anne

6  McCall and suggested that Tom O'Loughlin teach the

7  SIDS class and that you put all the haters in that

8  class.  What, if anything, did Anne McCall say in

9  response?

10    A.   I thought she agreed with me.  That was my

11  recollection; that that's what we will do.

12    Q.   So she agreed that Officer O'Loughlin

13  should teach the class, correct?

14    A.   Chief O'Loughlin, yes.

15    Q.   I'm sorry, Chief O'Loughlin should teach

16  the class.

17    A.   Yes.  She didn't object.

18    Q.   Now, after that conversation, with whom, if

19  anyone, did you next speak on the subject of Chief

20  O'Loughlin teaching the SIDS course at the T

21  Academy?

22    A.   The general manager.

23    Q.   Was that an in-person visit or a call?

24    A.   Telephone call.

60

1      A.    No.   I didn't have any names at the time.

2  Since I didn't know the phone call was coming in, it

3  wasn't something I had time to even think about.

4      Q.    Did you ever learn from any source whether

5  someone had, in fact, called the general manager to

6  turn the general manager's attention to this issue?

7      A.    Somebody said that somebody from the union

8  called, but I never had a name or anything.   I don't

9  think I heard that until later.

10     Q.    What did you do after having this

11 conversation with the general manager that related

12 in any way to Tom O'Loughlin and the SIDS course?

13     A.    I called Tommy.

14     Q.    Would you give us your best memory, please,

15 of everything you said and everything Chief

16 O'Loughlin said in that phone call.

17     A.    First of all, I was sick to my stomach

18 because I didn't want to make the phone call.   But I

19 said, "Tommy," I think I said, you know, "it has

20 nothing to do with me.   I just take orders from

21 higher-ups.   And I apologize, but they don't want

22 you to teach the SIDS course."

23     Q.    Did he say anything?

24     A.    I think he said, "This isn't fair,"

1    something to that effect.

2        Q.    Do you remember anything else that either

3    of you said?

4        A.    No, only because I couldn't -- like I said

5    before, it wasn't a conversation -- I was just

6    totally disgusted with the place by this time.  And

7    now this is a guy putting me in a position to make

8    that phone call -- it was just horrible.  And the

9    conversation was pretty short.

10       Q.    When you say, "This is the guy who put me

11   in the position of making the phone call" --

12       A.    No, of deputy Chief.  My allegiance was to

13   Tom O'Loughlin, because he had always treated me and

14   my family good.

15       Q.    Did you say anything to Chief O'Loughlin in

16   that call about Anne McCall?

17       A.    I think the Chief raised something -- this

18   is coming from Anne McCall.  And I think I said,

19   "Tommy, I just take my orders from higher-ups.  I

20   don't know where it's coming from," because I didn't

21   know where it was coming from at the time, because I

22   had only got the phone call from Mike Mulhern five

23   minutes ago.

24       Q.    But your memory is that the Chief suggested

62

1     that Anne McCall had caused this to happen?

2          A.   I think so, but -- like I've said before, I

3     wasn't -- I was upset about making the phone call.

4     But I believe the Chief raised that this is from

5     Anne McCall.

6          Q.   What was your reaction to the suggestion

7     that somehow Anne McCall had caused this?

8          A.   I don't believe I even got into it.  I

9     don't think I said anything, except "I don't know

10    where it's coming from, except that I got a phone

11    call."

12         Q.   I take it, then, that the Chief made no

13    suggestion that the union had anything to do with

14    this; is that right?

15         A.   As I said, I don't remember the union ever

16    coming up in it.

17         Q.   Given that in your own conversation with

18    Anne McCall, you understood she was in agreement

19    with having the Chief teach this class, did you have

20    any reaction to his suggestion that somehow she was

21    preventing him from teaching it?

22         A.   Not --

23         Q.   Did you believe she was preventing him from

24    teaching it?

75

1          Q.    Did you ever hear from anyone else at the

2    Academy or within the T that Anne McLaughlin had

3    rather strenuously objected to Tom O'Loughlin

4    returning to teach at the Academy?

5          A.    No, not from anybody at the T, no.

6          Q.    I may have said "Anne McLaughlin" in the

7    last question.  So the question was, with regard to

8    Anne McCall, did anyone ever tell you that Anne

9    McCall had objected.  And your answer was "No"?

10         A.    As far as I remember, that's correct.

11         Q.    Have you ever heard Anne McCall use

12   profanity?

13         A.    Yes, usually with my name in front of it,

14   but it's nothing -- that's the only time, and it was

15   more of a joke.

