1      thought he is gone."  They said, "Well,

2      he's over there, and he refuses to

3      leave."

4  Q.  Who is it that you had that conversation

5      with?

6  A.  I believe both of them.

7  Q.  At the same time?

8  A.  No.

9  Q.  Let's split it up then.  How many

10     conversations about that subject did you

11     have with Flemming?

12 A.  One or two at the most.

13 Q.  And how many conversations about that did

14     you have with McCall?

15 A.  One.

16 Q.  Okay.  Do you remember the dates of these

17     conversations?

18 A.  No.

19 Q.  Do you recall where they took place?

20 A.  I believe at the station.

21 Q.  In any of those conversations, sir, those

22     two or three conversations total you have

23     described, were there any other people

24     present during the conversations?

1    A.    I don't think so, no.

2    Q.    Okay.  Why don't you start with the one

3          or two conversations with Flemming.  What

4          do you remember about those?

5    A.    He basically told me that Chief

6          O'Loughlin was still here and he was

7          teaching at the academy.  I said, "Why? I

8          thought he's gone."  He said, "Well, he

9          refuses to leave."  And he said, "He will

10         sue us if we try and kick him out."

11   Q.    When was this, sir?

12   A.    This was September or October.

13   Q.    Okay.  Now, what was the context in which

14         that came up?

15   A.    I don't know what brought it up.  It was

16         just in conversation.  The Chief was gone

17         or about to leave when this -- I think

18         the Chief was already gone when I was

19         told about this.

20   Q.    Okay.

21   A.    So it must have been October.

22   Q.    Let's stick with the Flemming

23         conversation.

24   A.    Again, I don't recall exactly when the

```
 1        date was.  It could have been November or
 2        October.
 3   Q.   Okay.  So you don't remember the date of
 4        the conversation?
 5   A.   No.
 6   Q.   Let's stick with what was said during the
 7        conversation.  All right.  You were
 8        talking to Flemming?
 9   A.   Ah-huh.
10   Q.   Yes?
11   A.   Yes.
12   Q.   You have to answer out loud.
13   A.   Yes.
14   Q.   No one else was present?
15   A.   I don't believe so.
16   Q.   All right.  Did this come up during the
17        course of a subject the two of you were
18        talking about or in some other way?
19   A.   I'm not quite sure.
20   Q.   Did he just mention it out of the blue to
21        you?
22   A.   Yeah.  I'm trying to think of how it came
23        about.  It probably came about, like,
24         "Things are different.  The Chief is
```

1      gone." And he said, "No, he isn't. He

2      is still over at the Academy." So I had

3      some questioning about that. I couldn't

4      understand that.

5   Q. Why would Chief Flemming be telling you

6      about that?

7   A. Because it probably came up in the

8      conversation when I basically said "I

9      thought he's gone."

10  Q. You said you thought he was gone, and he

11     said, no, he refuses to leave. Then is

12     it at that time that Chief Flemming said

13     he refuses to leave and he has threatened

14     to sue us if we try and make him leave?

15  A. Yeah.

16  Q. I see. Did you have any response to

17     that?

18  A. I think I just shook my head and just

19     said, "I don't believe it."

20  Q. Okay. Did you speak with anyone -- did

21     you relate that conversation to anybody

22     else?

23  A. I spoke with Deputy McCall about it and

24     basically was told the same thing.

```
1    Q.   Okay.

2    A.   And after that I spoke with the general

3         manager.  I don't know if he called me or

4         I called him, but we had a conversation.

5         Within the conversation, it was brought

6         up "How are things going?"  I said, "It's

7         going pretty good."  He said, "It must be

8         calmer there and less stressful."  I

9         said, "To a degree."  I said, "But the

10        Chief is still here.  He hasn't left."

11        He said, "What do you mean?"  I said,

12         "Well, I'm told he is still at the

13        Academy."  He said, "I don't understand

14        that.  I thought he was gone."  I said,

15         "Apparently he's not."  That was it.

16   Q.   Who was that conversation with?

17   A.   Michael Mulhern, the general manager at

18        the time.

19   Q.   How many times had you spoken with

20        Michael Mulhern before that?

21   A.   Before that?

22   Q.   Yes.

23   A.   In the course of my duties as president

24        of the union, probably 10, 20 times.
```

1  Q.  When is it you spoke to Mulhern about

2      that subject that you just mentioned?

3  A.  Right around that same time period that I

4      spoke to Flemming and McCall.

5  Q.  All right.  So you were no longer

6      president of the union at that point?

7  A.  I think I either was or I was business

8      agent.  It was right at the end of my

9      time.

10  Q.  Are you sure it wasn't January, sir?

11  A.  I don't remember that.  I don't think it

12      was that late.

13  Q.  Okay.  Well, let's go back to your

14      conversation with Anne McCall.  You said

15      you discussed this subject of Tom

16      O'Loughlin teaching at the Academy with

17      Anne McCall.  How did that come up?

18  A.  Well, I saw her in the station.  I asked

19      her about it.  She said, "Yeah, it's

20      true; he's still there."

21  Q.  What is it you said to her and what is it

22      she said to you?