16         Q.    Did you ever hear her use profanity when

17   discussing Tom O'Loughlin?

18         A.    No.

19         Q.    Has anyone ever told you of an incident or

20   incidents in which she used profanity in connection

21   with Tom O'Loughlin and his desire to teach at the

22   Academy?

23         A.    Once again, I don't remember hearing it,

24   but I think I remember reading it someplace, but I

88

1    A.    I don't think so, no, because I didn't know
2  who had made that phone call.
3    Q.    Did Michael Mulhern ever say to you that it
4  was Anne McCall who placed the call to him?
5    A.    No.
6    Q.    Did you ever tell Tom O'Loughlin that Anne
7  McCall had called officers at the Academy and, using
8  expletives, told them that O'Loughlin was not to
9  teach?
10    A.    No.
11    Q.    Did you ever tell Tom O'Loughlin that he
12  was not being permitted to teach because Anne McCall
13  was retaliating against him for something?
14    A.    No.
15    Q.    Did you ever tell him that he was not being
16  allowed to teach because Anne McCall was retaliating
17  because of something to do with Sonny Peixoto?
18    A.    No.
19    Q.    Did you ever tell Chief O'Loughlin that
20  Michael Mulhern was not aware that Anne McCall was
21  retaliating against O'Loughlin in preventing
22  O'Loughlin from teaching?
23    A.    I'm a little confused on that one.
24    Q.    I can understand that.  I gather if you

111

1    Chief and Tommy Komola sat in on the contract

2    negotiations were really contentious.  They would

3    come back and tell their membership that the Chief

4    was opposed to, you know, their raises and

5    everything else.  And I think they deliberately went

6    after Tom O'Loughlin because of it.

7        Q.    You also mentioned part of the Zero

8    Tolerance Policy being directed at trespassers on

9    the T tracks, T right-of-way?

10       A.    Yes.

11       Q.    Is that something that MBTA management

12   wanted action taken on promptly?

13       A.    I believe Bob Prince, yes.

14       Q.    And at that time when Mr. Prince was

15   general manager, was Mr. Mulhern the deputy general

16   manager?

17       A.    Yes.

18       Q.    And what was his -- what was Mr. Mulhern's

19   opinion on the Zero Tolerance Policy at the time?

20            MS. LUKEY:  Objection.  What did he

21   express?

22       Q.    Are you familiar with what his opinion of

23   the Zero Tolerance Policy was at the time?

24       A.    I'm trying to remember one instance where

112

1   he said something about kids getting arrested, that

2   he must have got a phone call for or something.  But

3   other than that, I don't really remember talking to

4   him about it.

5       Q.   Do you remember him saying anything about a

6   death in Attleboro on the T tracks?

7       A.    I think the one -- the death of the poor

8   girl in Abington was the -- Kelly Boyd was the --

9   because the Greenbush line was new, and the media --

10  because -- there was a large opposition to the

11  Greenbush line on the South Shore.  The poor kid,

12  Kelly Boyd, gets hit by a train.  I know because I

13  was investigating that.  We had to go to a meeting

14  in Abington with the community groups.  And there

15  was concern that nobody was doing anything about the

16  trespassers or the right-of-way.  And there was a

17  concern, I think, that the Greenbush line could be

18  derailed in its tracks because of it; and because of

19  the amount of deaths, that somebody had to do

20  something.

21      Q.   So in relation to taking action in

22  enforcing zero tolerance in relation to trespassers,

23  Chief O'Loughlin was doing what he was told by MBTA

24  management, correct?

113

1          MS. LUKEY:  Objection.

2      A.    Yes.  Well, probably even above MBTA

3  management.

4      Q.    Who would that be?

5      A.    I would think anybody from the Governor or

6  whoever was in charge, that they were probably

7  concerned, too.

8      Q.    And in terms of zero tolerance, was that

9  policy ever cancelled, to your knowledge?

10      A.    The program Operation Care stopped, and we

11  don't go out on the commuter rail anymore.  In fact,

12  they gave an officer an Officer of the Month for

13  taking a couple of kids home for catching them on

14  the right-of-way last week.

15      Q.    Do you have any idea if anything about the

16  Zero Tolerance Policy is currently on the MBTA

17  Police website?

18      A.    It was definitely on the website when Chief

19  Carter was here.  But the website has been revamped.

20  You'd have to go to the website.  They probably have

21  it right there.

22      Q.    You mentioned earlier today that while

23  there were two people -- strike that.

24          In terms of MBTA officers who left the