23  A.  I asked her if it was true that the Chief

24      was still here, that he was still

```
 1         teaching at the Academy, and she said it

 2         was.

 3    Q.   Okay.  What was the context of that

 4         conversation?

 5    A.   Not much.  She just shrugged her

 6         shoulders and walked away.

 7    Q.   Were you talking to her about something

 8         else or did you approach her specifically

 9         to talk about that?

10    A.   I don't think so.  I just saw her in the

11         building.

12    Q.   So you just saw her in the building, and

13         the first thing you say is, "Is it true

14         the Chief is still teaching?"

15    A.   Pretty much, yeah.

16    Q.   Well, let's get beyond that pretty much.

17         Did you say anything else to her?

18    A.   Not that I recall.

19    Q.   All you recall saying to her is, "Is it

20         true the Chief is still teaching?"

21    A.   Ah-huh.

22    Q.   Yes?

23    A.   Yes.

24    Q.   What did Ms. McCall say to you?
```

1    A.    What I just said.

2    Q.    Well, I want to know exactly what she

3          said.

4    A.    "Yeah, he's still here."  She kind of

5          shrugged her shoulders, and that was it.

6    Q.    How long did that conversation last?

7    A.    About 30 seconds, 10 seconds.

8    Q.    Did you or she say anything else during

9          that conversation?

10   A.    Not that I recall.

11   Q.    Do you know if you said anything else

12         during that conversation?

13   A.    No.

14   Q.    Okay.  Who else did you speak to about

15         this -- well, did you tell anyone else --

16         strike that.

17              Did you tell anyone that

18         Flemming said to you O'Loughlin is still

19         teaching and he is going to sue the T if

20         we don't let him?

21   A.    I don't know.  I know I told Mulhern he

22         was still at the Academy.  I don't know

23         if I mentioned that he was going to sue

24         or not.

1    Q.    Okay.  Do you know if you told anybody

2          that Flemming had said to you he was

3          going to sue?

4    A.    I would be guessing.

5    Q.    So the answer is you don't know?

6    A.    I don't know.

7    Q.    Okay.  Other than that one 30-second

8          conversation with McCall, have you had

9          any other conversations with McCall about

10         the subject of O'Loughlin teaching at the

11         Academy?

12   A.    Not really.  Either right at that time or

13         right after that, you know, I left the

14         police station and worked out of South

15         Boston at a small office.

16   Q.    I understand.  But did you have any

17         further conversations with McCall about

18         this?

19   A.    No, not until I found out that he had

20         left.  Someone had told me that he had

21         left.  So I might have talked to her.  I

22         might have talked to Flemming.

23   Q.    What do you recall about either of those

24         conversations?

```
1    A.   Just that the Chief was gone.

2    Q.   Did you say anything in either of those

3         conversations about whether he would

4         still be teaching or not?

5    A.   No.  It was just brought up that the

6         Chief was gone.

7    Q.   Who brought it up and what did they say?

8    A.   I believe both McCall and Flemming in

9         conversation had told me he was gone.

10   Q.   When did they say that to you?

11   A.   I'm not sure.

12   Q.   Do you recall exactly what they said?

13   A.   Just that the Chief was gone.

14   Q.   At any point since that one conversation,

15        have you ever spoken with McCall about

16        the subject of Tom O'Loughlin teaching at

17        the Academy?

18   A.   I might have.  I really don't recall.

19        This is five years ago.

20   Q.   So you might have, but you don't

21        remember?

22   A.   Yeah.

23   Q.   All right.  At any point have you spoken

24        with Anne McCall about this lawsuit that
```

```
1          Tom O'Loughlin brought?

2    A.   No.

3    Q.   Other than counsel, have you spoken with

4         anybody about it?

5    A.   No, nobody.

6    Q.   Have you spoken with Greg Lee about it?

7    A.   No.  He doesn't even know I'm here.

8    Q.   Does McCall know you are here?

9    A.   If she does, she didn't hear it from me.

10   Q.   All right.  Since that conversation with

11        Flemming -- well, you say you thought you

12        had one or two conversations with

13        Flemming about that subject, correct?

14   A.   I'm sure I had seen him a few times after

15        that.

16   Q.   Well, I'm not asking you if you had seen

17        him a few times after that.  I'm asking

18        if you had discussions with him about

19        that subject after that one time?

20   A.   No.  I didn't really care about it after

21        that.  I wasn't really interested.

22   Q.   So when you said one or two conversations

23        with him, you were mistaken?  It was

24        really one conversation?
```

1   A.   Possibly.

2   Q.   Well, which was it, sir?

3   A.   I'm not sure.

4   Q.   If you had a second conversation about it

5        with him, you don't recall anything about

6        that conversation?

7   A.   No, I don't.

8   Q.   I see.  Okay.  So you had one or two

9        conversations with Flemming about the

10       subject of Tom O'Loughlin teaching at the

11       Academy.  You had one conversation with

12       McCall about it.  Did you ever speak to

13       Greg Lee about it?

14  A.   I'm sure I did.

15  Q.   What do you remember about that?

16  A.   Other than probably telling him that the

17       Chief is still here, nothing.

18  Q.   Well, when you said you probably told

19       him, do you remember --

20  A.   Well, I'm sure --

21  Q.   You have to wait for me to finish my

22       question, and then I'll wait for you to

23       finish your answer.  All right?

24  A.   Okay.

1     teaching at the MBTA Police Academy?

2  A.  No.

3  Q.  What were the circumstances of your

4     speaking to Mulhern about this?

5  A.  Just what I said earlier.

6  Q.  And what was that?

7  A.  That we had a conversation.  I don't know

8     if I called him or he called me.  Within

9     the scope of the conversation, he asked

10    me how things were going, you know, "Is

11    it calmer there, less disruptive?"  I

12    said, "Yeah, it's getting better."  He

13    said, "Well, with the Chief gone, does

14    everyone feel better?, and I said, "Well,

15    that's the only thing I have a question

16    about.  He's still here."  He said, "What

17    do you mean?"  I said, "Well, I

18    understand he is at the Academy

19    teaching."  He said, "No, that can't be."

20    I said, "I don't know, check with Acting

21    Chief Flemming and ask him."  That's the

22    last time I talked to Mulhern.

23  Q.  Okay.  Is that all you said to him about

24    that subject?

1    A.    Yeah.    It was a brief conversation.

2    Q.    Okay.    You didn't express to him that

3          O'Loughlin shouldn't be teaching?

4    A.    I don't believe I said he has to be out

5          of here.    I said I just couldn't

6          understand why he was still here.

7    Q.    I understand you expressed some surprise

8          to him that O'Loughlin was teaching.

9    A.    I didn't say fire him or throw him out,

10         no.

11   Q.    Did you tell him it was bad for morale

12         that Tom would be teaching there?

13   A.    I might have.

14   Q.    You don't remember that?

15   A.    I don't remember.    I don't remember the

16         whole conversation, no.

17   Q.    Well, do you recall saying anything else

18         to him during that conversation about the

19         subject of Tom O'Loughlin teaching at the

20         Academy?

21   A.    No.    I don't remember everything that was

22         said.    No.

23   Q.    All right.    Do you know if there was

24         anything else said about him teaching at

1    the Academy?

2    A.   I don't recall.

3    Q.   Okay.   That conversation was regularly --

4         in that conversation, was Greg Lee on the

5         phone with you?

6    A.   No.

7    Q.   Do you know if Greg Lee ever spoke to

8         Mulhern about Tom O'Loughlin teaching at

9         the Academy?

10   A.   I don't know.

11   Q.   Now, when you were speaking to

12        Mr. Mulhern, were you still president of

13        the union or were you the business agent?

14   A.   I thought I was still president of the

15        union.

16   Q.   But you're not sure?

17   A.   I'm not sure of the exact time frame.   It

18        could have been afterwards, but I didn't

19        think so.

20   Q.   All right.   Did you ever speak to the

21        Boston Globe about Tom O'Loughlin or any

22        reporter from the Boston Globe about Tom

23        O'Loughlin?

24   A.   About this particular thing?

1    Q.   No.   About Tom O'Loughlin?

2    A.   Sure.   I talked to a lot of reporters

3         about Chief O'Loughlin.

4    Q.   Did you ever mention anything to any

5         reporter about him in the Globe in 2004?

6         Did you ever tell any reporter from the

7         Globe that Tom O'Loughlin was Nancy

8         O'Loughlin's cousin?

9    A.   I don't recall that.

10   Q.   Did you ever tell a reporter from the

11        Boston Globe that Nancy O'Loughlin could

12        be subject to criminal charges?

13   A.   No.

14   Q.   Did you ever tell any reporter for the

15        Boston Globe that Nancy O'Loughlin was an

16        officer who had been suspended for

17        various reasons?

18   A.   No.

19   Q.   You never did that?

20   A.   I don't recall that, no.

21   Q.   Okay.   Now, you said that that

22        conversation that you had with Mulhern

23        was the last time you spoke with him,

24        correct?

1    A.   About this case?

2    Q.   No.  You said a moment ago that that

3         conversation with Mulhern was the last

4         time you spoke with Mulhern.

5    A.   The last time I spoke with him -- I

6         probably spoke to him two or three times

7         after that over a span of a couple of

8         years.

9    Q.   Okay.

10   A.   Retirement parties and things like that.

11   Q.   Okay.  At any time after that

12        conversation, sir, did you mention

13        anything to him or did he mention

14        anything to you about Tom O'Loughlin?

15   A.   No.

16   Q.   In any prior conversations with him, did

17        you mention anything about Tom

18        O'Loughlin?

19   A.   Prior to this?

20   Q.   Prior to the conversation that you were

21        telling me about when you discussed Tom

22        O'Loughlin teaching at the Academy.

23   A.   I'm sure I talked to him.  I might have

24        brought the Chief's name up.

1    Q.   Did you tell him the Chief wasn't doing a
2         good job?
3    A.   I'm sure I did.  Yeah.
4    Q.   Do you have any knowledge of what course
5         it was that Tom O'Loughlin was going to
6         be teaching at the Academy?
7    A.   I'm pretty sure it was probably SIDS.
8    Q.   Why are you pretty sure about that?
9    A.   Because he was very knowledgeable on
10        that.
11   Q.   Did you have any opinion as to whether it
12        would be bad for him to teach that course
13        at the Academy?
14   A.   No.
15   Q.   Since he was very knowledgeable about
16        SIDS, why did it surprise you that he
17        would still be teaching that course?
18   A.   It didn't surprise me he would be
19        teaching that course.  It surprised me
20        that he was still here.  He had left.
21   Q.   When you say "still here," was he, to
22        your knowledge, employed in any capacity
23        other than possibly teaching the course?
24   A.   No.

1      While I was there, before I left for

2      business agent, I was president of the

3      union.  I was also a detail officer, and

4      I worked right below the Chief and the

5      deputy chief.  I was always there.

6   Q.  You didn't attend command staff meetings?

7   A.  No.

8   Q.  I see.  Is there any other way that you

9      know there was bad blood between the two

10     of them?

11  A.  No.

12  Q.  Did Anne McCall ever say anything to you

13     that was in any way negative about Chief

14     O'Loughlin?

15  A.  Not that I recall.

16  Q.  Okay.

17  A.  I didn't have a lot of conversations with

18     her.

19  Q.  But to the extent you did, she never said

20     anything you remember that was negative

21     about O'Loughlin?

22  A.  Not to my knowledge, no.

23  Q.  Did Anne McCall in any way encourage you

24     to speak to Mulhern about Tom O'Loughlin

```
1        teaching at the Academy?

2    A.  No.

3    Q.  Did she know you had spoken to Mulhern

4        about that?

5    A.  I'm sure she probably found out after she

6        called the Chief or after he called the

7        Chief or the Acting Chief.

8    Q.  After who called the --

9    A.  Mulhern.

10   Q.  How do you know he did that?

11   A.  Because later on they told me the Chief

12       was no long there.

13   Q.  Who is "they"?

14   A.  McCall and Flemming.

15   Q.  When did McCall tell you that?

16   A.  I have no idea when.

17   Q.  But at some point --

18   A.  Sometime later, after my initial

19       conversation.

20   Q.  Do you recall what she said to you?

21   A.  I think the same thing the Acting Chief

22       did.  They said, "He is no longer there."

23       That's it.

24   Q.  How do you know that Mulhern had anything
```

1       to do with that?

2   A.  Well, I would assume that Mulhern called

3       them.  I'm pretty sure they said he did.

4   Q.  So McCall or Flemming told you that they

5       had been called by Mulhern?

6   A.  I think so, yeah.

7   Q.  And what is it they said Mulhern told

8       them?

9   A.  I don't know.

10  Q.  Is there any other way you know that

11      Mulhern was involved in the decision that

12      O'Loughlin wouldn't teach?

13  A.  No.

14  Q.  What does Greg Lee know about O'Loughlin

15      teaching at the Academy or not teaching

16      there?

17  A.  I don't know.  You would have to ask him.

18  Q.  Did you ever talk to him about that?

19  A.  No, I haven't.  I haven't seen him in

20      ages.

21  Q.  When was the last time you saw him?

22  A.  I think at a retirement party a year or

23      two ago.

24  Q.  Now, when you had this conversation with

1      Mr. Mulhern, was that face-to-face?

2  A.  No.

3  Q.  It was on the phone?

4  A.  I'm pretty sure it was on the phone, yes.

5  Q.  How long was the whole conversation?

6  A.  It was very brief.

7  Q.  How brief was it?

8  A.  A minute, maybe.

9  Q.  Well, was the minute just about Tom

10     O'Loughlin or was the whole conversation

11     with him a minute?

12  A.  The whole conversation with him was about

13     a minute.

14  Q.  Okay. You don't recall if you called him

15     or he called you?

16  A.  No. I don't remember.

17  Q.  Okay. Well, if you had called him, why

18     would you have been calling?

19  A.  Why would I have been calling? I

20     probably would have been calling him to

21     ask him about the Chief still being here,

22     if I called him. If he called me, I

23     probably brought it up in conversation.

24  Q.  What would Mulhern have been calling you

1      about if he is the one who initiated the

2      conversation?

3   A.  If he called me, it was probably about

4      how things were going.

5   Q.  That would just be a one-minute

6      conversation?

7   A.  Pretty much, yeah.

8   Q.  And if you had called him, why would you

9      have taken it upon yourself to call

10     Mulhern about O'Loughlin teaching at the

11     Academy?

12  A.  Because I thought he had left, and he

13     hadn't left.

14  Q.  Right.  So why would you call the general

15     manager of the MBTA about someone

16     teaching at the police academy?

17  A.  Because he is in charge of the MBTA.  He

18     oversees everybody.

19  Q.  Well, who was in charge at the time of

20     the police academy?

21  A.  Who was in charge of what?

22  Q.  The MBTA Police Academy.  Who was the

23     head of the Academy?

24  A.  The Chief or the Acting Chief.

1    Q.   Wasn't McCall involved in supervising the

2         Academy?

3    A.   She probably oversaw it, too, yes.

4    Q.   You didn't know that?

5    A.   I don't know if she was still in charge

6         of training.  At one time she was.  I

7         don't know if she was at that time.

8    Q.   Well, if you didn't know if she was in

9         charge of it, why did you mention to her

10        that O'Loughlin was still teaching there?

11   A.   Because she was the deputy chief.

12   Q.   Did you mention it to any other deputy

13        chiefs?

14   A.   I don't think so.  I don't recall.

15   Q.   So you had some problem, then, with Tom

16        O'Loughlin teaching at the Academy?

17   A.   I had a problem with the fact that he was

18        still here.  He had gone.  We had a new

19        chief coming in, and I couldn't

20        understand why he was still around.

21   Q.   Was he around in any way other than

22        teaching a course possibly at the

23        Academy?

24   A.   No.

1  Q.  All right.  Well, if you had a problem

2      with him teaching a course at the

3      Academy, why didn't you tell the Chief of

4      Police that instead of going to the

5      general manager?

6  A.  I'm sure I mentioned to the Chief that it

7      didn't make sense why he was still here.

8      Then, like I told you earlier, he said,

9      "Well, he's not leaving because he said

10     he would sue us."

11 Q.  Well, in calling Mulhern -- if you called

12     Mulhern to talk to him about this, I take

13     it your goal was to stop O'Loughlin from

14     teaching at the Academy?

15 A.  I wanted to make him aware of it.  I

16     didn't think it was a good idea.

17 Q.  Was it your goal to have him do something

18     to stop O'Loughlin from teaching at the

19     Academy?

20 A.  No.  My goal was to make him aware of

21     it.  Whatever was his decision was his.

22 Q.  Why do you think he wasn't aware of it

23     from speaking with Chief Flemming?  Did

24     you think this was something that Mulhern

1       had no knowledge of?

2    A.   Yes.

3    Q.   Why did you think that Mulhern had no

4       knowledge of it?

5    A.   I got that feeling from Flemming, you

6       know, that he was handling it and he

7       didn't know what to do.

8    Q.   But he didn't say whether Mulhern knew

9       about it or not?

10   A.   No.

11   Q.   Did you ever ask him if Mulhern knew

12      about this?

13   A.   I don't believe I did, no.

14   Q.   And you wouldn't, as a matter of

15      following the chain of command, speak to

16      Flemming and see if Mulhern knew about

17      this before just calling the general

18      manager?

19   A.   No, I don't think so.

20   Q.   You were aware of the chain of command at

21      that time?

22   A.   I already spoke to Flemming.  He made me

23      aware of it.

24   Q.   But you hadn't expressed to him that you

1       thought O'Loughlin shouldn't be there?

2    A.  I'm sure I said, "I don't understand why

3        he is still here.  I thought he was

4        gone."

5    Q.  Well, that's just showing you didn't

6        understand it.  You didn't express to him

7        that it was a bad idea and that you were

8        opposed to it?

9    A.  His conversation -- basically, it sounded

10       to me like there was nothing he could do

11       about it.

12   Q.  So you took matters into your own hands

13       to call Mulhern?

14           MR. REISER:   Objection.   You

15       can answer.

16   Q.  Sir, is that what you did?

17   A.  I either called him -- when I had a

18       conversation with him, whether he called

19       me, it was brought up in the

20       conversation.

21   Q.  Did you ever call anyone who was assigned

22       to the Academy to speak with him?

23   A.  No.

24   Q.  Did you ever speak to Frank Wolvertine

1     about it?

2   A.   No.

3   Q.   Did you ever talk to Chris Donahue about

4     it?

5   A.   Chris Donahue who?

6   Q.   Chris Donahue who was one of the officers

7     assigned to the Academy, sir?

8   A.   No.

9   Q.   Did you ever -- did you attend -- how

10     often did union meetings occur back in

11     the fall/winter of '02/03?

12  A.   They only had maybe two to four union

13     meetings a year.

14  Q.   Did you ever discuss this subject at a

15     union meeting?

16  A.   No, never.

17  Q.   Did you ever tell anyone at the union

18     that you had spoken to Mr. Mulhern about

19     Tom O'Loughlin teaching at the Academy?

20  A.   I don't recall.

21  Q.   Did you ever tell anyone other than

22     counsel that you spoke to Michael Mulhern

23     about Tom O'Loughlin teaching at the

24     Academy?

1   A.   I don't recall if I talked to anyone

2        about it.

3   Q.   Did Mulhern say to you -- did you say to

4        Mulhern that O'Loughlin had threatened to

5        sue if he wasn't allowed to teach?

6   A.   I think I told him that.

7   Q.   You didn't mention that to me before.

8        Did you forget about it?

9   A.   Maybe I did.

10  Q.   I see.  Is there anything else in your

11       conversation with Mulhern that you

12       remember now?

13  A.   I don't.  It's six years ago.

14  Q.   If you told Mulhern that O'Loughlin had

15       threatened to sue if he wasn't allowed to

16       teach, did you tell him how you had that

17       information?

18  A.   I'm sure I told him that I spoke to the

19       Acting Chief.

20  Q.   But you don't remember if you said that

21       stuff or not?

22  A.   No, I don't.

23  Q.   Okay.  Do you recall what his response

24       would have been, if you said that to him?

1    A.    I thought I said earlier that he didn't

2          believe it.

3    Q.    He didn't believe he was teaching there

4          or he didn't believe he had threatened to

5          sue?

6    A.    That he was teaching there.

7    Q.    Did you have any -- did he have any

8          response when you said he had threatened

9          to sue?

10   A.    Not that I recall.

11   Q.    This was the first Mulhern had heard

12         about this, correct?

13   A.    Yeah.

14   Q.    I see.  I mean, are you guessing that or

15         did he say that to you?

16   A.    He seemed, you know, to just not

17         understand it.  It was the first he heard

18         of it, to my knowledge.

19   Q.    Let me understand this a little better.

20         You will acknowledge that Tom O'Loughlin

21         was an expert in SIDS, correct?

22                MR. REISER:   Objection.  You

23         can answer.

24   Q.    Sir?

# EXHIBIT L

T/OL
Ex 6

ANNENBERG & LEVINE, LLC
Attorneys at Law
370 Washington Street
Brookline, Massachusetts 02446
617-566-2700

Mitchell Jay Notis
Of Counsel

October 29, 2002

By Messenger

Gregory A. Manousos, Esq.
Morgan, Brown & Joy
One Boston Place
Boston, MA 02108-4472

Re: Helder Peixoto vs. MBTA and Anne McCall, MCAD Docket Number 02-BEM-00069

Dear Mr. Manousos:

As you are aware, I represent Officer Helder Peixoto in the above-captioned action now pending at the Massachusetts Commission Against Discrimination. It is our claim in this action, among other things, that Deputy Chief Anne McCall has intentionally subjected Officer Peixoto to retaliation and harassment for several years.

Unfortunately, this case has not been progressing to conclusion at the MCAD. Additionally, new evidence has come to our attention which strongly confirms our claims regarding the intentional retaliation engaged in by Deputy McCall. It has become clear that Deputy McCall has engaged in a campaign of harassment and discrimination against Officer Peixoto. She has done this in retaliation against him for his having made internal complaints to the MBTA's Organizational Diversity Office about her, and for his having filed charges of discrimination with the MCAD. Deputy McCall has consistently devoted her time and energy to trying to cause Officer Peixoto harm, to cause him to be either disciplined or fired, and to destroy his career.

Deputy McCall's efforts have to some extent succeeded, as she has forced Officer Peixoto to spend inordinate amounts of time and energy defending against her groundless charges, ands she has forced him to undergo the pressure and stress her harassment causes. Deputy McCall has wrongfully caused Officer Peixoto to undergo extreme emotional distress, sometimes to the extent that he is unable to work or to engage in his daily activities. This situation simply cannot be allowed to continue, or to escalate.

Gregory Manousos, Esq.
October 29, 2002
Page 2

These factors have led us to conclude that in order to properly litigate this dispute, it is necessary for the case to be removed from the MCAD, and a lawsuit filed in federal court. In addition to the claims set forth in the MCAD action, the facts of this matter will also support the prosecution of claims pursuant to 42 United States Code Section 1983 against Deputy McCall for the intentional violation of Officer Peixoto's civil rights.

My point in writing to you at this point in time is to suggest to you the possibility of submitting this dispute to mediation or conciliation, to determine if a negotiated resolution to this matter can be achieved. Officer Peixoto would prefer not to have to engage in protracted federal litigation against the MBTA and Deputy McCall. However, he cannot allow the present situation to continue to escalate, and Officer Peixoto must be made whole for all of the wrongs done to him by the MBTA and Deputy McCall. Accordingly, if this dispute is not making satisfactory progress towards resolution within a reasonable time after your receipt of this letter, we will proceed to remove this matter to court.

So that you have a greater understanding of our position, we have set forth below some (but not all) examples of Deputy McCall's consistent practice of engaging in hostile, unjustified and retaliatory actions against Officer Peixoto:

1. Presenting apparently false testimony in an October 2002 Civil Service hearing involving Officer Peixoto.

2. Consistently, over several years, falsely telling former Chief Thomas O'Laughlin that Officer Peixoto had either violated departmental rules or policies, had broken various laws, had been insubordinate, or was not mentally competent to be an MBTA Police Officer.

3. Informing Chief O'Laughlin in August 2001 that Officer Peixoto had violated MBTA policy regarding certain contacts he had with the media. Deputy McCall had Officer Peixoto suspended for the media contacts. Notably, Chief O'Laughlin and the MBTA felt that Deputy McCall's actions were an attempt to infringe upon Officer Peixoto's First Amendment rights.

4. Accusing Officer Peixoto in November 2001, in a memo to Chief O'Laughlin, of various violations of law and MBTA policy.

T. O'L 0473

Gregory Manousos, Esq.
October 29, 2002
Page 3

5. In a January 2002 memo to Chief O'Laughlin objecting to his decision not to discipline Officer Peixoto regarding an Internal Affairs matter, Deputy McCall refers to Chief O'Laughlin as attempting to act as "defense counsel for Officer Peixoto." In that memo, she also objected to Chief O'Laughlin's failure to find fault with Officer Peixoto. The "defense counsel" reference was later referred to by Chief O'Laughlin as being a possible indicator of Deputy McCall's "bias" against Officer Peixoto.

6. In April 2002 Deputy McCall assisted Officer Powers in his slander of Officer Peixoto (claiming that Officer Peixoto was psychologically unfit for duty), and asked Powers to inform MBTA General Manager Mulhearn that Officer Peixoto had subjected her to harassment and frivolous complaints. She suggested that General Manager Mulhern be told that Officer Peixoto should not be in a position of authority, and that he abused authority. She made these suggestions knowing that her remarks would be passed on to the highest levels of MBTA management, permanently tainting Officer Peixoto's career.

7. In August 2001 Deputy McCall wrote to Chief O'Laughlin that Officer Peixoto's behavior during a hearing that she was conducting regarding his suspension was "unprofessional." Deputy McCall falsely and inappropriately stated that Officer Peixoto's behavior was "insulting" and unprofessional. In response, Chief O'Laughlin commented negatively about Deputy McCall's remarks, and noted that her suggestion as to how the hearing decision should be handled procedurally, could result in, essentially, a denial of substantive due process.

8. In August 2001 Deputy McCall suggested to Chief O'Laughlin that Officer Peixoto be disciplined for improper use of sick leave. After discussions with Superintendent Komola, it was determined that Officer Peixoto's use of sick leave was appropriate.

9. In January 2002 Deputy McCall falsely stated to Superintendent Komola, that Officer Peixoto was "irresponsible and untruthful."

10. In October 2001 Deputy McCall conducted an investigation of Officer Peixoto for being AWOL. As Deputy McCall realized, the alleged AWOL time was in actuality time when Officer Peixoto was attending, with his supervisor's permission, his own workers compensation hearing. Deputy McCall's investigation was found to be without merit. Deputy McCall's allegation that Officer Peixoto had "lied" to his supervisor about this incident, was also found, by Chief O'Laughlin, to be without merit. Chief O'Laughlin wrote that the very information presented by Deputy McCall "supports a finding contrary to that which [she] recommended."

Gregory Manousos, Esq.
October 29, 2002
Page 4

11. In a memo to Chief O'Laughlin dated September 7, 2001, Deputy McCall falsely accuses Officer Peixoto of a "continuing pattern of using his official position for personal gain," and suggests that a discharge hearing be conducted.

12. On June 19, 2002 Deputy McCall yelled at Officer Peixoto, without having any reason to do so.

13. On June 25, 2002 Deputy McCall verbally assaulted Officer Peixoto, with no justification, causing him to suffer heart palpitations and related symptoms. This incident, coupled with her prior attacks and actions against Officer Peixoto, caused him to be unable to work due to job related stress for several weeks. Among the various things Deputy McCall yelled on June 25 was the following: "Why don't you fax something else to Diversity," a reference to some of the complaints Officer Peixoto had filed against her. Deputy McCall then proceeded to make derogatory references to people of Portugese ancestry. These actions were witnessed by other employees.

14. Deputy McCall has purposely misplaced Officer Peixoto's medical records/reports.

15. Deputy McCall has leaked a story to the media regarding Officer Peixoto.

16. Deputy McCall informed Officer Peixoto that she would be conducting an internal investigation of him, even though the conduct at issue involved an incident in which Officer Peixoto was not on duty.

17. Internal investigations of Officer Peixoto have been conducted under the supervision of Deputy McCall within days, even though similar investigations of other officers are conducted over a period of three to eight months.

18. In February 2002, Deputy McCall failed (or refused) to investigate allegations made by Officer Peixoto of threats made against him by another MBTA officer.

19. Deputy McCall has started various baseless internal affairs investigations against Officer Peixoto.

20. In September 2002 Deputy McCall wrongfully started an investigation of Officer Peixoto in regard to his having attended his own unemployment benefits hearing, even though Officer Peixoto had properly accounted for his time. Not only was this particular incident inappropriate, but it revealed that Deputy McCall had taken it upon herself to review Officer Peixoto's time records, in order to be able to further harass him.

Gregory Manousos, Esq.
October 29, 2002
Page 5

     The above is not a complete listing of all of the actions which have been taken against Officer Peixoto by Deputy McCall in the past two years which are either inappropriate, discriminatory, retaliatory or in violation of officer Peixoto's civil rights. However, it does provide a good snapshot of the wrongs which Officer Peixoto has been subjected to.

     Apparently. Deputy McCall's retaliatory actions toward Officer Peixoto stem, initially, from the fact that on or about early November 2001, Officer Peixoto filed a complaint against Deputy McCall with the MBTA's Office of Organizational Diversity.[1] Since then, Officer Peixoto has filed other complaints regarding Deputy McCall, and her retaliation and mistreatment of him is related to those subsequent complaints as well.

     Most importantly, as knowledgeable a witness as former Chief of the MBTA Police Department Thomas O'Laughlin is of the opinion that Deputy McCall's actions were retaliatory.

     In this regard, it is my understanding that Chief O'Laughlin has written in an official MBTA document that the reason he, Chief O'Laughlin, was the subject of complaints filed by Deputy McCall, was the fact of:

     **"...her displeasure with my refusal to participate in her scheme of retaliation against Officer Helder Sonny Peixoto in response to his filing of a complaint in accordance with MGL Chapter 151B and the Organizational Diversity Policies of the MBTA, against Deputy Chief Anne McCall and the MBTA...I believe that deputy Chief Anne McCall has committed a violation of MGL Chapter 151B, the Organizational Diversity Policies of the MBTA, and MGL Chapter 149 section 185 (Massachusetts Whistleblower Law)..."**

     I do not believe I have to stress to you the impact that this statement by Chief O'Laughlin would have upon a jury sitting in judgment upon Officer Peixoto's claims against Deputy McCall and the MBTA, and reviewing this opinion of the Chief of Police. As I am sure you are aware, Chief O'Laughlin is an extremely persuasive, effective witness in front of a jury. I would imagine that his testimony from the witness stand would be even more powerful than his written statement on this issue.

     As I have mentioned, we would like to be able to resolve this dispute without the necessity of prolonged litigation. However, we will proceed with any and all litigation, in an expeditious manner, if that is what is required to correct the wrongs done to Officer Peixoto, and to make him whole for those wrongs done to him.

---

[1] Even prior to this early November 2001 date, Deputy McCall had, on several occasions, exhibited unfair treatment and malice towards Officer Peixoto.

T. O'L 0476

Gregory Manousos, Esq.
October 29, 2002
Page 6


     Please contact me as soon as possible to let me know how you wan to proceed. I look forward to hearing from you.


                     Very truly yours,

                     Mitchell Jay Notis

CC: Helder Peixoto

T. O'L 0477

# EXHIBIT M

COPY

1

2          UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS
3    C.A. NO: 04-10257 MEL         VOLUME I

4    ***********************************
     THOMAS J. O'LOUGHLIN,
5                        Plaintiff
                  vs.
6    MASSACHUSETTS BAY TRANSPORTATION
     AUTHORITY and ANNE McCALL and MICHAEL
7    MULHERN,
                  Defendants
8    ***********************************

9

10

11          DEPOSITION of CHRISTOPHER

12   DONAHUE, a witness called on behalf of

13   the Plaintiff, pursuant to the

14   Massachusetts Rules of Civil Procedure,

15   before Lisa E. Berkland, a Certified

16   Shorthand Reporter and Notary Public in

17   and for the Commonwealth of

18   Massachusetts, held at Wilmer, Cutler,

19   Pickering Hale & Dorr, 60 State Street,

20   Boston, Massachusetts, on Friday, August

21   31, 2007, commencing at 11:00 a.m..

22

23               LISA E. BERKLAND, CSR
                 P.O. Box 286
24               Westwood, MA 02090
                 (508) 850-5171

1

    APPEARANCES:

2

LAW OFFICE OF MITCHELL J. NOTIS

3
    (By Mitchell J. Notis, Esquire)
    370 Washington Street

4
    Brookline, Massachusetts  02445
    (617) 566-2700

5
        On behalf of the Plaintiff.

6

WILMER, CUTLER, PICKERING, HALE & DORR

7
    (By Gregory M. Reiser, Esquire)
    60 State Street

8
    Boston, Massachusetts  02109
    (617) 526-6527

9
        On behalf of the Defendants.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1      personal opinion, that's false.

2   Q.  I don't disagree with you on that, but do

3      you know if anyone ever said that Tom had

4      said that?

5   A.  Oh.  I'm sorry.  I went through that

6      whole schpiel --

7   Q.  It was good that you did.

8   A.  I volunteered that.

9   Q.  It was good that you did.  Are you aware

10     of anyone saying that Tom O'Loughlin said

11     that about failing?

12  A.  No, not that I recall.

13  Q.  Do you have any knowledge of Anne McCall

14     preventing Tom O'Loughlin from teaching

15     at the Academy?

16  A.  She could have been the one that didn't

17     want him to teach the SIDS class.

18  Q.  Do you know any knowledge about that or

19     are you just speculating?

20  A.  I'm speculating.

21  Q.  Okay.  So you don't have any facts that

22     you can tell me that would support that?

23  A.  I don't have any facts.

24  Q.  Okay.  Do you know if she ever said

1      anything about Tom O'Loughlin never

2      setting foot in the Academy?  Did you

3      ever hear anything like that?

4   A.   I don't recall.

5   Q.   Do you recall Anne McCall ever giving

6      Wolvertine or you an order that you were

7      not to contact Tom O'Loughlin?

8   A.   Not to contact him?

9   Q.   Yes, after he was chief?

10   A.   No.

11   Q.   Okay.  Do you recall Anne McCall ever

12      saying that Tom O'Loughlin was not to set

13      foot in the Academy?

14   A.   I don't recall that.

15   Q.   Before coming here today, have you spoken

16      to anybody about this lawsuit?

17   A.   No, I have not.

18   Q.   You don't know what it's about?

19   A.   No, I do not.

20   Q.   Okay.  Do you know if McCall ever told

21      Wolvertine that Tom O'Loughlin was not to

22      teach at the MBTA Police Academy?

23   A.   Not to my knowledge.

24   Q.   And she never told you that?